# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CAREY DALE GRAYSON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.  2:06-cv-1444-RDP-RRA** |
| | ) | |
| **RICHARD ALLEN, Commissioner,** | ) | |
| **Alabama Dept. of Corrections,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

This action seeks habeas corpus relief with respect to petitioner Carey Dale Grayson's ("Grayson" or "Petitioner") state court conviction and death sentence on a charge of capital murder. *See* 28 U.S.C. § 2254. All of the claims and the request for an evidentiary hearing have been briefed to the court and the petition is now ready for adjudication.

## TABLE OF CONTENTS

I.     THE OFFENSE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.    THE SENTENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.   PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IV.    THE SCOPE OF FEDERAL HABEAS REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       A.    Exhaustion and Procedural Default. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

             1.    General Principles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

             2.    Exhaustion and Procedural Default Issues Pertinent
                   To Grayson's Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

a.     Rule 32, Alabama Rules of Criminal Procedure. . . . . . . . . . . . . 21

b.     Abandonment and Fair Presentation. . . . . . . . . . . . . . . . . . . . . . 25

B.     The "Cause and Prejudice" Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

C.     The "Fundamental Miscarriage of Justice" Standard. . . . . . . . . . . . . . . . . . . . . . 31

D.      Rules Governing Habeas Corpus Cases Under § 2254. . . . . . . . . . . . . . . . . . . . 32

1.     28 U.S.C. § 2254(d) and (e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

2.     Procedural Rules Governing Habeas Corpus Cases Under § 2254. . . . . . 34

V.     PETITIONER'S CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

A.     <u>Claim One</u>     The State Violated Petitioner's Right to Due Process and
His Rights under the Eight and Fourteenth Amendments When
It Presented Different and Inconsistent Theories at His Trial
From Those Presented at His Co-defendants' Trials. . . . . . . . . . 35

B.     <u>Claim Two</u>     Ineffective Assistance of Trial Counsel. . . . . . . . . . . . . . . . . . . . 39

1.     General Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

a.     The Performance Prong. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

b.     The Prejudice Prong. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

c.     Deference to Historical Factual Findings. . . . . . . . . . . . . . . . . . 43

2.     Specific Claims of Trial Counsel's Ineffectiveness. . . . . . . . . . . . . . . . . 44

a.     Failure to Investigate and Present the Extensive Mitigating
Evidence Caused the Jury to Make an Unreasoned
Sentencing Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

b.     Counsel Were Ineffective at the Penalty Phase of Trial. . . . . . . . 60

1.     *Failure to Give an Opening Statement.* . . . . . . . . . . . . . . 60

2.     *Failure to Object to the Timing of the Jury Instructions.* . 62

2

3. *Failure to Argue Uncontroverted Nonstatutory Mitigating Evidence Concerning His Character and Background.* . . 63

4. *Failure to Present Evidence of Mental Illness.* . . . . . . . . . 65

5. *Failure to Adequately Argue That Jury Could Consider Mercy.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

6. *Failure to Object When the State Urged the Jurors to Ignore the Statutory Mitigating Evidence of Age.* . . . . . . 66

c. Trial Counsel Failed to Argue Motions Adequately or Failed to Present Necessary Motions Altogether. . . . . . . . . . . . . . . . . . . . . 67

1. *Counsel Inadequately Argues the Motion to Suppress.* . . 67

2. *Counsel Inadequately Argued a Motion for Continuance.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

3. *Inadequate Argument of Under-Representation in Grand Jury.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

4. *Motion to Limit Evidence of Post-Mortem Mutilation.* . . . 71

5. *Failure to File a Motion for Change of Venue.* . . . . . . . . 72

6. *Failure to File a Motion for Jury Instructions That Would Have Presented Grayson with Two Mental Health Defenses.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

7. *Failure to Move for a Jury Instruction Regarding the Heinous, Atrocious or Cruel Aggravating Factor.* . . . . 76

8. *Failure to Move for a Competency Hearing, and Hearings on Motion for Preliminary Hearing and Proposed Jury Instructions.* . . . . . . . . . . . . . . . . . . . . . 76

d. Trial Counsel's Inadequate Preparation Rendered Them Ineffective in Their Presentation of Petitioner's Mental Health Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

1. *Ineffective Assistance at the Guilt Phase of Trial and.* . . . 77

2.      *Ineffective Assistance at the Penalty Phase*. . . . . . . . . . . 77

e.      Trial Counsel Were Ineffective for Making Only
        Perfunctory Arguments and Failing to Present
        Relevant Evidence to the Court During Petitioner's
        Sentencing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

f.      Trial Counsel Were Ineffective for Failing to Make
        Appropriate Objections. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

        1.      *Failure to Object to the Trial Court's
                Complicity Instruction*. . . . . . . . . . . . . . . . . . . . . . . . . . 81

        2.      *Failure to Object to Prosecutor's Improper Comment
                on His Decision Not to Testify*. . . . . . . . . . . . . . . . . . . . . 85

        3.      *Failure to Object to the State's Explanation of
                Reasonable Doubt During Voir Dire and the
                Trial Court's Reasonable Doubt Instruction*. . . . . . . . . . 86

        4.      *Failure to Object to Inflammatory Testimony
                By the Pathologist, Dr. Embry*. . . . . . . . . . . . . . . . . . . . 87

        5.      *Failure to Object to Admission of Evidence
                Not Linked to Grayson*. . . . . . . . . . . . . . . . . . . . . . . . . . 89

        6.      *Failure to Object to Court's Failure to Repeatedly
                Instruct the Jurors Not to Expose Themselves to
                Media Coverage During the Trial*. . . . . . . . . . . . . . . . . . 90

        7.      *Failure to Object to the Court's Random Dismissal
                Of Two Alternate Jurors*. . . . . . . . . . . . . . . . . . . . . . . . . 92

        8.      *Failure to Object to Admission of a Prescription
                Bottle*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

        9.      *Failure to Object to Hearsay Testimony Elicited
                From Agent Flippo*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

g.      Counsel Failed to Object Adequately. . . . . . . . . . . . . . . . . . . . . 94

h.      Counsel Failed to Adequately Challenge Petitioner's
        Capital Murder Conviction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

                  i.       Trial Counsel Were Ineffective at Jury Selection,
Thereby Denying Petitioner His Right to be Tried
And Sentenced Before a Fair and Impartial Jury............ 96

                        1.     *Failure to Adequately Question the Venire and
Request a Jury Questionnaire.* ..................... 96

                        2.     *Failure to Challenge Jurors for Cause.* .............. 98

                        3.     *Failure to Raise a J.E.B. v. Alabama,
511 U.S. 127 (1997) Claim.* ...................... 100

                  j.       Trial Counsel Were Ineffective in Not Requesting Funds
For Numerous Experts................................. 102

                  k.      Trial Counsel Were Ineffective in Cross-examining the
State's Witnesses, and Even Appeared to Be
Engaged in a Strategy of Slandering the Victim. ............ 104

C.    <u>Claim Three</u>   The Prosecutor Engaged in Egregious Misconduct Which
Denied Petitioner a Fair Trial and Sentencing Determination... 105

D.    <u>Claim Four</u>    The Trial Court Violated Petitioner's Constitutional Rights.... 107

              1.     The Trial Court Erred by Allowing Admission
Of Petitioner's Co-defendants' Statements Through
the State's Cross-Examination of a Defense Expert. ......... 107

              2.     The Trial Court Erred in Refusing to Supply
Petitioner's Trial Counsel with Copies
of the Transcripts from His Co-defendants' Trials. .......... 110

              3.     Petitioner's Constitutional Rights Were Violated by
the Admission of Irrelevant and Highly Prejudicial
Evidence Concerning Satanism........................... 114

                        a.     Presentation and Resolution of the Claim on
Direct Appeal.................................... 116

                        b.     Presentation and Resolution of the Claim on
Collateral Review................................. 119

                        c.     Presentation of a Federal Claim in State Court. ....... 120

d.      Improper Prosecutorial Argument Concerning
        Satanism............................................... 122

4.      Petitioner's Federal and State Constitutional Rights
        Were Violated When the Fruits of an Illegal Search
        Were Admitted Against Him at Trial...................... 124

5.      Petitioner's Rights Were Violated by Admission
        of His Involuntary Statement............................ 127

6.      Trial Court's Failure to Grant Motion for Acquittal
        Violated Petitioner's Rights............................ 133

7.      Petitioner's Constitutional Rights Were Violated When
        the State's Witnesses Were Allowed to Testify to Extensive
        Hearsay................................................. 138

8.      Trial Court Erred in Sustaining the State's Objections
        to the Defense Expert Testimony......................... 139

9.      The Trial Court Erred in Not Allowing Trial Counsel
        to Question a Witness for the State Concerning a Civil Suit
        Involving the Wrongful Death of the Victim.............. 140

10.     The Trial Court's Failure to Recuse Itself Violated
        Petitioner's Rights..................................... 151

11.     Petitioner's Rights Were Violated When the Trial Court
        Denied Him Funds for a Neurologist...................... 152

12.     Petitioner's Federal Constitutional Rights Were Violated
        by the Trial Court's Failure to Disqualify the District
        Attorney's Office....................................... 153

13.     Petitioner's Rights Were Violated When the Trial Court
        Failed to Grant a Continuance to Allow Petitioner's Attorney
        to Obtain Necessary Information......................... 153

14.     The Trial Court Erred by Instructing on the Aggravating
        Circumstances of Heinous, Atrocious, Or Cruel
        Aggravating Circumstance During the Sentencing Phase of
        Petitioner's Trial. .................................... 153

15.     The Trial Court Erred by Instructing the Jury Prior to the Sentencing Phase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

16.     The Trial Court's Failure to Grant Motion for Dismissal for Systematic Underrepresentation of Cognizable Groups in the Composition of the Grand Jury Violated Petitioner's Federal and State Constitutional Rights.. . . . . . . . . . . . . . . . . . . 156

17.     The Trial Court Erroneously Admitted Physical Evidence Without Establishing Relevance, Chain of Custody, or Laying the Proper Predicate for the Evidence. . . . . . . . . . . . . . 157

E.    <u>Claim Five</u>    Appellate Counsel was Ineffective.. . . . . . . . . . . . . . . . . . . . . . . 158

F.    <u>Claim Six</u>    Pretrial Publicity Made it Impossible to Receive a Fair Trial. . . 161

G.    <u>Claim Seven</u>    Petitioner's Rights to a Fair and Impartial Jury Were Violated by the Jurors' Failure to Truthfully Disclose on Voir Dire and by the Jury's Consideration of Extraneous Material. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

H.    <u>Claim Eight</u>    Alabama's Capital Punishment Sentencing Scheme is Invalid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

I.    <u>Claim Nine</u>    The Manner of Execution Used by the State of Alabama Constitutes Cruel and Unusual Punishment.. . . . . . . . . . . . . . . 168

J.    <u>Claim Ten</u>    In Part, Inadequate Compensation and Lack of Funding for Experts Denied Petitioner Effective Assistance of Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

K.    <u>Claim Eleven</u>   The Cumulative Effect of All Error Entitles the Petitioner to Relief.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

VI.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

# I. **THE OFFENSE**

The following summary of the evidence relevant to the offense is taken from the Alabama

Court of Criminal Appeals' opinion on direct appeal. *Grayson v. State*, 824 So.2d 804, 809 (Ala.

Crim. App. 1999). To the extent the appellate court relies upon the trial court's findings of fact, these findings are taken directly from the trial court's sentencing order. (Vol. 22, Tab. 52 at 1-2).[1]

The trial court made the following findings of fact concerning the crime and the appellant's participation in it:

On the night of [February 21, 1994,] Vickie Deblieux, age 37, was dropped off by a friend on I-59 near Chattanooga, Tennessee, to hitchhike to her mother's home in Louisiana.

Four teenagers, the [Petitioner], Kenny Loggins, Trace Duncan, and Louis Mangione, all who had been drinking alcohol and using drugs, saw her hitchhiking on I-59 at the Trussville exit in Jefferson County, Alabama. They offered to take her to Louisiana; instead they took her to a wooded area, on the pretense of picking up another vehicle.

After arriving in this area, they all got out of the vehicle, and began to drink. The [Petitioner], along with the others threw bottles at Ms. Deblieux, who began to run from them. They tackled her to the ground and began to kick her repeatedly all over her body. When they noticed that she was still alive, one of them stood on her throat, supported by the [Petitioner], until she gurgled blood and said 'Okay, I'll party,' then died.

They then put her body in the back of a pickup truck and took her and her luggage to Bald Rock Mountain, after removing her clothing and a ring, and they played with her body and then threw her off a cliff.

They then went to a car wash in Pell City to wash the blood out of the truck. After rummaging through her luggage, they hid the luggage in the woods.

On their return to Birmingham, they took Mangione home and then returned to Bald Rock Mountain, where they began to mutilate the body by stabbing and cutting her 180 times, removing part of a lung, and removing her fingers and thumbs.

---

[1] References herein to "C.R.___", "Vol.___," "Tab___," or a combination thereof, are to the records of the State courts found in Document 14 of the habeas record.

The next morning [Petitioner's] girlfriend found the three of them in Birmingham asleep in the truck all covered in mud and blood. The [Petitioner] told her they got blood on them from a dog.

On [February 26, 1994,] three rock climbers found Ms. Deblieux's body and called the police. Her body was taken to the medical examiner's office.

The medical examiner found the following injuries; almost every bone in her skull was fractured, every bone in her face was fractured at least once, lacerations on the face over these fractures, a missing tooth, left eye was collapsed, right eye was hemorrhaged, tongue discolored, 180 stab wounds (postmortem), two large incisions in her chest, her left lung had been removed and all her fingers and both thumbs were cut off.

The medical examiner opined that the cause of death was blunt force trauma to the head and that she was alive during the beating.

All defendants were later arrested after Mangione began showing one of Ms. Deblieux's fingers to friends.

[Petitioner's] Case:

*Ralph Wiley,* the [Petitioner's] uncle testified that he was disabled because of a bipolar disorder, which is a prevalent disorder in the defendant's family. That [Petitioner's] mother died when he was age three and his father has been married four or five times. He had not been around [Petitioner] in many years.

*Dora Roper*, the [Petitioner's] second cousin testified that her mother had mental problems for which she had to be hospitalized.

*Jan Arnett*, testified that she was [Petitioner's] junior high school teacher when he was ages 13-16. That he was hyperactive in class, not interested in school, and wouldn't do classwork or homework. . . . She tried to get [Petitioner's] father to help the [Petitioner]. That [Petitioner] was not violent and knew right from wrong. . . .

*Dr. Rebert*, a forensic psychologist for the State of Alabama, Department of Mental Health, opined that the [Petitioner] at the time

of the incident suffered from a mental disease or defect. She described this as a bipolar disorder and said he was in a manic state at the time of the incident; however, he did know the difference between right and wrong and was able to appreciate the nature and quality or wrongfulness of his acts.

*Dr. Goff*, a private psychologist who opined that at the time of the incident the [Petitioner] suffered from a mental disease or defect, bipolar I disorder, which involves extreme mood swings. However, the [Petitioner] did know right from wrong but would not be able to respond to the rightness or wrongness of his acts.

*Jan Deblieux*, the victim's mother testified that she was not involved in a lawsuit filed by her daughter's estranged husband.

The record further indicates that, although the investigation originally involved suspects in Chattanooga because the victim was from that area, the investigation eventually led the police to the Jefferson County jail, where the [Petitioner] was incarcerated. He was interviewed by the police at the jail where he agreed to give a statement, indicating that "they were not hanging this case on him and [he wanted] to tell his side of the story." The [Petitioner] then gave the following statement which was admitted at trial:

Kenny, T.R., Louis and myself were all drinking very heavily when T.R. and Louis suggested that we get into a fight. We left and went riding around and found a hitchhiker at I-59 exit in Trussville, Alabama. We picked her up and took her to the pipeline . . . . Medical Center East. We were all talking when she made a remark about killing us all when I threw a beer bottle at her, then Kenny hit her with his bottle, Louis hit her with his and T.R. with his. After that she began to run when Kenny got her in the back of the head with another bottle, causing her to fall. We all ran over and began to kick her and hit her. When she stopped moving, Kenny saw she was still alive and stood on her throat [until] she died. Then we took her to Pell City and left the body. We then went to the car wash and washed out the bed of Kenny's truck and we took Louis home. When we got back to my car, T.R. and Kenny asked me to show them the way to the body and I did. When we got there, T.R. and Kenny began to mutilate the body by cutting off the fingers and cutting open the stomach. T.R. had found a bottle and shoved it into the [vagina] while Kenny took out her eyes. After this we dumped the body and left for T.R.'s house. Kenny and I returned to my car and we went .

. . to Hardee's in Chalkville and all three of us fell asleep in the truck, where Kenny's girlfriend woke us up later that morning.

Upon further questioning, by the authorities, the [Petitioner] made other statements concerning the details of the offense. The [Petitioner] stated that while T.R. was standing on the victim's throat, he placed his hands on the [Petitioner] for balance. He further indicated that, when they dumped the victim's clothes over the cliff, T.R. took some of the clothing and Kenny took a ring from the victim. The [Petitioner] indicated that he took nothing from her. The [Petitioner] was then asked why he and his accomplices had killed the victim; the [Petitioner] responded that he did not know why they had killed her, "but it was not his problem." The officer who took the [Petitioner's] statement noted that he was very cooperative and that his attitude was "almost one of humor. He had a smile during the entire time we were speaking with him."

*Grayson v. State*, 824 So.2d 804, 809 -811 (Ala. Crim. App. 1999).

## II. <u>THE SENTENCE</u>

Before making a sentencing determination, the trial court set out an exposition of the evidence presented at the penalty phase of trial. (Vol. 22, Tab. 52 at 2-3). With the exception of Kimberly Ackerson, the State's rebuttal witness, all other witnesses were called by the defense. The order reads:

*Joyce Hufford*, the [Petitioner's] grandmother testified that [Petitioner's] parents' divorced when he was age three and lived with her. His mother died when he was age twelve and went to live with his father. He began to run with a bad group and quit going to school when he was sixteen. The family had a history of mental illness.

*Dr. Goff*, a private psychologist testified that at the time of the offense, the [Petitioner's] capacity to conform his conduct to the dictates of and the requirements of the law was substantially diminished.

*Lela Busby*, a state probation officer testified that the [Petitioner] had no prior criminal history.

*Kimberly Ackerson*, a clinical and forensic psychologist opined that the [Petitioner] at the time of the incident was not under the influence of extreme mental

11

or emotional disturbances and he could have appreciated what he was doing was wrong and could conform his conduct to the requirements of the law.

(Vol. 22, Tab. 52 at 2-3).

After a sentencing hearing, the trial court found the existence of two statutory aggravating circumstances and two statutory mitigating circumstances. *Id.* at 3-7. These are the underlying facts with regard to the *statutory aggravating* factors that were found to exist:

[1]     The capital offense was committed where the [Petitioner] was engaged or was an accomplice in the commission of, or an attempt to commit, or right after committing, or attempting to commit, rape, robbery, burglary or kidnapping.

    The Court finds that this aggravating circumstance does exist in that the [Petitioner] was engaged or an accomplice in a kidnapping based on the following facts.

    The [Petitioner], along with his accomplices, picked up Ms. Deblieux, who was hitchhiking, on I-59 on the pretense of taking her to Louisiana.  When they arrived she was hit in the head with a bottle and brutally beaten to death.

    Her body along with her luggage was take to Bald Rock Mountain: After dumping the body they took a ring and the luggage, went through it, and dumped it in the woods behind a car wash in Pell City.

[2]     The capital offense was especially heinous, atrocious or [cruel] as compared to other capital offenses.

    The Court finds, based on the following facts, that this aggravating circumstance does exist.

    After Ms. Deblieux was hit in the head with a bottle, she was then tackled and brought to the ground where she was repeatedly kicked in the head and body by the [Petitioner] and his accomplices. At one point one of them stood on her throat until she gurgled and said "Okay, I'll party" and died.

    The medical examiner testified that among other injuries, she had every facial bone in her face broken at least once, and multiple

12

head and body injuries including a swollen tongue which indicated multiple blows to the head and asphyxiation.  He also testified that she was alive during this brutal beating.

And although the 180 stab and incise wounds were committed post-mortem, which included removing the lung, these injures do reflect the shockingly evil conscienceless and pitiless nature of the crime.

(*Id.* at 3-6).

Next, the trial court identified and explained its reasoning either for finding or rejecting the following *statutory mitigating* factors:

1.   The defendant has no significant history of prior criminal activity.
     Does exist.

2.   The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.
     Does not exist.

     Having considered the testimony of Dr. Rebert, Dr. Goff, Dr. Ackerson and all the testimony at both the guilt and sentencing stages of this trial the Court finds that this circumstance does not exist.

3.   The victim was a participant in the defendant's conduct or consented to it.
     Does not exist.

4.   The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor.
     Does not exist.

5.   The defendant acted under extreme duress or the substantial domination of another person.
     Does not exist.

6.   The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.
     Does not exist.

Having considered the testimony of Dr. Rebert, Dr. Goff, Dr. Ackerson and all the testimony at both the guilt and sentencing stages of this trial the Court finds that this circumstance does not exist.

7.      The age of the defendant at the time of the crime.
        Does exist.

[Petitioner] was nineteen at the time of this offense.

(*Id.* at 6-7).

Finally, the court found "[n]othing from proceedings conducted . . . or the presentence report suggests a basis for [non-statutory] mitigating factors. (*Id.* at 7). It then held "that the aggravating circumstances noted above outweigh the mitigating circumstances noted and the jury's 12 to 0 recommendation for death is the appropriate sentence." (*Id.* at 7).

## III.  <u>PROCEDURAL HISTORY</u>

On February 6, 1996, Grayson was found guilty of capital murder during the course of kidnapping or an attempt thereof, in violation of § 13A-5-40(a)(1), *Code of Alabama*, 1975.[2] A penalty hearing immediately followed and the jury unanimously recommended that he be sentenced to death.

A formal sentencing hearing as required by Alabama Code § 13A-5-47 (1975) was conducted, and on March 8, 1996, the trial court judge sentenced Grayson to death. An automatic appeal followed.

---

[2] In Count II of the indictment, Grayson was charged with capital murder during the course of a robbery or attempt thereof, in violation of § 13A-5-40(a)(1), *Code of Alabama*, 1975. He was convicted of the lesser included offense of intentional murder under Count II and sentenced to life imprisonment. The Alabama Court of Criminal Appeals reversed the Count II conviction on the ground that Grayson "was placed in jeopardy twice for the same offense . . . . [b]ecause the murder that was the subject of Count II was the same murder that was the subject of Count I of the indictment. *Grayson v. State*, 824 So.2d 804, 843 (Ala. Crim. App. 1999).

On November 19, 1999, the appellate court entered a published opinion affirming Grayson's capital conviction and death sentence. *See Grayson v. State*, 824 So.2d 804 (Ala. Crim. App. 1999).

The Supreme Court of Alabama affirmed the conviction and sentence on May 11, 2001, finding no reversible error, plain or otherwise. *See Ex Parte Grayson*, 824 So.2d 844 (Ala. 2001).

The United States Supreme Court denied Grayson's petition for writ of *certiorari* on October 7, 2002. *See Grayson v. Alabama*, 537 U.S. 842 (2002).

On July 30, 2003, Grayson filed a pro-se petition for relief from judgment pursuant to Rule 32 of the Alabama Rules of Criminal Procedure. On August 21, 2003, the court appointed John Waddell to represent Grayson and gave him 45 days to amend the Rule 32 petition. (Vol. 14 at 2). On August 21, 2003, attorney Mike Peterson filed a notice of appearance and an amended petition. (Vol. 15, Tab. 41). Peterson also requested and was granted additional time to file a second amended petition (Vol. 14 at 3), which was filed on November 24, 2003. *Id.* On January 16, 2004, the State filed an answer requesting dismissal of the second amended petition. *Id.*

On February 2, 2004, Grayson filed a motion for discovery of records*. Id.* On February 11, 2004, he filed a response to the State's motion to dismiss, as well as a third amended petition. *Id.* at 4. Subsequently, Grayson and the State filed opposing papers relating to Grayson's third amended petition. *Id.*

On March 18, 2004, the circuit court dismissed Grayson's second amended petition without an evidentiary hearing. (Vol. 22, Tab. 56).[3] By post-judgment motion, Grayson objected to the court's failure to rule upon his third amended petition. (Vol. 14 at 160). On April 12, 2004, the

---

[3] Because the post-conviction trial court's opinion will be quoted extensively herein, from this point forward the opinion typically will be cited by tab and page number(s) only.

circuit court denied Grayson's request to file a third amended petition by minute entry.  *Id.* at 161.

On December 23, 2005, the Alabama Court of Criminal Appeals affirmed the trial court's decision by unpublished opinion.  *Grayson v. State*, slip. op., CR-03-1208 (Ala. Crim. App. Dec. 23, 2005); (*see also* Vol. 22, Tab. 57).[4]

The Supreme Court of Alabama denied certiorari review on May 19, 2006.  *Ex parte Grayson*, CR-03-1208, (Ala. 2006); (*see also* Vol. 22 at Tab. 58).

On July 25, 2006, Grayson filed the present Habeas Petition (the "Petition") in this court.

## IV.  THE SCOPE OF FEDERAL HABEAS REVIEW

Pursuant to 28 U.S.C. § 2254(a), a federal district court is prohibited from entertaining a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court . . ." unless the petitioner alleges "he is in custody in violation of the Constitution or laws or treaties of the United States."  In other words, this court's review of habeas claims is limited to federal constitutional questions.  Claims pertaining solely to questions of state law fall outside the parameters of this court's authority to provide relief under § 2254.  Accordingly, unless otherwise expressly stated, use of the word 'claim' in this opinion presupposes a claim of federal constitutional proportion.

**A.     Exhaustion and Procedural Default**

**1.     General Principles**

Prior to seeking relief in federal court from a state court conviction and sentence, a habeas petitioner is required first to present his federal claims to the state court by exhausting all of the

---

[4] Because the Alabama Court of Criminal Appeals' opinion on collateral review will be quoted extensively herein, from this point forward the opinion typically will be cited by tab and page number(s) only.

state's available procedures.  The purpose of this requirement is to ensure that state courts are

afforded the first opportunity to correct federal questions affecting the validity of state court

convictions.  As explained by the Eleventh Circuit:

> In general, a federal court may not grant habeas corpus relief to a state
> prisoner who has not exhausted his available state remedies.   28 U.S.C. §
> 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted unless it
> appears that . . . the applicant has exhausted the remedies available in the courts of
> the State. . . ."). "When the process of direct review . . . comes to an end, a
> presumption of finality and legality attaches to the conviction. . . . The role of federal
> habeas proceedings, while important in assuring that constitutional rights are
> observed, is secondary and limited.   Federal courts are not forums in which to
> relitigate state trials." *Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989)
> (*quoting Barefoot v. Estelle*, 463 U.S. 880, 887(1983)).

> Exhaustion of state remedies requires that the state prisoner "fairly presen[t]
> federal claims to the state courts in order to give the State the opportunity to pass
> upon and correct alleged violations of its prisoners' federal rights." *Duncan v.
> Henry*, 513 U.S. 364, 365 (1995) (*citing Picard v. Connor*, 404 U.S. 270, 275-76
> (1971) (internal quotation marks omitted).  The Supreme Court has written these
> words:

>> [T]hat the federal claim must be fairly presented to the state courts .
>> . . . it is not sufficient merely that the federal habeas applicant has
>> been through the state courts. . . .  Only if the state courts have had
>> the first opportunity to hear the claim sought to be vindicated in a
>> federal habeas proceeding does it make sense to speak of the
>> exhaustion of state remedies.

> *Picard*, 404 U.S. at 275, 92 S.Ct. at 512.  *See also Duncan*, 513 U.S. at 365, 115
> S.Ct. at 888 ("Respondent did not apprise the state court of his claim that the
> evidentiary ruling of which he complained was not only a violation of state law, but
> denied him the due process of law guaranteed by the Fourteenth Amendment.").

> Thus, to exhaust state remedies fully the petitioner must make the state court
> aware that the claims asserted present federal constitutional issues.  "It is not enough
> that all the facts necessary to support the federal claim were before the state courts
> or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459
> U.S. 4, 5-6, 103 S.Ct. 276, 277, 74 L. Ed. 2d 3 (1982) (citations omitted).

*Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998).

Moreover, if a petitioner fails to raise his federal claim to the state court at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits, *i.e.,* the claim is procedurally defaulted.  Usually, if the last state court to examine a claim explicitly finds that the claim is defaulted because the petitioner failed to follow state procedural rules, then federal review of the claim is also precluded pursuant to federal procedural default principles.  As explained by the Eleventh Circuit:

> The federal courts' authority to review state court criminal convictions pursuant to writs of habeas corpus is severely restricted when a petitioner has failed to follow applicable state procedural rules in raising a claim, that is, where the claim is procedurally defaulted.  Federal review of a petitioner's claim is barred by the procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, *Harris v. Reed*, 489 U.S. 255, 263, 109 S.Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989), and that bar provides an adequate and independent state ground for denying relief.  *See id.* at 262, 109 S.Ct. at 1042-43;  *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S.Ct. 1981, 1987, 100 L. Ed. 2d 575 (1988).  The doctrine serves to ensure petitioners will first seek relief in accordance with state procedures, *see Presnell v. Kemp*, 835 F.2d 1567, 1578-79 (11th Cir. 1988), *cert. denied*, 488 U.S. 1050, 109 S.Ct. 882, 102 L. Ed. 2d 1004 (1989), and to "lessen the injury to a State that results through reexamination of a state conviction on a ground that a State did not have the opportunity to address at a prior, appropriate time." *McCleskey v. Zant*, 499 U.S. 467, 111 S.Ct. 1454, 1470, 113 L. Ed. 2d 517 (1991).

*Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991).  Federal deference to a state court's clear finding of procedural default under its own rules is so strong that a:

> "state court need not fear reaching the merits of a federal claim in an *alternative* holding.  Through its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law." *Harris*, 489 U.S. at 264 n. 10, 109 S.Ct. 1038 (emphasis in original).  *See also Alderman v. Zant*, 22 F.3d 1541, 1549-51 (11th Cir. 1994)(where a Georgia habeas corpus court found that the petitioner's claims were procedurally barred as successive, but also noted that the claims lack merit based on the evidence, "this

18

> ruling in the alternative did not have an effect . . . of blurring the clear determination by the [Georgia habeas corpus] court that the allegations was procedurally barred"), *cert. denied*, 513 U.S. 1061, 115 S.Ct. 673, 130 L. Ed. 2d 606 (1994).

*Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999).

The Supreme Court defines an "adequate and independent" state court decision as one "'[which] rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment.'" *Lee v. Kemna,* 534 U.S. 362, 375 ( 2002) (*quoting Coleman v. Thompson,* 501 U.S. 722, 729 (1991) (emphases added)). Whether or not a state procedural rule is "adequate and independent" so as to have a preclusive effect on federal review of a claim "'is itself a federal question.'" *Id.* (*quoting Douglas v. Alabama*, 380 U.S. 415, 422 (1965)).

A state procedural rule is "independent of the federal question" when it "rests solidly on state law grounds [that are] not intertwined with an interpretation of federal law." *Judd v. Haley,* 250 F.3d 1308, 1313 (11th Cir. 2001) (*quoting Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)). To be considered "adequate," by a federal court, the state procedural rule must be both "'firmly established and regularly followed.'" *Lee v. Kemna,* 534 U.S. at 375 (*quoting James v. Kentucky*, 466 U.S. 341, 348 (1984)). In other words, the rule must be "clear [and] closely hewn to" by the state for a federal court to find it to be adequate. *James v. Kentucky*, 466 U.S. at 345. This does not mean that the procedural rule must be applied rigidly in every instance, or that occasional failure to do so eliminates its "adequacy." Rather, the "adequacy" requirement means only that the procedural rule "must not be applied in an arbitrary or unprecedented fashion." *Judd v. Haley,* 250 F.3d at 1313. If it is adequate, then the federal court normally will foreclose its review. If, however, the rule is not firmly established, or if it is applied in an arbitrary, unprecedented and manifestly unfair fashion, it is not adequate to preclude federal review. *Card v. Dugger*, 911 F.2d at 1517.

Of course, there are also instances where the doctrines of procedural default and exhaustion intertwine. For instance, if a petitioner's federal claim is unexhausted, the district court will traditionally dismiss it without prejudice or stay the cause of action in order to allow the petitioner to first avail himself of his state remedies. However, "if it is clear from state law that any future attempts at exhaustion [in state court] would be futile [under the state's own procedural rules,]" this court can simply find that the claim is "procedurally defaulted, even absent a state court determination to that effect[.]" *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (*citing Picard v. Connor,* 404 U.S. 270, 276 (1971) and *Snowden v. Singletary*, 135 F.3d 732, 737 (11th Cir. 1998)).

There are only three circumstances in which an otherwise valid state-law ground will not bar a federal habeas court from considering a constitutional claim that was procedurally defaulted in state court: (1) where the petitioner had good "cause" for not following the state procedural rule and was actually "prejudiced" by not having done so; (2) where the state procedural rule was not "firmly established and regularly followed"; and (3) where failure to consider the petitioner's claims will result in a "fundamental miscarriage of justice." *See Edwards v. Carpenter*, 529 U.S. 446, 455 (2000) (Breyer, J., concurring); *see also*, *e.g.*, *Coleman v. Thompson*, 501 U.S. at 749-50 (holding that a state procedural default "will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice") (citations and internal quotation marks omitted); *Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural

default."); *Smith v. Murray*, 477 U.S. 527, 537 (1986) (same); *Davis v. Terry*, 465 F.3d 1249, 1252 n. 4 (11th Cir. 2006) ("It would be considered a fundamental miscarriage of justice if 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'") (*quoting Schlup v. Delo*, 513 U.S. 298, 327 (1995) (*in turn quoting Murray v. Carrier*, 477 U.S. at 496)).

### 2.    Exhaustion and Procedural Default Issues Pertinent to Grayson's Case

Many of Grayson's habeas claims are affected by various procedural rules.  Accordingly, it is prudent to discuss the particular rules that may affect the scope of review by this court.  The court does so at this juncture to avoid repetition, promote clarity, and provide a reference point for later discussion of Grayson's claims.

### a.    Rule 32, Alabama Rules of Criminal Procedure

The state court's application of several provisions of Alabama Rule of Criminal Procedure 32 are routinely relied upon by Respondent as a basis for asserting that many of Grayson's claims are procedurally defaulted.  These can be divided into three (3) categories: Preclusion, Burden and Pleading Requirements, and Grounds for Summary Dismissal.  Each of these is summarized in turn below.

**Preclusion**

**Rule 32.2(a)**    A petitioner will not be given relief under this rule based upon any ground:

(1) Which may still be raised on direct appeal under the Alabama Rules of Appellate Procedure or by posttrial motion under Rule 24; or

(2) Which was raised or addressed at trial; or

(3) Which could have been but was not raised at trial, unless the ground for relief arises under Rule 32.1(b); or

(4) Which was raised or addressed on appeal or in any previous collateral proceeding not dismissed pursuant to the last sentence of Rule 32.1 as a petition that challenges multiple judgments, whether or not the previous collateral proceeding was adjudicated on the merits of the grounds raised; or

(5) Which could have been but was not raised on appeal, unless the ground for relief arises under Rule 32.1(b).

**Burden and Specificity Requirements**

**Rule 32.3 Burden of Proof**

The petitioner shall have the burden of pleading and proving by preponderance of the evidence the facts necessary to entitle the petitioner to relief. The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence.

**Rule 32.6 Commencement of Proceedings**

**(b) Specificity.** The petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of the grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.

**Grounds for Summary Dismissal**

**Rule 32.7 (d) Summary disposition**. If the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, the court may either dismiss the petition or grant leave to file an amended petition. Leave to amend shall be freely granted. Otherwise, the court shall direct that the proceedings continue and set a date for hearing.

Grayson does not dispute that Rules 32.2(a)(1)-(5) and 32.7(d) are adequate and independent state procedural rules for purposes of federal review. He does however, take the opposite position with regard to Rules 32.3 and 32.6(b). First, Grayson attacks the Alabama Court of Criminal

Appeals' affirmation of the Rule 32 court's summary dismissal of many of his ineffectiveness claims on the grounds that he did not meet his burden to plead with specificity. (Doc. #44 at 6). He also argues that he "not only met but easily surpassed, the minimal pleading standards of Rule 32," but his sole factual support for this contention is that his second amended Rule 32 petition "consisted of 203 paragraphs filling 116 pages, supported by extensive facts and record citations." (*Id.* at 5-6). The Rule 32 court specifically addressed the deficits in each of the dozens of ineffectiveness sub-claims raised by Grayson in his petition. Thus, Grayson's contention that the ineffectiveness claim was sufficiently specific because it was comprised of 203 paragraphs and 116 pages has no merit.

The court also finds unavailing Grayson's three other arguments challenging the preclusive effect of the state court's reliance on Rule 32.3 and 32.6(b). First, Grayson makes a *per se* argument that neither rule is an adequate and independent state procedural rule. (Doc. #44 at 26-27). He also complains that the state court made an arbitrary and capricious application of the rules to his claims by improperly imposing a burden of proof on him at the pleading stage when it dismissed his claims under the guise of Rules 32.3 and 32.6(b). Grayson asserts that this alleged error abrogates any federal preclusive effect of the rules' application. (*Id.* at 29) (*citing Lee v. Kemna*, 534 U.S. 364 (2002)). Finally, Grayson contends that the rules are not independent of federal law because the state court utilized *Strickland v. Washington* as providing the seminal ineffectiveness standard when dismissing some of his claims for lack of specificity. (*Id.*). The court will address each of these arguments below.

This court rejects Grayson's assertion that Rules 32.3 and 32.6(b) are *per se* inadequate and dependent for federal preclusionary purposes. While not binding, *Jenkins v. Bullard*, 210 Fed. Appx.

895, 900 (11th Cir. 2006) is persuasive authority that Rules 32.3 and 32.6(b) are generally adequate

and independent state procedural rules. The pertinent portion of the unpublished opinion reads:

> Rules 32.3 and 32.6(b) have been firmly established and regularly followed by the Alabama courts. The Court of Criminal Appeals has consistently affirmed, as it did with *Jenkins*, lower court decisions that have summarily dismissed Rule 32 petitions that do not include specific facts which would entitle the petitioner to collateral relief. *See, e.g.*, *Shaw v. State*, 949 So.2d 184, ---- (Ala. Crim. App. 2006); *Tubbs v. State*, 931 So.2d 66, 68 (Ala.Crim.App. 2005); *Boyd v. State*, 913 So.2d 1113, 1126-32 (Ala. Crim. App. 2003); *Chambers v. State*, 884 So.2d 15, 18-19 (Ala. Crim. App. 2003).

*Jenkins v. Bullard*, 210 Fed. Appx. 895, 900 (11th Cir. 2006).

Moreover, just as Grayson's petition is defective in part because it is not sufficiently specific,

his global approach to his remaining arguments is due to be rejected for the same reason. Unlike

Rule 32.2(a), pursuant to which the court simply must determine whether a claim has been raised

at the proper time during the proceedings, Rule 32.3 and 32.6(b) have specificity and full disclosure

requirements that demand the state court engage in a much different fact finding process. A state

court is entitled to entitled to interpret its own rules. Considering the deference owed to both state

court findings of fact and rule interpretations, general federal procedural default principles prevent

this court from disturbing the Alabama Court of Criminal Appeals' findings in connection with

claims that were dismissed by that court as insufficiently pleaded, even if the court were to disagree

with some of the appellate court's decisions. Furthermore, it was appropriate for the state court to

identify the *Strickland* standard when explaining why a particular claim was insufficiently pleaded.

Grayson does not explain why or how any of his remaining arguments is pertinent to a

particular claim dismissed by the state court. The fact-intensive nature of a proper application of

these rules also means that in order for Grayson to convince this court that the rules were arbitrarily

24

and capriciously applied to him, or so interwoven with federal law as to make the ruling dependent

on federal law, he must identify the sub-claim he alleges is not precluded by Rule 32.3 and 32.6(b),

and state with particularity why that claim is not precluded.  As such, unless Grayson identifies a

particular sub-claim and makes a reasoned argument (with factual support) premised on any of the

above theories, the court will devote no further attention to questioning the preclusionary effect of

Rule 32.3 and 32.6(b).  These rules are indeed adequate and independent state procedural rules.

### b.    Abandonment and Fair Presentation

Respondent argues that Grayson failed to appeal to the Alabama Court of Criminal Appeals

all but a handful of the Rule 32 court's dismissal/rejection of many of the Rule 32 claims.  (*See

generally* Doc. #40 at 12-39)(*citing Brownlee v. Haley*, 306 F.3d 1043, 1066 (11th Cir. 2002)).

Respondent also contends that certain abandoned claims cannot be considered to have been fairly

raised before the Alabama Supreme Court on collateral appeal.  (*Id.* at 13-14) (*citing Dill v. Holt*,

371 F.3d 1301, 1303 (11th Cir. 2002)(*quoting O'Sullivan v. Boerckel*, 526 U.S. 838, 845

(1999)("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional

issues by invoking one complete round of the State's established appellate review process. . ."; 

*Castille v. Peoples*, 489 U.S. 346, 351 (1989)(holding that "where the claim has been presented for

the first and only time in a procedural context in which its merits will not be considered unless 'there

are special and important reasons therefore' . . .does not . . . constitute 'fair presentation'").[5]

---

[5] Respondent concedes that Grayson did raise some of the abandoned claims before the Alabama Supreme Court, but because that is a court of discretionary review, the claims cannot be considered fairly raised for habeas purposes.  (Doc. #44 at 14)(*citing Falconer v. Lane*, 905 F.2d 1129, 1134-34 (7th Cir. 1990)(*interpreting Castille v. People*, 489 U.S. 346, 351 (1989))).  Grayson does not dispute this assertion and no further discussion of Respondent's fair presentation argument is necessary.

Grayson protests that he did raise these claims on collateral appeal because "he gave the court of appeals examples of some of the claims that required discovery and evidentiary hearing. . . . Additionally, . . . [he] cited to *all* of the subclaims that he raised in support of his claim of ineffective assistance of counsel [in a footnote.]"  (Doc. #44 at 25) (*citing* [Vol. 20,] Tab. 46 at 29, n.9).

This court begins its analysis by reviewing how Grayson raised his claim in his brief on collateral appeal, and then by examining the Alabama Court of Criminal Appeals' opinion.  The first issue in Grayson's brief was whether the trial court had erred in adopting the State court's proposed order.  (Tab. 46 at 3).  The other pertinent portions of the brief (at least to the extent this court is able to decipher them) seem to argue that the trial court erred in denying his ineffectiveness claims on the merits or dismissing the claims as insufficiently specific.  With regard to the merits denials, Grayson wrote, "[t]he majority of allegations pled in support of Mr. Grayson's claim that he was denied the effective assistance of trial counsel were denied on the merits."[6] (*Id.*)

Thereafter, Grayson presents nine examples of wrongly dismissed merits claims in the body of the brief.  *Id*. at 30-49.  These examples actually identified a particular claim and have some semblance of a reasoned argument.  Grayson adopted the same footnoting method when arguing that the Rule 32 court erroneously "dismissed portions of the second amended petition for lack of

---

[6]  At the conclusion of this sentence, Grayson placed a footnote (footnote 9) which read as follows:

*See* [the Rule 32 court's] Order at 14-19 (¶¶ 9-12 [referring to paragraph numbers of the Rule 32 petition]), 19-22 (¶19), 24 (¶19), 25 (¶20), 26-27 (¶22), 27-29 (¶23), 29 (¶24), 31 (¶¶ 27-28), 33-34 (¶44), 41-43 (¶¶ 45-48), 46-47 (¶52), 47-49 (¶¶ 53-55), 49-50 (¶56), 50-51 (¶57), 51-53 (¶¶ 58-59), 53-54 (¶¶ 60-63), 54-55 (¶¶ 64-68), 55-56 (¶¶ 69-70), 56-57 (¶72), 57-58 (¶73), 58-60 (¶¶ 74-75), 61 (¶76), 61-62 (¶¶77-86), 63-65 (¶¶88-93), 65-66 (¶94), 66-67 (¶95), 68-69 (¶¶ 98-102), 70-73 (¶¶ 103-104), 75-76 (¶110), 76 (¶111), 77 (¶¶ 112-13), 78-80 (¶115), 80-81 (¶116), 82 (¶118), 82-83 (¶119), 84-87 (¶¶121-32), 88-89 (¶133), 89-104 (¶¶ 135-45), 101 (¶140), 101 (¶142), 103 (¶143), 105-106 (¶149), 106-107 (¶150), 107-11 (¶¶151-57), 111-17 (¶¶ 158-59), 117-32 (¶¶ 201-203), 136-40 (¶¶204-206).

specificity." *Id.* at 50, n. 14, n. 15.   He then set out four examples of ineffectiveness claims that he believed should not have been dismissed for lack of specificity.  *Id*. at 51-59.   Finally, Grayson adopted the same *modus operandi* with regard to substantive claims dismissed as procedurally defaulted by the Rule 32 court.  *Id.* at 67.   His sole argument against the procedural default of the substantive claims was based on federal cause and prejudice principles (*i.e.,* the ineffectiveness of his trial and appellate counsel), a concept which is non-existent in Alabama state court.  *Id.*

The state appellate court's order is also confusing.[7]   It appears that the appeals court interpreted one aspect of Grayson's brief as arguing that "the trial court improperly summarily dismissed his ineffective-assistance-of-counsel-claim." (Tab. 57 at 5).  In the two subcategories that follow this declaration, the court addressed those ineffectiveness claims that the trial court dismissed on the merits and the claims dismissed for lack of specificity in short form.  (*Id.* at 5-7).

In Section I.A., the court interpreted Grayson's argument as follows:  "[t]he appellant argues that the trial court erred when it adopted the State's proposed findings of fact and conclusions of law holding that appellant's trial counsel was not ineffective when the facts pleaded in the second amended petition established that trial counsels' performance was constitutionally deficient and prejudicial." (*Id.* at 5-6).  The appellate court acknowledged that the practice of adopting the State's

_____

[7] Unmentioned by either party in the confusion, is the fact that abandonment was used once as a ruling in the appellate court's opinion. This occurred after discussion of one of Grayson's example claims - that juror T. Jackson was biased.  Although the "other . . .potential jurors" aspect of this claim was listed in the cryptic form quoted above (footnote 9 of Grayson's brief), the appellate court expressly held:

> Because the appellant does not dispute the propriety of the trial court's disposition of his other claims regarding other potential jurors, these claims have been abandoned on appeal.  *Brownlee v. State*, 666 So. 2d 91 (Ala. Crim. App. 1995).

(Tab. 57 at 11).  There are only two conclusions that can be drawn from this: either the state appellate court's intent was to reject as abandoned, all cryptic footnote citations, or considering the other portions of the opinion quoted above, it simply ignored the footnotes.

proposed findings was frowned upon, but also noted that an order entered in such a manner would only be reversed if clearly erroneous. (*Id.* at 6). The appellate court then pointed out that the trial court had completed an extensively detailed order when dismissing the petition, and found that "[b]ecause the record supports the trial court's findings, the appellant's argument is without merit." (*Id.* at 7).

In Section II. B, the appellate court identified Grayson's argument as "[t]he appellant argues that in adopting the State's proposed order, the trial court erroneously required him to prove his ineffectiveness claims at the pleading stage." *Id.* at 7. The court examined the record and found that Grayson's argument was not supported. It wrote, "[a]lthough the appellant was not required to prove his allegations in his Rule 32 petition, he was however, required to comply with Rule 32.6(b), [] which requires that the petition itself disclose the facts pleaded in the appellant's petition relied upon seeking relief. Because there are no facts that alter the validity of the trial court's reasoning, and because the petition presents only conclusory allegations, his argument is without merit." *Id.* (quotation omitted).

To begin, Respondent is correct that in *Brownlee v. Haley*, 306 F.3d 1043 (11th Cir. 2002), the Eleventh Circuit held that a claim is defaulted in federal court if the state court rules that the claim has been abandoned. It wrote:

> The procedural default governing the racial bias claim is slightly different, but equally valid. Although it is true that, like the other procedurally defaulted claims, this claim was not raised at trial or on direct appeal, the Court of Criminal Appeals rejected it on the ground that it was abandoned. Brownlee did raise the issue before the trial court in the Rule 32 proceedings, but he did not expressly include it in his appellate brief challenging the denial of his Rule 32 motion. Instead, he stated in a footnote of the brief that he was preserving all of the issues raised in his initial Rule 32 petition. As the Court of Criminal Appeals noted, this footnote was insufficient to preserve an issue under Alabama law. *See Brownlee*, 666 So.2d at 93; *see also*

*Burks v. State*, 600 So.2d 374, 380 (Ala. Crim. App.1991)[8]("Errors assigned and not argued will be treated as abandoned. Issues listed in [a] brief but not argued will not be reviewed on appeal. Allegations not expressly argued on appeal are deemed by us to be abandoned.") (citations, quotations, and punctuation omitted). Plainly, this ruling constituted a dismissal of the claim on a procedural ground, thus barring federal habeas review.

306 F.3d at 1066.

Thus, in *Brownlee*, the Eleventh Circuit found a racial bias claim to be procedurally defaulted precisely because the Alabama Court of Criminal Appeals *expressly* found the petitioner had abandoned his claim during state court proceedings. Grayson's case is distinct from *Brownlee* in that there is only one aspect of one claim in the case that was expressly deemed abandoned by the Alabama Court of Criminal Appeals. As for the other aspects of the claim, the well-established rule remains that federal courts will not find a claim procedurally defaulted unless the last state court to address the claim clearly and expressly dismissed the claim pursuant to adequate and independent state procedural rules. In Grayson's case, the state appellate court's opinion offers nothing but

---

[8] The pertinent portions of this citation page read:

In a pro se brief filed April 26, 1991, the appellant raises 26 additional issues. The allegations contained in the appellant's brief are confusing and disorganized, sometimes to the point of being unintelligible and incoherent. Most of the issues are not supported by legal authority. Most of the appellant's references to specific pages in the record on appeal do not sustain the argument for which they are cited. In such cases as that presented here, the appellate courts of this state have not been reluctant to hold that the appellant has waived the alleged errors. "The law is settled that '"[w]here an appellant fails to cite any authority, we may affirm, for it is neither our duty nor function to perform all the legal research for an appellant.'" *McConico v. McKibben*, 581 So.2d 829 (Ala. 1991). *Accord, Vinzant v. State*, 462 So.2d 1037 (Ala.Cr.App.1984). Errors assigned and not argued will be treated as abandoned. *See Edgil v. City of Carbon Hill*, 214 Ala. 532, 533, 108 So. 355, 356 (1926). Issues listed in brief but not argued will not be reviewed on appeal. *Jackson v. State*, 265 Ala. 690, 692, 93 So.2d 808, 810 (1957). "[A]llegations ... not expressly argued on ... appeal ... are deemed by us to be abandoned." *United States v. Burroughs*, 650 F.2d 595, 598 (5th Cir.), *cert. denied*, 454 U.S. 1037, 102 S.Ct. 580, 70 L. Ed. 2d 483 (1981).

*Burks v. State*  600 So.2d at 380.

silence with regard to Grayson's cryptic footnotes.  This silence, combined with other confusing aspects of the opinion that appear to be an affirmation of the trial court's decisions, requires this court to address the claims that were not expressly deemed abandoned by the state appellate court. This ruling does not extend to those claims that Grayson completely failed to raise at all in his appellate brief.

**B.      The "Cause and Prejudice" Standard**

The "cause *and* prejudice" standard is framed in the conjunctive; therefore, a petitioner must prove both parts.  To show cause, a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim previously.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

> Objective factors that constitute cause include "'interference by officials'" that makes compliance with the State's procedural rule impracticable, and "a showing that the factual or legal basis for a claim was not reasonably available to counsel."  *Ibid*.  In addition, constitutionally "[i]neffective assistance of counsel . . . is cause."  *Ibid*. Attorney error short of ineffective assistance of counsel, however, does not constitute cause and will not excuse a procedural default.  *Id.*, at 486-488, 106 S. Ct., at 2644-45.

*McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991).  *See also Murray v. Carrier*, 477 U.S. at 488-89 ("Ineffective assistance of counsel . . . is cause for a procedural default."); *Reed v. Ross*, 468 U.S. 1, 16 (1984) ("[W]here a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures.").

Once cause is proved, a habeas petitioner also must prove prejudice.  Such a showing must go beyond proof "that the errors at his trial created a *possibility* of prejudice, but that they worked

to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

C.     The "Fundamental Miscarriage of Justice" Standard

In a "rare," "extraordinary,"[9] and "narrow class of cases,"[10] a federal court may consider a procedurally defaulted claim in the absence of a showing of "cause" for the procedural default, if (1) a "fundamental miscarriage of justice" has "probably resulted in the conviction of one who is actually innocent," *Smith v. Murray*, 477 U.S. 527, 537-38 (1986) (quoting, respectively, *Engle v. Isaac*, 456 U.S. 107, 135 (1982), and *Murray v. Carrier*, 477 U.S. at 496),[11] or if (2) the petitioner shows "by clear and convincing evidence that[,] but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323-27 & n.44 (1995) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)); *see also, e.g., Smith v. Murray*, 477 U.S. at 537-38.  Even when exhaustion and procedural default are not at issue, federal review of a claim that has been decided on the merits by a state court is restricted.

---

[9] *Schlup v. Delo*, 513 U.S. 298, 321 (1995) ("To ensure that the fundamental miscarriage of justice exception would remain 'rare' and would only be applied in the 'extraordinary case,' while at the same time ensuring that the exception would extend relief to those who were truly deserving, this Court explicitly tied the miscarriage of justice exception to the petitioner's innocence.").

[10] *McCleskey v. Zant*, 499 U.S. 467, 494 (1991) ("Federal courts retain the authority to issue the writ of habeas corpus in a further, narrow class of cases despite a petitioner's failure to show cause for a procedural default.  These are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime.  We have described this class of cases as implicating a fundamental miscarriage of justice.") (*citing Murray v. Carrier*, 477 U.S. 478, 485 (1986)).

[11] Specifically, the *Murray v. Carrier* Court observed that, "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."  477 U.S. at 496.

**D.      Rules Governing Habeas Corpus Cases Under § 2254**

**1.      28 U.S.C. § 2254(d) and (e)**

When it enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

Congress significantly limited the circumstances under which a habeas petitioner may obtain relief.

Indeed, under the AEDPA, a petitioner is only entitled to relief on a federal claim if he shows that

the state court's adjudication of his claim "resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established Federal law, as determined by the Supreme

Court," or that the court's rulings "resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding."   28

U.S.C. § 2254(d)(1) and (2); *see also Williams v. Taylor*,  529 U.S. 362, 404 (2000); *Brown v.

Payton*, 544 U.S. 133 (2005); *Miller-El v. Dretke*, 545 U.S. 231 (2005); *Putman v. Head*, 268 F.3d

1223, 1241 (11th Cir. 2001).  "Moreover, a state court's factual determinations are presumed correct

unless rebutted by clear and convincing evidence." *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th

Cir. 2005) (*citing* 28 U.S.C. § 2254(e)(1)).

A state court's adjudication of a claim will be sustained under § 2254(d)(1), unless it is

"contrary to" clearly established, controlling Supreme Court precedent, or it is an "unreasonable

application" of that law.  These are two different inquiries, not to be confused or conflated, as the

Supreme Court explained in *Williams v. Taylor*, 529 U.S. 362 (2000):

> Section 2254(d)(1) defines two categories of cases in which a state prisoner may
> obtain federal habeas relief with respect to a claim adjudicated on the merits in state
> court.  Under the statute, a federal court may grant a writ of habeas corpus if the
> relevant state-court decision was either (1) "*contrary to* . . . clearly established
> Federal law, as determined by the Supreme Court of the United States," or (2)
> "*involved an unreasonable application of* . . . clearly established Federal law, as
> determined by the Supreme Court of the United States."  (Emphases added.)

*Williams,* 529 U.S. at 404.  The statute limits the source from which "clearly established Federal law" can be drawn to "holdings, as opposed to the dicta, of the [Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412; *see also Jones v. Jamrog*, 414 F.3d 585 (6th Cir. 2005); *Sevencan v. Herbert*, 342 F.3d 69 (2nd Cir. 2003); *Warren v. Kyler*, 422 F.3d 132, 138 (3rd Cir. 2005) ("[W]e do not consider those holdings as they exist today, but rather as they existed as of the time of the relevant state-court decision.") (internal quotation marks and citation omitted).

A state-court determination can be "contrary to" clearly established Supreme Court precedent in either of two ways:

> First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Likewise, a state-court determination can be an "unreasonable application" of clearly established Supreme Court precedent in either of two ways:

> First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Id.* at 407; *see also Putman v. Head*, 268 F.3d 1223 (11th Cir. 2001).  Whether a particular application of Supreme Court precedent is "reasonable" turns not on subjective factors, but on whether the application of Supreme Court precedent at issue was "objectively unreasonable."  The

question is not whether the state court "correctly" decided the issue, but whether its determination was "reasonable," *even if incorrect*. *See Bell v. Cone*, 535 U.S. 685, 694 (2002).

### 2.    Procedural Rules Governing Habeas Corpus Cases Under § 2254

Because "habeas corpus review exists only to review errors of constitutional dimension," a habeas corpus petition must meet the "heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2c." *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (citations omitted).  A petitioner must specify all grounds for relief available to him, state the facts supporting each ground, and state the relief requested.  28 U.S.C. § 2254, Rule 2(c)(1)(2)(3) of the *Rules Governing Section 2254 Cases*.  A "general reference to the transcripts, case records and briefs on appeal patently fails to comply with Rule 2(c)." *Phillips v. Dormire*,  No. 4:04CV1483, 2006 WL 744387, *1 (E.D. Mo. Mar. 20, 2006) (*citing Adams v. Armontrout*, 897 F.2d 332, 333 (8th Cir. 1990).

The burden of proof is on the habeas petitioner to establish a factual basis for the relief he seeks.  *Hill v. Linahan*, 697 F.2d 1032, 1034 (11th Cir. 1983); *Corn v. Zant*, 708 F.2d 549, *reh'g denied*, 714 F.2d 159 (11th Cir. 1983).  Consequently, a petitioner must provide substantial evidence to meet his burden of proof to show why federal post-conviction relief should be awarded.  *Douglas v. Wainwright*, 714 F.2d 1532, *reh'g denied*, 719 F.2d 406 (11th Cir. 1983), *vacated on other grounds*, 468 U.S. 1206 (1984) and 468 U.S. 1212 (1984), *on remand* 739 F.2d 531 (11th Cir. 1984).  That is, to carry his burden, a petitioner must demonstrate at least *prima facie* evidence establishing the alleged constitutional violation.  The mere assertion of a ground for relief, without more factual detail, does not satisfy a petitioner's burden of proof or the requirements of 28 U.S.C. § 2254(e)(2) and Rule 2(c), *Rules Governing § 2254 Cases in the United States District Courts*.

34

With these principles in mind, the court turns its attention to the eleven claims in Grayson's habeas petition, which he organizes as "Claim One" through "Claim Eleven."

## V.  PETITIONER'S CLAIMS

Grayson has raised a number of claims in this case.  The court will address each of them in turn.

**A.**     **Claim One**     **The State Violated Petitioner's Right to Due Process and His Rights Under the Eighth and Fourteenth Amendments When it Presented Different and Inconsistent Theories at His Trial from Those Presented at His Co-defendants' Trials (Doc. #36 at 4-5)**

Grayson initially alleges that in an effort to obtain a conviction and death sentence, the prosecutor improperly argued that he was the ringleader on the night of the murder.  (Doc. #36 at 4-5).  However, according to Grayson, the prosecutor already had accused each of the other co-defendants of being the ringleader during their respective trials.  Grayson argues that such a presentation of inconsistent theories violated his Eighth and Fourteenth Amendment rights to due process of law.  (*Id.*).

Respondent answers that the claim is procedurally defaulted because Grayson did not raise it on direct appeal.  (Doc. #40 at 8).  When the claim was raised for the first time during post-conviction proceedings, the Rule 32 court found it to be procedurally barred pursuant to Ala. R. Crim. P. 32.2(a)(3) & (5).  (Tab. 56 at 158-59).  The decision was affirmed by the Alabama Court of Criminal Appeals.  (Tab. 57 at 17-18).

Grayson's reply is threefold.  (Doc. #44 at 9-18).  He argues

This claim was properly raised at trial [by way of a motion to obtain the trial transcripts of the three co-defendants] and through a petition for writ of mandamus. If those filings are not considered sufficient to preserve this issue, then Rule 32 proceedings were the correct court to raise this issue in because neither trial, nor

direct appeal counsel, had access to the transcripts to allow them to properly raise the claim.  In the alternative, there is sufficient cause and prejudice to excuse the failure to raise the claim.  Finally, as to Respondent's alternative argument that § 28 U.S.C. 2254 (d)(1) and (2) [sic] operate to foreclose this claim, this is incorrect because that section only operates in the event there has been a prior merits ruling in state court, which has never occurred with regard to this issue.

*Id.* at 9.

The claim that the trial court refused to afford defense counsel free transcripts of the co-defendants' trials was raised at trial and on direct appeal, but the only assertion in that claim was that Petitioner was being denied a fair trial as an indigent defendant because he could not afford to pay for the transcripts.  In fact, he raises the same claim as trial error in his habeas petition.  *See* (Claim Four B, *infra*).  This court rejects  Grayson's assertion that the above-styled habeas claim is the same legal claim he raised on direct appeal.  Grayson's claim on direct appeal was that, as an indigent defendant, he was being denied equal protection of the law.

Moreover, as set out in the discussion of Claim Four B, *infra*, Grayson was not constitutionally entitled to the transcripts he sought.  Moreover, even assuming *arguendo* that Grayson was entitled to the transcripts pursuant to the separate and distinct constitutional claim raised in Claim Four D, the trial record shows that defense counsel was aware before Grayson's case was even tried that he was allowed to listen to the tapes of the co-defendants' trials and make a transcript request for information he deemed important to the defense.  Finally, Grayson has never revealed when or how he discovered the information from the co-defendants' trials.   Therefore, Grayson has no legitimate basis upon which to claim that he could not have raised this claim until his Rule 32 petition.

Claim One is procedurally defaulted.  Because Grayson could have raised this claim in a timely fashion at trial or on direct appeal, his argument that the state court hindered him from doing so cannot serve as cause to overcome the procedural default.  (Doc. #44 at 14).  Grayson's additional argument that the ineffectiveness of appellate counsel to raise the issue as a federal claim on direct appeal should serve as "cause" to overcome the procedural default also fails, because that independent claim of ineffective appellate counsel is itself procedurally defaulted.  *See infra*, Claim Five discussion; *see also, Hill v. Jones,* 81 F.3d 1015, 1030 (11th Cir. 1996)("[P]rocedurally -defaulted claims of ineffective assistance cannot serve as cause to excuse a default of a second claim.").  After careful examination of the record and applicable law, this court finds that the claim is due to be dismissed because it is procedurally barred from review in this court.

Alternatively, the court finds that, even were this claim not procedurally defaulted, it is without merit.  Grayson relies in part on *Berger v. United States*, 295 U.S. 78 (1935) and *Bradshaw v. Stumpf*, 545 U.S. 187 (2005) to support his argument. However, the Eleventh Circuit recently rejected the assertion that federal constitutional precedent exists for a due process claim pertaining to inconsistent theories in the prosecution of co-defendants.  As the court stated in *Fotopoulos v. Secretary, Dept. of Corrections*  516 F.3d 1229 (11th Cir. 2008):

> In *Berger*, the Supreme Court ordered a new trial after it determined that the prosecutor had struck "foul" blows. *Id.* at 88, 55 S.Ct. at 633.  The Court described the conduct of the prosecutor as "indecorous and improper" because he, among other things, bullied witnesses and misstated facts, but the *Berger* Court did not mention any issue about the use of alleged inconsistent theories. *Id.* at 84, 55 S.Ct. at 631. The conduct of the State in this appeal is in no way similar to the misconduct of the prosecutor in *Berger*.

Moreover, as Justice Thomas explained in his concurrence in *Bradshaw*,[12] "[the Supreme] Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories." 545 U.S. at 190, 125 S.Ct. at 2409 (Thomas, J. concurring).

*Id.* at 1235.

Neither can Grayson rely on *Parker v. Singletary,* 974 F.2d 1562 (11th Cir. 1992) to claim the prosecutor's inconsistent ringleader arguments violated his right to due process at the penalty phase of trial.  In that case:

Parker [made] the argument that the failure to disclose [inconsistent triggerman theories] violated "his due process right to have the jury at his trial take into account - both in determining his guilt or innocence and in deciding whether to recommend a sentence of death - that the [S]tate had previously contended that someone other than Parker fired the shot that killed Ms. Slater." [footnote omitted]. But no due process violation occurred, because there was no necessary contradiction between the state's positions in the trials of the three co-defendants.  Given the uncertainty of the evidence, it was proper for the prosecutors in the other co-defendants' cases to argue alternate theories as to the facts of the murder.  The issue of whether the particular defendant on trial physically committed the murder was an appropriate question for each of the co-defendants' juries.  Moreover, the Second Circuit has forbidden the evidentiary use of prior jury argument in federal court under similar circumstances.  The state's mere failure to disclose the alternate positions it had taken in the trials of the other co-defendants thus did not result in a due process violation.

*Parker v. Singletary*, 974 F.2d 1562, 1578-1579 (11th Cir. 1992) (footnotes omitted).

Just as in *Parker*, the ringleader theories in Grayson's case were not impossibly contradictory considering the uncertainty as to which of the co-defendants acted as a ringleader in the murder of Ms. Deblieux.  As aptly stated by the Eleventh Circuit, it was proper for the prosecutor to present to the jury the question of the identity of the ringleader.

---

[12] Additionally, Grayson's conviction became final on October 7, 2002.  *See Grayson v. Alabama*, 537 U.S. 842 (2002).  Since *Bradshaw* was not decided until 2005, it would be impossible for Grayson to contend that the state court's rejection of his claim is contrary to or an unreasonable application of *Bradshaw*.

This claim is due to be dismissed as procedurally defaulted, or, in the alternative, is due to be denied on the merits.

**B.**   **Claim Two**   **Ineffective Assistance of Trial Counsel (Doc. #36 at 5-42)**

Grayson alleges he was denied effective assistance of counsel in numerous respects.  Before the court addresses each of these allegations, it will discuss the general constitutional standard applicable to his ineffective assistance claims.

**1.**   **General Standard**

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-pronged standard for judging, under the Sixth Amendment, the effectiveness of attorneys who represent criminal defendants at trial or on direct appeal[13]

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  *First*, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel"

---

[13]  Ineffective assistance of counsel claims are specifically limited to the performance of attorneys who represented a defendant at trial or on direct appeal from the conviction.  *See* 28 U.S.C. § 2254(I) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."); *see also Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings.  Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings.") (citations omitted).

> The [*Coleman*] Court went on to conclude that because errors of post-conviction counsel cannot be *constitutionally ineffective*, a petitioner "must 'bear the risk of attorney error that results in a procedural default.'"  Thus, because [petitioner] had no constitutional right to counsel during his post-conviction proceedings, his attorneys' errors during those proceedings cannot constitute cause to excuse his procedural default.  Because [petitioner] has failed to establish one element of the cause and prejudice exception, he cannot show the exception applies.

*Johnson v. Singletary*, 938 F.2d 1166, 1175 (11th  Cir. 1991) (*en banc*) (emphasis supplied) (*quoting Coleman*, 501 U.S. at 752 (*in turn quoting Murray v. Carrier*, 477 U.S. 478, 488 (1986)), and *citing Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982)).

> guaranteed the defendant by the Sixth Amendment. *Second*, the defendant must
> show that the deficient performance prejudiced the defense. This requires showing
> that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial
> whose result is reliable. Unless a defendant makes both showings, it cannot be said
> that the conviction or death sentence resulted from a breakdown in the adversary
> process that renders the result unreliable.

*Id*. at 687 (emphasis supplied); *see also Williams v. Taylor*, 529 U.S. 362, 390 (2000). The two parts

of the *Strickland* standard are conjunctive, and a petitioner accordingly bears the burden of proving

*both* "deficient performance" *and* "prejudice" by "a preponderance of competent evidence."

*Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*). Thus, a court is not

required to address both aspects of the *Strickland* standard when a habeas petitioner makes an

insufficient showing on one of the prongs. *See*, *e.g.*, *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th

Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth

Amendment, the court need not address the performance prong if the defendant cannot meet the

prejudice prong, or vice versa.").

### a.      The Performance Prong

To establish that counsel's performance was deficient, a defendant "must show that counsel's

representation fell below an objective standard of reasonableness," which is defined in terms of

"reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 687-88; *see also*

*Williams*, 529 U.S. at 390-91; *Darden v. Wainwright*, 477 U.S. 168, 184 (1986). The *Strickland*

Court instructed lower federal courts to be "highly deferential" when engaging in such assessments:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too
> tempting for a defendant to second-guess counsel's assistance after conviction or
> adverse sentence, and it is all too easy for a court, examining counsel's defense after
> it has proved unsuccessful, to conclude that a particular act or omission of counsel
> was unreasonable. A fair assessment of attorney performance requires that every
> effort be made to eliminate the distorting effects of hindsight, to reconstruct the

circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, *a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance*; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689 (emphasis supplied) (citations and internal quotation marks omitted); *see also*, *e.g.*, *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994) (holding that, "[w]hen reviewing whether an attorney is ineffective, courts should always presume strongly that counsel's performance was reasonable and adequate") (internal quotation marks omitted).  To overcome the presumption that counsel's conduct fell within the wide range of reasonable professional assistance, the habeas petitioner "must establish that no competent counsel would have taken the action that his counsel did take."  *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (*en banc*) (footnote and citation omitted).

The reasonableness of counsel's performance is judged from the perspective of the attorney, at the time of the alleged error, and in light of all the circumstances.  *See*, *e.g.*, *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001) (giving lawyers "the benefit of the doubt for 'heat of the battle' tactical decisions"); *Mills v. Singletary*, 161 F.3d 1273, 1285-86 (11th Cir. 1998) (noting that *Strickland* performance review is a "deferential review of all of the circumstances from the perspective of counsel at the time of the alleged errors").

Under this standard, there are no "absolute rules" dictating what reasonable performance is or what line of defense must be asserted.  [*Chandler*, 218 F.3d] at 1317.  Indeed, as we have recognized, "[a]bsolute rules would interfere with counsel's independence-which is also constitutionally protected-and would restrict the wide latitude counsel have in making tactical decisions."  *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001).

41

*Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005).  "Even if many reasonable lawyers would

not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds

unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v.*

*Zant*, 13 F.3d 384, 386 (11th Cir. 1994).  In short, an attorney's performance will be deemed

deficient only if it is objectively unreasonable (*i.e.*, falls below the wide range of competence

demanded of attorneys in criminal cases), and it is shown that no competent attorney would have

taken the action that petitioner's counsel did take.  *See, e.g.*, *Chandler*, 218 F.3d at 1315; *Cross v.*

*United States*, 893 F.2d 1287, 1290 (11th Cir. 1990).

### b.    The Prejudice Prong

In addition to showing deficient performance, a petitioner must show prejudice.  To satisfy

the prejudice prong, a habeas petitioner "must show that there is a reasonable probability that, but

for counsel's unprofessional errors, the results of the proceeding would have been different.  A

reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Strickland*, 466 U.S. at 694; *see also Williams*, 529 U.S. at 391.  As the Eleventh Circuit has stated,

somewhat differently, "[a] finding of prejudice requires proof of unprofessional errors so egregious

that the trial was rendered unfair and the verdict rendered suspect." *Johnson v. Alabama*, 256 F.3d

1156, 1177 (11th Cir. 2001) (*quoting Eddmonds v. Peters*, 93 F.3d 1307, 1313 (7th Cir. 1996) (*in*

*turn quoting Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986))) (internal quotation marks

omitted); *see also, e.g.*, *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (holding that, to show

prejudice a defendant must show that counsel's errors were so serious that they rendered the

defendant's trial unfair or unreliable, not merely that the outcome would have been different).

A habeas petitioner "must affirmatively prove prejudice, because '[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial.'"  *Gilreath v. Head*, 234 F.3d 547, 551 (11th Cir. 2000) (*quoting Strickland*, 466 U.S. at 693).  The fact that counsel's error may have "had some conceivable effect on the outcome of the proceeding" is not sufficient to show prejudice.  *Strickland*, 466 U.S. at 693; *see also Gilreath*, 234 F.3d at 551 (same); *Tompkins v. Moore*, 193 F.3d 1327, 1336 (11th Cir. 1999).  Instead, a petitioner must present competent evidence proving "that trial counsel's deficient performance deprived him of 'a trial whose result is reliable.'"  *Brown v. Jones*, 255 F.3d 1272, 1278 (11th Cir. 2001) (*quoting Strickland*, 466 U.S. at 687).  "[T]he benchmark for judging any claims of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial [or subsequent direct appeal] cannot be relied upon as having produced a just result."  *Strickland*, 466 U.S. at 686.

### c.    Deference to Historical Factual Findings

"Ineffectiveness of counsel is a mixed question of fact and law."  *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001) (*citing Meeks v. Moore*, 216 F.3d 951, 959 (11th Cir. 2000)).  "State court findings of historical facts made in the course of evaluating an ineffectiveness claim are subject to a presumption of correctness under 28 U.S.C. § 2254(d)."  *Thompson*, 255 F.3d at 1297.

2.      **Specific Claims of Trial Counsel's Ineffectiveness**

a.      **Failure to Investigate and Present the Extensive Mitigating Evidence Caused the Jury to Make an Unreasoned Sentencing Decision (Doc. #36 at 6-16)**

The parties devote a significant amount of time arguing about various procedural matters. The court will cut through those arguments[14] and address the real habeas questions associated with the claim.  Those questions are whether Grayson can show he is entitled to § 2254(d) relief and whether he should be afforded an evidentiary hearing. To that end, the post-conviction record reflects

---

[14]  For example, Grayson asserts that the state court denied him an evidentiary hearing (and thus the opportunity to develop a factual basis for this claim by way of such a hearing), even though the allegations underlying this claim were sufficiently specific and disputed. (Doc. #44 at 3-7).  Grayson is incorrect.  The Rule 32 court did not find that the claim was insufficiently pled.  Instead, it assumed Grayson's factual allegations were true (*i.e.* undisputed) and denied the claim on the merits.

On the other hand, Respondent argues that several "new facts" in the habeas petition are procedurally defaulted because Grayson did not present those facts in his Rule 32 petition.  (Doc. #40 at 10).  With one exception, after careful examination of the Rule 32 claim and its habeas counterpart, the court finds Respondent's arguments about the "new facts"advanced by Grayson to be of little force in the face of the state court's decision on the merits. To the extent respondent is correct in alleging that Grayson has alleged "new facts," those facts fall into two categories.  The first set of "new facts" is indeed new in the sense that the allegations are substantially different from those presented to the state court. Within this set of facts, Grayson argues for the first time that counsels' inadequate investigation prevented the showing of mitigating evidence that he suffers not only from Bipolar I Disorder, as testified to at trial, but also to Attention Deficit Hyperactivity Disorder (ADHD). (Doc. #36 at 12-15).  This court is precluded from examining these new facts because Grayson failed to raise them in state court and, at this juncture, would be procedurally barred from doing so under state procedural rules.

The second set of new facts essentially boils down to Grayson now connecting the names of Tommy Winchester, Kim Cheek, and April Thompson to the mitigating evidence these individuals allegedly would have provided, whereas in his Rule 32 petition he simply listed two paragraphs' worth of witness names and then described the mitigating evidence without attaching an identifiable person to it. (*See* Doc. #36 at 9-12 and Vol. 16 at 433-41). The court is not persuaded that these facts are new, particularly when the state court assumed them to be true when it denied Grayson's claim.

Also, through Tommy Winchester, Grayson adds one new factual anecdote about Grayson's demeanor when Grayson lived in North Carolina.  (Doc. #36 at 10-11).  Certainly, from a technical standpoint, this is a new fact.  Nonetheless, the court notes that its inclusion as part of a § 2254(d) analysis of Grayson's habeas claim would make no difference to the ultimate outcome of this court's decision.

that after assuming the factual allegations in Grayson's petition to be true, the Rule 32 court denied

his request for an evidentiary hearing and denied this claim on the merits. (Tab. 56 at 117-34).  The

Alabama Court of Criminal Appeals affirmed.  (Tab. 57 at 14-15).  Grayson contends that he should

be granted an evidentiary hearing because, although he was diligent in pursuing such a hearing in

state court, he was denied the opportunity to "develop the factual basis" for the claim.  (Doc. #44 at

4)(*quoting Valle v. Sec'y of the Dept. of Corr.*, 459 F 1206, 1216 (11th Cir. 2006)(*citing* §

2254(e)(2))); *see also Breedlove v. Moore,* 279 F.3d 952, 960 (11th Cir. 2002).

In addition to requesting an evidentiary hearing and discovery,[15] Grayson requests this court

use its authority to order expansion of the habeas record pursuant to Rule 7 of the Rules Governing

§ 2254 Cases in the United States District Courts. (Doc. #44 at 7, n. 6)  The court will exercise its

discretion to expand the record, but only as to this claim.

Attached to a previous submission by Grayson (a reply brief which was stricken for failure

to comply with court instructions), are several exhibits comprised of documents and affidavits in

support of this claim.  (*See* Doc. #28, Exhibits 1-15, or "A-O").  The court finds that expansion of

the record to include these exhibits is beneficial to the proper resolution of this claim.  As such, the

record has been expanded to include these exhibits.  (*See* #Doc. 46).  Nevertheless, the court notes

that:

> "no evidentiary hearing is necessary where the proffered evidence would not affect
> the resolution of the claim."  *Bolender v. Singletary,* 16 F.3d 1547, 1555 n. 9 (11th
> Cir.1994). Therefore, in order to obtain an evidentiary hearing, [Grayson] must
> demonstrate that his factual allegations, if proven, would indicate that the state courts
> acted contrary to, or unreasonably applied, clearly established federal law when they

---

[15]  His request for discovery is due to be denied outright because Grayson never identifies the
substance or source of any information for which he purportedly desires discovery.

rejected his . . . claims.  *See* § 2254(d).

*Valle v. Secretary for Dept. of Corrections,* 459 F.3d at 1216.

After careful examination of the entire state court record and the habeas claim (as expanded),[16] this court finds that an evidentiary hearing is not warranted.  Although Grayson alleges he should be afforded an evidentiary hearing in this court because he was unable to develop the factual basis for his claim in state court, that argument ignores a crucial point—the state court assumed that all of the facts Grayson offered in support of his claim were true, but it still denied Grayson relief.  The state court still rejected his claim on the merits and its rejection of the claim on the merits is neither contrary to nor an unreasonable application of clearly established federal law.

Before illustrating the foundation for this decision in detail, the historical facts (as set out in detail in the Rule 32 court's rejection of the claim) show that the vast majority of the mitigating evidence that Grayson alleges was not presented at trial *was* in fact presented. (Tab. 56 at 121-36).  Moreover, to the extent the *post-conviction* petition did allege mitigating evidence that was not presented at trial, a large portion of that evidence is cumulative.  (Vol. 16 at 98-11).  To the extent the *post-conviction* petition did allege non-cumulative evidence that was not presented at trial, that evidence centers around the poverty, neglect, and physical abuse that Grayson suffered at the hands his natural father from age 12, to possibly age 16.  *Id.*[17]

In the light of the habeas lens through which a federal district court is required to review a state court's rejection of such a claim on collateral review, this court's analysis will center around

---

[16]  Respondent objected to the expansion of the record.  Those objections are overruled.

[17]  Again, the trial judge and the post-conviction judge are the same individual, Judge Michael McCormick.

the Rule 32 court's rejection of this claim. In doing so, the court will avoid unnecessary repetition, appropriately compartmentalize the evidence, and preserve the investigatory conditions under which it was proffered and the timing thereof.  If there are any additional facts from the trial record,[18] post-conviction record, allegations in the habeas petition, or the record as expanded for this claim, this information will be placed in a bracketed footnote during this court's recitation of the Rule 32 court's findings of fact and conclusions of law.

> First, Grayson alleges in paragraphs 165 and 191[19] that numerous people were available to testify or give information regarding Grayson's upbringing and background.  The petition, does not, however, indicate how a reasonably competent attorney would have come into contact with these individuals.[20]  There is nothing

---

[18]  With the exception of those 'new facts' that are procedurally defaulted, as set out in footnote 14, *supra*.

[19]  These two paragraphs are essentially a long list of individuals Grayson alleged his counsel failed to locate or uncover.  (Vol. 16 at 441-42).

[20]  The state court was correct in noting that the petition does not reveal how counsel should have or could have discovered and investigated these individuals.  Grayson's habeas petition suffers from the same flaw.  That is, he argues that if the investigation of his case had begun in February 1995, instead of October 1995, other witnesses and documentary evidence would have been found and presented at trial.  (Doc. #36 at 6).  However, Grayson never alleges that he informed counsel of these individuals or illustrates how counsel by some other reasonable means, including investigative assistance, could have discovered these individuals in the time period about which he complains.

Moreover, a careful review of Exhibit K in the expanded record shows that on June 6, 1994, counsel wrote a letter to Grayson asking that he provide a tremendous amount of information to counsel.  (*See* Exhibit K to Doc. 28 at 1-2 ).  Counsel asked Grayson to provide biographical information about himself, including where he was born and all information on his parents, including whether or not they suffered from mental defects or illnesses. Counsel also asked for the same information about Grayson's sisters and brothers, and "what they are doing where located in the family." Grayson was asked to provide the same information on himself, beginning with his "early childhood — who you lived with — day care etc.. go through school years, teachers."  Counsel specifically requested that Grayson  "list any of your friends, close relatives, or acquaintances that we may be able to contact regarding any first hand information on you." Grayson was instructed to use this method throughout his junior and senior years in high school, and to include all jobs and employers. Counsel wrote, "I realize that this is a significant amount of information but, believe me, it is entirely needed in a capital murder case in the event a capital murder verdict is returned."  Counsel also described the sentencing phase as a second trial, and wrote, "We are allowed to call as many witnesses as necessary to testify and argue in favor of life in prison without parole rather than the death penalty. One area

in the petition to indicate where these witnesses live–although the petition does note that Grayson lived in several states other than Alabama and "lived like gypsies" (Pet. at p. 105, para. 175)–and nothing to indicate how these witnesses would have been discovered during a reasonably competent investigation.

The record established, however, that trial counsel came into contact with Ralph Wiley, Joyce Hufford, and Dara Roper, members of Grayson's family, during their investigation. Further, the record supports a finding that trial counsel sought out and interviewed Grayson's former teachers, as evidenced by the testimony of Jan Arnett. The record of Grayson's trial also demonstrates that counsel were trying to contact members of Grayson's family who resided outside of Alabama.[21] On page 337 of the record, trial counsel referenced locating and contacting a maternal aunt in Springfield, Illinois during their investigation.[22] The record gives support to a

_____

that many attorneys fail to adequately prepare for is the sentencing phase of a capital murder case. It appears to me in your situation there is some information out there that may be very favorable [(and mentions reading articles where school teachers commented in surprise about the allegations against Grayson.)]."

Exhibit L is a copy of Grayson's 2 page undated written response to his trial counsel. To the extent the information contained in the letter is imperative to the question of who counsel should contact, Grayson identified the people as Trenton West, 467-6641, Erica Jones 467-6641, Anne Hibberts 761-0001, Bill Grayson, William Grayson, 338-6745, Carey Jones, Hal Jones, 467-6544. *Id.* at 1.

[21] At a December 8, 1995 pre-trial hearing, defense counsel Alvis informed the court that the defense expert "had attempted to locate certain persons" and had been successful with some but not others. (Vol. 4, Tab. 7 at 289-93). One of the purposes of the hearing was Alvis's motion to continue the trial to find the witnesses, whom he described as family members with medical information, that he, his investigator and Dr. Goff had attempted to contact. *Id.* Alvis had been informed by Dr. Goff, the defense neurolopsychologist, that Grayson's family medical history was important. *Id.* Further, all experts who had examined Grayson found he had some level of mental illness, and that there was a familial connection. *Id.* Defense counsel referred to Grayson's family as "not very . . . cohesive" and scattered all over the United States. *Id.* Counsel stated he had made four calls himself to Grayson's uncle but none were returned. *Id.* On several occasions counsel indicated that he and the private investigator had attempted to contact witnesses for the defense, but phone calls were not returned or witnesses could not be found.

[22] At a January 26, 1996, pre-trial hearing, Alvis again requested a trial continuance in order to let the State's expert, Dr. Ackerson, speak with family members about their mental health history before making her final diagnosis. (Vol. 4, Tab. 10 at 336-49). Counsel asserted that he found an uncle in Columbiana who agreed to cooperate and provide medical information, and an aunt in Springfield, Illinois, who had not agreed to come to trial, but would provide medical records. (*Id.* at 336-37). Defense counsel Alvis stated,

Mr. Grayson has had a displaced childhood and adolescence. His mother was killed when he was twelve, and he has lived with a number of persons since then: His father, uncles, grandmothers and et cetera. And he does not present to us the same type family unit where we can send an investigator to talk to mom and talk to Daddy, and you know, what

48

finding that trial counsel obviously conducted an investigation into Grayson's family and schooling.

Further, the record indicates that certain members of Grayson's family were not excited about the prospect of testifying on the petitioner's behalf.  Immediately before testifying, Dara Roper told this Court, "Your Honor, to protect my family's privacy, they're upset about me being here, can I request that my name not be printed in the paper or news?"  (R. 576-77)  This statement, combined with Grayson's father's failure to have involvement in his son's case, sends a strong message concerning the Petitioner's family's willingness to get involved in this matter.  Thus, this Court has to consider these obstacles put in front of trial counsel.

Also, this Court notes that trial counsel had the assistance of an investigator during the pre-trial investigation of Grayson's penalty-phase.  This information, in addition to the investigation shown on the record of Petitioner's trial, allows this Court to conclude that trial counsel engaged in an investigation of Grayson's background and character.[23]

---

happened, tell us what happened.  We've had to search for these persons.

We're in a position at this position this report affects the defense strategy that we planned to utilize in this case.  Because one of the things that this examiner has said in this report is that she feels that neither Dr. Rebert nor Dr. Goff had adequate information before them to make the diagnosis they made.  We feel like once this examiner is presented with this information that her position as to that will change. . . . .

(*Id.* at 338-39).  Counsel admitted he did not have written medical information with him at the time of the hearing, and that the reason Grayson's uncle had not been contacted earlier was because he had been institutionalized at Hillcrest Hospital until late December, and that it was through the uncle that Grayson's aunt in Illinois was found.  (*Id.* at 348-49).  The trial court denied the request for continuance.

[23]  In his Rule 32 petition as well as the habeas petition, Grayson alleges counsel was desultory in his investigation because, although the court awarded the defense money for a private investigator in February 1995, colloquies between defense counsel Alvis and the court during a pre-trial hearing on October 16, 1995, show that an investigator apparently was not hired to assist Grayson's case until after this date.  (Vol. 4, Tab. 6 at 209-10).  Pre-trial hearing records show that co-defense counsel Boudreaux represented Grayson at February 17, 1995, pre-trial  hearing. (Vol. 3, Tab. 4 at 103-105).  There is also some indication that the money awarded in February 1995, was for a general investigator, as Boudreaux indicated they would stay their motion request also asking for additional funds for a mitigation investigator until later.  (*Id.*).  Whether counsel failed to communicate with one another or some other mix-up occurred is irrelevant.  For purposes of this opinion, it is assumed that a private investigator did not begin his work in Grayson's case until October 1995.  However, the point is essentially irrelevant, because Grayson has not illustrated what witnesses or what evidence would have been discovered and what information would have been provided even if the investigator had begun his work in February 1995 (as opposed to October 1995).

The question, as discussed in *Wiggins v. Smith*, 123 S.Ct. 2527 (2003), is whether the investigation into Grayson's background was a reasonable one. For several reasons, this Court concludes from its observations of counsel at trial and the record of Grayson's trial that the investigation was reasonable. As demonstrated below, any limitations that can be presumed based on the pleadings in the petition are limitations that would be supported by reasonable professional judgments.

Before discussing *Wiggins*, it is important to note that complaints of uncalled witnesses are not favored in post-conviction proceedings. *Mayo v. Lynaugh*, 882 F.2d 134, 139 (5th Cir. 1989)("Complaints of uncalled witnesses are not favored in federal habeas review because allegations of what a witness would have testified are largely speculative.") The *Chandler* opinion gives perhaps the best reason for denying this sort of claim. There, the court noted:

> For example, "[i]t is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigation [] evidence, had they been called or . . . had they been asked the right questions." *Waters*, 46 F.3 at 1514 (en banc). But "[t]he mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel" *Id.* (noting that such witnesses show nothing more than that, "with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings."). And, basing the inquiry on whether an investigation (if one had been undertaken) would have uncovered mitigating evidence (or witnesses) is an example of judging counsel's acts from the benefit of hindsight. The proper inquiry was articulated in *Rogers v. Zant*: "Once we conclude that declining to investigate further was a reasonable act, we do not look to see what a further investigation would have produced." 13 F.3d 384, 388 (11th Cir. 1994).

*Chandler*, 218 F.3d 1305, 1316, n.20. Further, it is important to note that counsel are faulted for failing to locate, interview and call these people as witnesses, though it is not alleged that Grayson himself alerted his trial counsel to these individuals. There is a large distinction between a claim that trial counsel failed to locate or call certain witnesses that they may or may not have known about and a claim that trial counsel failed to contact potential mitigation witnesses that their client specifically named for his counsel. *Cf., Bunch v. Thompson*, 949 F.2d 1354, 1365 (4th Cir. 1991) ("It is difficult for us to fault counsel for failing to obtain additional testimony when the client himself was not forthcoming with names.")

The above-cited portion of *Chandler* was simply a restatement of the rule later reaffirmed by the Court in *Wiggins*. In *Wiggins*, the Court restated its earlier rule in Strickland that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins,* 123 S.Ct. at 2539 *(quoting, Strickland*, 466 U.S. at 690-91). In *Wiggins* there was a total lack of investigation which resulted in no mitigating evidence being offered during Wiggins' penalty phase. That is not the situation presented in the present case.

Here, where much of the evidence pleaded by Grayson in the petition was offered by trial counsel during the trial, the record supports a finding of reasonableness. Trial counsel knew about the presence of bipolar disorder in Grayson's family. In fact, this evidence was used during Grayson's trial to support the expert testimony offered by the defense that Grayson suffered from bipolar disorder. Further, Joyce Hufford testified to these facts in her testimony. Thus, the existence of other witnesses who also knew of this evidence is irrelevant in determining whether the investigation was reasonable. Further, the decision not to call witnesses to testify in a cumulative fashion is not unreasonable, certainly not in this case following the testimony of Wiley, Roper, and Hufford. The use of this information in bolstering the bipolar disorder speaks to the reasonableness of the investigation.

Further, trial counsel established Grayson's sleeping patterns, pleaded in . . . the second amended petition, through the testimony of Jan Arnett, one of Grayson's school teachers. Trial counsel then contrasted this evidence with evidence of Grayson's hyperactivity, another fact alleged in the petition. Obviously counsel performed a reasonable investigation where they discovered and put on the very evidence Grayson alleges should have been discovered and introduced. Grayson is complaining that his trial counsel did not do a thing which the record plainly shows trial counsel did.

Also elicited during this testimony was evidence that Grayson was frequently absent from school. This teacher also testified that her efforts to get Grayson's father involved in his schooling were unsuccessful, seeing Grayson's father once in the three years she taught him. This same teacher further testified to Grayson's poor academic performance, noting that Grayson had failed the sixth and seventh grades. This same teacher further testified that Grayson was three years older than the other students in her class, a result of his having been held back academically.

The death of Grayson's mother was also established before the jury, as was Grayson's reaction to this event. This is not evidence that Grayson's trial counsel failed to discover due to lack of investigation. The record shows that trial counsel

were aware of these facts and elicited them during trial through Ralph Wiley and Joyce Hufford.

The record also establishes, through the testimony of Ralph Wiley, that trial counsel were familiar with the period in Grayson's life where he and his mother lived with Ralph Wiley and a man named Wayne Sojourner, one of the numerous uncalled witnesses cited by Grayson in the petition. Trial counsel established that this living arrangement existed when Grayson was a young child, and lasted for several years.

Although Grayson asserts that trial counsel failed to discover evidence of Helen Weisse's mental illness, the testimony of Dara Roper and Ralph Wiley demonstrates that counsel were aware of this fact and they attempted to elicit information concerning this fact during the guilt-phase in front of the jury, including information concerning Helen Weisse's trips to mental hospitals. During the penalty phase, this evidence was established through the testimony of Joyce Hufford.

The record also shows that Grayson's trial counsel were aware of the fact that Helen Weisse attacked Bill Grayson with a knife. This evidence was excluded from the jury on the basis of irrelevance.[24] This incident occurred before the birth of Petitioner and there was no explanation for how such an attack was relevant to Petitioner's character or how it could have had any effect on his life or behavior. This attack did not occur in his presence. Thus, the record shows that trial counsel were aware of this fact, attempted to elicit this fact, and this evidence was excluded by the Court. This information, however, was available to trial counsel as a result of their reasonable investigation. The fact that this evidence was not admitted was do [sic] to the actions of this Court and not the inaction of Grayson's trial counsel.

Joyce Hufford is another witness that demonstrates trial counsel's investigation into Grayson's background. Besides establishing Grayson's age - a mitigating circumstance - trial counsel were able to (again) establish that Grayson's parents separated when he was young, that Grayson's father was not divorced from Grayson's mother when he impregnated another woman, and that following the separation Grayson lived with Hufford and his father had nothing to do with him. Trial counsel were also able to (again) establish that Grayson's father had been married 4 or 5 times after the divorce between Grayson's mother and father.

Hufford was also able to elaborate on the death of Grayson's mother the week before his twelfth birthday, including the changes in Grayson's behavior afterwards. Trial counsel were also able to elicit the witness's statement that some people were of the opinion that Grayson's mother was murdered, not the result of a car accident.

---

[24] Grayson contends that the court did not exclude this from the jury. The point is irrelevant, however, because his own allegations show the incident occurred before Grayson was even born.

Hufford also established the fact that Grayson's troubled education ended when he dropped our of school at the age of sixteen.

Hufford also testified that during the two years Grayson lived with his father following his mother's death, his relationship with his father was not a good one. She also noted that Grayson lived in an apartment with his step-mother and several of her children. Hufford then testified that following this living arrangement, Grayson bounced around from family member to family member looking for a place to stay.

In regards to mental illness, Hufford was allowed to testify to the existence of bipolar disorder in Grayson's grandmother. Though the Court excluded the information during the guilt phase, it was allowed during the penalty phase, due to the less-stringent evidentiary rules. Thus, this evidence - that Grayson earlier in his petition stresses was very important and crucial - was not only discovered by trial counsel, but used during the penalty-phase of petitioner's trial. Hufford also testified that Grayson's other uncle suffered from mental depression, in addition to Ralph Wiley's bipolar disorder. Hufford also testified that Grayson's mother's sister (his aunt) suffered from bipolar disorder. Again, this is the very same evidence that Grayson alleges in this petition was not discovered or not used at trial. The record plainly contradicts those pleadings.

Also, Grayson's prior drug use was known to trial counsel, as they used this information during the testimony of Doctors Rebert and Goff. Both witnesses testified that Grayson was using drugs and alcohol as a self-medication measure. Trial counsel were also aware of Grayson's spending spree . . ., as this information was used by Dr. Rebert to support her diagnosis of bipolar disorder. Again, despite Grayson's assertions that trial counsel failed to investigate and discover this information, the record plainly establishes that trial counsel were aware of Grayson's background and upbringing, and that they introduced this evidence during Grayson's trial.

This Court's observation of Grayson's trial and a review of the record convinces the Court that trial counsel performed a reasonable investigation. Further, this Court finds that, based on the circumstances and facts surrounding the horrific murder of Vickie Deblieux, a decision to limit the "typical" mitigation evidence and to focus on the mental health evidence to be a decision a reasonable attorney could have reached.

To be certain, trial counsel introduced evidence that Grayson's mother died when he was young, causing him to become withdrawn. Grayson's father's total lack of participation in his son's trial also spoke volumes about Grayson's family life. The testimony of Grayson's family established that his family members had little to

do with him, his uncle seeing him once in the years following his mother's death. Counsel established that Grayson's parents divorced when he was 3 years old.

Trial counsel, however, focused most of their efforts on supporting their bipolar disorder strategy.[25]   Grayson's prior drug use was offered to support a finding that he was self-medicating.   Grayson's spending spree was offered to establish a period of mania.  Grayson's sleep patterns and absences from school were offered to support a finding of depression.  Grayson's family history of mental illness was used to strengthen the diagnosis of bipolar disorder, due to the higher incidence of bipolar disorder in patients with genetic or familial links to others with the disorder.  In short, the record makes it clear that trial counsel wanted to establish that Grayson's bipolar disorder was a major mitigating circumstance and a contributing factor to the commission of this crime.  Because this was a reasonable choice, this Court must conclude that the investigation which led to this defense was reasonable, as established in this order and on the record of this trial.

The whole purpose of a penalty-phase is to narrow the class of defendants on which the death penalty is imposed.  This whole system was developed due to the United States Supreme Court's decision that the automatic imposition of the death penalty violated constitutional principles.  Thus, the decision to impose the death penalty is based solely on aggravating circumstances set forth by statute as being factors that make death the more appropriate punishment in a capital case.  If the State cannot establish at least one aggravating circumstance, the death penalty may not be imposed.

These circumstances are then weighed against mitigating circumstances, not limited by statute, that speak to a defendant's character or background, or facts or circumstances surrounding the crime, that suggest that death is not an appropriate punishment.  The weight or usefulness of these factors is, in large part, dependent on the facts and circumstances of the crime for which the death penalty is being considered and their relationship to the defendant and his commission of the death-eligible offense.

In a typical mitigation case, a defendant's background, character, or social status is used in an effort to diminish the aggravating circumstances making death a potential punishment.  For example, a defendant's age, lack of family support structure, and lack of a prior criminal history may be offered as mitigation to minimize the robbery/murder aggravating circumstance where a young teenager shoots the clerk at a gas station during a routine robbery.  Although not offered as an excuse for the crime, the mitigation is offered to suggest that the defendant is not in

---

[25]  The court also finds that the overriding theme, indeed "strategy" as defense counsel himself described it during pre-trial hearings that were transcribed, was indeed focused on a mental health defense.

a class of defendants for whom the death penalty should be reserved, but was a misguided youth who made a terribly stupid mistake.

On the other hand, in this case, where the State had two aggravating circumstances and evidence of a terrible, brutal, cold, and calculated murder - a murder that was a far cry from the typical murder case - the amount of mitigation required to establish that death was not the appropriate punishment was great. Thus, a reasonable attorney could conclude that the usual mitigation case of disadvantaged upbringing, lack of success in life, and poor socialization would be less than sufficient to outweigh the aggravating circumstances available to the State. In short, this case is an example of a case where a very specific and significant type of mitigation evidence would be required to undo the aggravating circumstances and remove the defendant from the class of murderers for whom the death penalty was intended.

To this end, a reasonable attorney could conclude that nothing about a defendant charged with this crime could negate the aggravating circumstances, unless such circumstances were used to show that the defendant had a condition that caused, or allowed, this terrible crime to occur. By using mental illness as a means to explain the defendant's actions, a horror-movie quality crime could be used to support mitigation, rather than aggravation. Such a strategy would give the jury a reason for such a senseless act, and allow them to see the defendant as a helpless victim of mental illness.

Looking at the facts of this case, the murder of Vicki Deblieux and the subsequent mutilation of her body screams "mental illness" much more than it does "neglected childhood," "young age," or "no significant history of prior criminal activity." Based on the horrific facts, a reasonable attorney could conclude that a crime of this magnitude would have to be seriously considered by a jury as a the result of mental illness much more readily as the product of youth, neglect, or poor socialization. The diagnosis of bipolar disorder in Grayson, combined with these facts, is more than enough to allow a reasonable attorney to conclude that the defendant's mental illness was perhaps the sole chance of establishing that Grayson was not in the class of defendants for whom the death penalty was intended.

As such, the defense strategy becomes reasonable when the transcript is reviewed. Once trial counsel determined that Grayson was suffering from a mental disorder, a decision to limit the amount of time and resources spent on investigating and presenting other, more typical mitigation[26] evidence was reasonable to the

---

[26]   The background and character evidence, as alleged in Grayson's Rule 32 petition and habeas petition (Doc. #36 at 6-16) is summarized herein. Grayson alleges that his grandmother, Helen Weisse, exposed his mother to "violence, reckless and criminal behaviors, including forcing her children to cash bad

checks and her own promiscuous behavior, which includes prostitution." (*Id.* at 7). Therefore, his mother was destined to be unstable and expose him to violence and poverty. (*Id.*). His mother was also sexually abused as a teenager. (*Id.*). In any event, after Terry ("Terri") divorced Petitioner's father, she was often depressed and rarely held her son or told him that she loved him. At one point, things were so bad that, during the winter, Terry and infant son were living in a house with no electricity. (*Id.* at 8). His father also took him on dates with other women when he was still married to Terri. (*Id.*). In Exhibit O to Doc. #28, Joyce Hufford, in an affidavit executed January 11, 2008, indicated she was a nurse's assistant at a hospital, and that Terry and an infant Grayson lived with her for about a year after his parents separation, but before they divorced.

Grayson asserts that his mother's frustration with his hyperactivity led her to "beat him and lock him in his room," and his father would beat him as well when he went to visit. (Doc. #36 at 7). Eventually, his mother moved in with Wayne Sojourner, who was physically abusive, but this ended when Grayson was 8 or 9. (*Id.*). Terry then moved in a with a girlfriend, commonly left Petitioner with other people, and the two lived like gypsies. (*Id.*). Terry became involved in drugs and alcohol, and became involved with Howard Bradford, who owned a bar called the Fuzzy Mule, a bar known for drug trafficking. At the age of 11, Petitioner became a drug runner, delivering drugs on a bicycle that had been bought for him specifically for that purpose." (*Id.* at 8-9). At the end of her life, Terry Grayson, her mother Helen Weisse, Petitioner, and his uncle, Ralph Wiley, all lived together. "Ralph frequently urinated in the bed he shared with Dale." (*Id.* at 9). Grayson's mother, who was intoxicated, was struck by a car while walking to the Fuzzy Mule one evening. (*Id.*). Shortly after his mother's death, Grayson moved into an apartment with father, Bill Grayson and his step-mother, Belinda Grayson, along with her two children, April [Thompson] and Tommy. (*Id.*). Belinda would not allow Grayson to have a picture of his mother displayed. (*Id.*) She also worked at a bar at night in Pell City, and beat Grayson if he woke her up during the day. (*Id.*). Grayson's father would beat him so severely that his step-mother asked that he do it outside of the apartment complex. (*Id.*). The children at the complex were mean to Grayson. (*Id.*). Bill and Belinda Grayson were aware Grayson needed to take mental health medication, but refused to provide it due to cost. (*Id.*). Grayson was so despondent one Christmas, he wrote that "school was so miserable that he planned to stop attending." (*Id.* at 9-10). *See also*, (Exhibit E to Doc. #28, affidavit of April Thompson). Thompson provides much of the information concerning Grayson's life with his father. She was four years older than Grayson and acted as his big sister. She moved into an apartment above her father when she became pregnant at 16, and remained at the complex for approximately 2 years after that. Grayson visited her frequently and received respite at her home. (*Id.*). Joyce Hufford attested that she wanted Grayson to live with her after his mother died, she knew the situation was not good at his father's house, but that Grayson would not move in with her. (Exhibit O to Doc. #28, Affidavit of Joyce Hufford).

Grayson had very little supervision so he became heavily involved in drugs and alcohol with his step-siblings. (Doc. #36 at 10). When Grayson's father and stepmother divorced, a teenage Grayson would wander around the complex looking for food, or go to a local bar to borrow money from a friend for food. (*Id.*). Grayson's father used Grayson's social security money. (*Id.*). Grayson took legal action against his father and received the money that was his. (*Id.*). At 15, Grayson moved to North Carolina and lived his with sister's ex-husband. (*Id.*). While there, his neighbor, Tommy Winchester, stated Grayson would attempt to get into fights, but Grayson would always lose. (*Id.*). In fact, Winchester beat Grayson in his own yard one time and Grayson did not even resist. (*Id.*). If Winchester mentioned Grayson's family, Grayson would cry and run away for a few days. (*Id.*). After one year, Grayson moved back to Alabama, but his father would not take him in. (*Id.* at 11). His uncle, Hal Jones, took him in for a while, but then kicked him

extent that trial counsel did interview family members, at least one school teacher, and put before the jury much of the information Grayson pleads in his petition.

Trial counsel did not fail to do a mitigation investigation into Grayson's upbringing and family life, as was the case in *Wiggins*, but instead allowed this evidence to come in before the jury but not to overshadow or cloud the issue of Grayson's bipolar disorder, an alleged contributing factor to the commission of the capital murder. Unlike the sexual abuse that went undiscovered by the defense attorneys in *Wiggins*, Grayson's petition offers no compelling mitigation evidence that went undiscovered by trial counsel in the present case.[27] Further, because the relevant inquiry is whether any limitations on an investigation into Grayson's background and character are supported by reasonable professional judgments, the importance of the bipolar disorder mitigation evidence in this case is extremely important in understanding why reasonable counsel could have decided to portray Grayson's difficult childhood in broad strokes rather than in minute detail.

Because the record shows that trial counsel investigated and made themselves aware of Grayson's childhood, his parent's divorce, his father's numerous marriages, Grayson's numerous moves growing up, his father's lack of interest in Grayson's life, his difficulty in school, his mother's death when Grayson was eleven, and Grayson's lack of a solid family support structure, this Court finds that Grayson's attorneys performed a reasonable investigation into Grayson's childhood. This Court further

---

out. Grayson resorted to living out of his car. (*Id.*). Also in his late teens, Grayson spent a large sum of money received from his mother's life insurance policy in a short period of time. (*Id.*). He wrote bad checks. (*Id.*). At 19, he had a girlfriend for several months named Kim Cheek, and he was kind to her and her small children. (*Id.* at 19-20; *See* Exhibit G to Doc. #28, affidavit of Kim Cheek).

[27] At this juncture, the trial court placed footnote 11, which reads:

For example, Grayson complains that trial counsel did not locate and show to the jury copies of home videos of Grayson singing "A Swingin' Song" as a small child on his aunt's farm. Taking this pleading as true - that trial counsel did not discover this home video during their investigation and interaction with Dara Roper, Ralph Wiley, and Joyce Hufford - this is not the type of evidence that a reasonable lawyer would have been required to put on along with the evidence of Grayson's turbulent family life (divorce, deadbeat dad, mental illness) and his bipolar disorder. In fact, evidence of a happy child enjoying his life might be held back by a reasonable defense attorney for fear that it would make the evidence of Grayson's turbulent upbringing look manufactured. The "happy child" as described by the Rule 32 petition could be seen as proof that the divorce of Grayson's parents and the events following that had little or no impact on Grayson's life. Further, this type of evidence is not of the nature and quality of the sexual abuse that trial counsel failed to uncover in *Wiggins*.

(Tab. 56 at 134).

finds that a decision to focus on Grayson's diagnosis of bipolar disorder, rather than play up the "typical" mitigation evidence was reasonable on the facts of this case, considering the need to give the jury a significant reason to find that the State's aggravating circumstances did not justify the death penalty. There is nothing pleaded in this petition which, taken as true, casts doubt on the quality and professional nature of trial counsel's investigation and mitigation case as evidence [sic] by the record and this Court's observation of Grayson's trial. The decision to focus on the bipolar disorder mitigation evidence was the product of competent, professional representation as guaranteed by the Constitution. For these reasons, this claim is denied.

(Vol. 22, Tab. 56 at 121-36).

On collateral appeal, the Alabama Court of Criminal Appeals' affirmed the trial court's

decision as follows:

The record indicates that trial counsel did call background witnesses, including family members and teachers, and with the help of an investigator, conducted an investigation into his family and schooling. Additionally, the trial court found that the decision not to call witnesses in a cumulative fashion was not unreasonable professional judgment. The trial court specifically found that "[b]ased on the horrific facts, a reasonable attorney could conclude that a crime of this magnitude would have to be seriously considered by a jury as the result of mental illness much more readily than as the product of youth, neglect, or poor socialization." Therefore, it was an effective trial strategy to limit the amount of time and resources spent on investigating and presenting more typical mitigation evidence which might cloud a bipolar defense. *See Moore v. State*, 659 So.2d 205 (Ala. Crim. App. 1994).

*Grayson v. State*, Slip. Op. CR-03-1208 at 14-15 (Ala. Crim. App. Dec. 12, 2005). (*See* C.R.. Vol.

22, Tab. 57 at 14-15).

When the state courts' decisions on collateral appeal are viewed in proper context, it is clear

that Grayson is not entitled to habeas relief on this claim.

In preparing for a capital case, an attorney does have a duty to conduct a reasonable investigation into possible mitigating evidence. *Grayson v. Thompson*, 257 F.3d 1194, 1225 (11th Cir. 2001). A total failure to investigate the defendant's past or present behavior can qualify as deficient performance under *Strickland*. *Housel v. Head*, 238 F.3d 1289, 1294 (11th Cir. 2001). However, effective

58

> assistance does not require that counsel investigate and present all evidence in mitigation. *Chandler*, 218 F.3d at 1319; *Grayson*, 257 F.3d at 1225. "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir.1995) (quotation omitted). As a result, it is not ineffective assistance to fail to present "redundant evidence." *Id.* at 1512. To assess the prejudice caused by counsel's alleged ineffective assistance at the penalty phase of a capital trial, we reweigh the evidence in aggravation against the totality of available mitigating evidence. *Wiggins v. Smith*, 539 U.S. 510, 534, 123 S.Ct. 2527, 2542, 156 L. Ed. 2d 471 (2003). The totality of the available mitigating evidence includes both evidence introduced at trial and the evidence introduced in the habeas proceeding. *Williams*, 529 U.S. at 397-98, 120 S.Ct. at 1515.

*Jennings v. McDonough*, 490 F.3d 1230, 1244 (11th Cir. 2007).

Grayson cannot show that the state court's rejection of this claim was contrary to or an unreasonable application of clearly established law, nor that it was it based upon an unreasonable determination of the facts in light of the evidence before it. The state records show that the mitigating evidence about which Grayson complains was either presented at trial, cumulative to evidence presented at trial, or evidence of his background and character that was not compelling, particularly when weighed against the "horror movie" quality crime that he committed. There also is more than enough record evidence for this court to determine, as did the state court, that, pursuant to the circumstances under which counsel was operating before trial, they engaged in a reasonable investigation and made a reasonable decision to limit the investigation, in order to further what they perceived and, indeed, stated, was a very real mental health defense. There is no reasonable probability that the outcome of Grayson's sentencing would have been altered by the presentation of any such evidence.

For all these reasons, this claim is due to be denied.

### b.   Counsel Were Ineffective at the Penalty Phase of Trial (Doc. #36 at 16-20)

### 1.   Failure to Give an Opening Statement

Grayson initially contends that counsel relinquished the opportunity to present a penalty phase opening statement, which would have provided the jury a framework to consider his mental illnesses and evidentiary alignment of statutory and non-statutory mitigating factors. (*Id.* at 16-17). Therefore, "the jury was not properly 'focused on . . . the characteristics of [Petitioner]'" and they were not provided with a preview of the important information they would need to make a reasoned "life or death decision in a rational and individualized manner." (*Id.* at 16-17, *quoting Gregg v. Georgia*, 428 U.S. 153, 206 (1976); *Tyler v. Kemp*, 755 F.2d 741, 745 (11th Cir. 1975)). He argues the "failure to present [an opening] argument prejudiced [Petitioner] because there is a reasonable probability that, but for [their] unprofessional error, the result of the sentencing proceeding would have been different." (*Id.* at 17) (*quoting Lawhorn v. Allen*, 519 F. 3d 1272, 1297 (11th Cir. 2008)).

On collateral review, the Alabama Court of Criminal Appeals affirmed the trial court's rejection of this claim. (Tab. 57 at 5-7). The trial court's findings of fact and conclusions of law state:

> This Court notes that the State had already agreed to waive its opening argument if Grayson did likewise when this decision was made. Instead of telling the jury what they expected the evidence to show, defense counsel immediately began offering mitigating evidence to the jury.
>
> It was not unreasonable to waive opening arguments at the penalty phase in this case. First, opening arguments of counsel are not evidence, and thus their utility is limited to giving the jury a road map of what counsel expects the evidence will show. Here, where much of the mitigation evidence had already been offered and the remaining evidence to be offered by the defense needed no "roadmap" to guide the jurors, a reasonably competent attorney could have decided not to alienate the jurors by making the proceedings last longer. There would have been a stark contrast between the State not arguing and the defense arguing very simple points that the

Court had already covered in its jury instructions.  Competent counsel would rightfully be concerned about alienating jurors or losing their attention in such a situation.

Further, reasonably competent counsel could have decided that it was better to deprive the State of an opportunity to discuss the aggravating circumstances and the likely weaknesses of Grayson's potential mitigation evidence than to make opening statements.  By agreeing to waive opening statements, the State made no remarks to the jury and the defense was immediately able to move into the taking of evidence following the Court's instructions, so that the instructions were still fresh in the jury's mind as the witnesses offered mitigation on behalf of Grayson.  These types of decision are those that reasonably competent counsel make every day.  Under the facts of this case, Grayson's counsel could have taken either option, argue or waive argument, and still have been performing above the minimum standards required by the Constitution. . . . .  This claim is denied.

(Tab. 56 at 105-106).

Grayson does not dispute the state court's factual findings.  Much of the mitigation evidence had been presented already at the guilt phase of the trial and the jury had already been given penalty phase instructions.  Defense counsel did present mitigating evidence at the penalty phase[28] and made a significant closing argument addressing the framework[29] within which the jury was to make its sentencing decision. Under the circumstances of this case, counsel was not objectively deficient for waiving an opening argument.  Moreover, Grayson did not experience the prejudice found in *Lawhorn v. Allen,* 519 F. 3d 1272, 1295 (11th Cir. 2008), because in that case defense counsel did not make a penalty phase opening statement on an erroneous belief that his forbearance would preclude the prosecutor from making an opening statement.   As a result, the prosecutor made two closing arguments and the defendant made none.  *Id.* at 1296-97.  Finally, Lawhorn's counsel did

---

[28]  (Vol. 9, Tab. 24 at 930-79).

[29]  (Vol. 9, Tab. 27 at 1042-47 & Vol. 10 at 1048-67).

not present mitigating evidence or request the trial judge to spare Lawhorn's life at the sentencing hearing. *Id.*

For the foregoing reasons, Grayson cannot show that the state court's denial of this claim on the merits is contrary to or an unreasonable application of clearly established federal law. Accordingly, this claim is due to be denied.

### 2.      Failure to Object to the Timing of the Jury Instructions

Grayson alleges that counsel failed to object to the reading of jury instructions before the penalty phase of his trial because Alabama statutory law "required the trial court to instruct the jury after the defendant and the State presented evidence and arguments." (Doc. #36 at 17-18) (*citing Alabama Code* §13A-5-46(d) (1975)).  He argues that the timing of the instructions did not give the jury guidance as to the proper manner to consider penalty phase evidence, and thus violated his "right to due process and a fair sentencing hearing."  (*Id.*).

On collateral appeal, the Alabama Court of Criminal Appeals affirmed the Rule 32 court's decision[30] that the timing of the trial court's instruction was not improper because Alabama appellate law allowed the trial court "discretion to deviate from the *Alabama Rules of Criminal Procedure*," although the practice was not condoned.  (Tab. 56 at 106-107).  Moreover, after Grayson's case was tried, the Alabama legislature amended the rule to specifically allow the court to exercise such discretion.  *Id.*  Finally, the court held that Grayson could not establish prejudice because it "did offer to reinstruct the jury if questions arose."  (*Id.* at 107).

Grayson identifies no Supreme Court case showing that the state court's decision was contrary to or an unreasonable application of clearly established federal law or an unreasonable

---

[30]  (Tab. 57 at 5-7).

determination of the facts in light of the evidence before it.  His assertion that the jury was clueless as to how to consider the penalty phase evidence rings hollow, since the instructions were given before that phase began and, after the evidence was proffered, defense counsel presented a lengthy argument addressing its relevance to the instructions.  Finally, the court offered to re-instruct the jury if asked.  For these reasons, this claim is due to be denied.

### 3. Failure to Argue Uncontroverted Non-statutory Mitigating Evidence Concerning His Character and Background

Grayson alleges that counsel failed to explain and argue the mitigating nature of "what little background and character evidence" they did provide to the jury.  (Doc. #36 at 18).  He argues that if counsel had explained, contextualized, and asked the jury to consider "uncontroverted" and "significant" mitigating evidence "involving [his] unstable and dysfunctional childhood, abandonment by his father or the effect of his mother's death," as a non-statutory mitigating factor, as allowed by § 13A-5-52, Code of Alabama, the result of the penalty phase of his trial would have been different.  (*Id*. (*citing* R. 932-38, the testimony of Joyce Hufford, Grayson's paternal grandmother)).

When the allegations underlying this claim were raised in the Rule 32 petition, they were raised as to one aspect of the claim, while the remainder of the claim was dedicated to allegations that faulted trial counsel for not arguing Grayson's familial history of mental health issues and his difficulties in school as non-statutory mitigating evidence.  (Vol. 16 at 111-12).

On collateral appeal, the Alabama Court of Criminal Appeals summarily affirmed the trial court's denial of this claim on the merits.  (Tab. 57 at 5-7).  The trial court began its decision with the following declaration: "[t]his Court recalls the mitigating evidence offered at trial.  Defense

counsel performed competently in arguing to the jury that the mitigation outweighed the State's offered aggravating circumstances." (Tab. 56 at 132).  The remainder of the opinion shows that the Rule 32 court examined defense counsel's closing argument page by page.  (*Id.* at 132-34).  In so doing, the court found that counsel had highlighted statutory mitigating and non-statutory mitigating factors.  (*Id.*).

With regard to statutory mitigating factors, the court found that counsel highlighted Grayson's lack of a criminal history, Grayson's mental health evidence showing that he was "under the influence of an extreme mental or emotional disturbance and . . . lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law," as well as Grayson's age, his minimal participation in the crime as evidenced by his own statement, the fact that blood evidence was linked only to his co-defendants, and that he was not a bully in school.  (*Id.* at 132-33).  The Rule 32 court further found that counsel had:

> followed this up by discussing the difference between life without parole and the electric chair.  (R. 1060-1064)  During this time trial counsel attempted to capitalize on the emotions of the jurors, reminding that a death sentence would one day mean that Grayson would be executed because of their act.  Counsel then used the remainder of his argument to humanize his client while encouraging the jury to not let pictures and the horrible nature of the crime cancel out the existence of mitigation.  In conclusion, defense counsel again asked the jury not to execute a mentally ill person or a young child.  (R. 1068)

> The Court finds that this closing argument was reasonable under the circumstances.  Although defense counsel did not reiterate some of the minor non-statutory mitigating factors brought out during the trial, defense counsel did focus on the statutory mitigating factors that appeared to be Grayson's best chance to escape a death recommendation.  Accordingly, defense counsel's closing argument was reasonable and this claim is denied.

(Tab. 56 at 133-34).

While Grayson claims that there was significant background and character evidence which his counsel did not argue at the penalty phase, it is readily apparent that the Rule 32 judge disagreed as to its significance, particularly in light of what it interpreted as a reasonable decision to focus on those mitigators that offered Grayson the best chance to attain a sentence of life without parole. Examination of the basis of the Rule 32 court's decision in its totality shows that there was not any unreasonable application of federal law to the facts before it.  This claim is due to be denied.

### 4.   Failure to Present Evidence of Mental Illness

To the extent Grayson argues that counsel failed adequately to present evidence and argue that he (Grayson) was mentally ill due to a combined diagnosis of ADHD and bipolar disorder associated with developmental delay, such a claim is procedurally defaulted and due to be dismissed. (Doc. #36 at 19-20).  Grayson already attempted to make this argument as part of Claim Two A (*see infra*), and it is due to been dismissed because he is attempting to raise these arguments based on the facts underlying this claim for the first time in this habeas petition.

The rest of this sub-claim is a request by Grayson to incorporate sub-claim Two D into this claim.  (*Id.*).  Grayson's request is denied.  Sub-claim Two D will be discussed further below.

### 5.   Failure to Adequately Argue That Jury Could Consider Mercy

Grayson next alleges that counsel also failed to argue "directly" that he was entitled to mercy because of these mitigating factors.  (Doc. #36 at 18-19).  Grayson did not appeal the trial court's denial of this aspect of his claim on collateral appeal.  Accordingly, this claim is also procedurally defaulted.

6.      **Failure to Object When the State Urged the Jurors to Ignore the Statutory Mitigating Evidence of Age**

Grayson argues that counsel was ineffective for failing to object to improper prosecutorial questioning during the voir dire process "that allowed the State to excuse those who would have trouble imposing the death penalty on such a young defendant."  (Doc. #36 at 19) (*citing* Vol. 5, at 49-52, 156-57, 161-62, 166, 177-78, 180, 196, 242-43, 244, 246, 248, 251; Vol. 6, 246, 248, 251). He also accuses the prosecution of making improper argument during the penalty phase of trial in an effort to persuade the jury not to consider Grayson's age as a statutory mitigating factor.  *Id.* (*citing* Vol. 9 at 1027-28).

Both of these claims were rejected on the merits by the Rule 32 court.  (*See* Tab. 56 at 46-47, 136). On collateral appeal, the Alabama Court of Criminal Appeals affirmed the denial, holding:

> The trial court, in its order, specifically found that it reviewed the "questioning during voir dire and the prosecutor's closing argument at the penalty phase."  The trial court noted that the State reminded the jury that age was a factor they should consider.[31]  The trial court further found that, although the State argued that age was not a mitigating factor that was entitled to any great weight, such an

---

[31] The trial court wrote: "This Court disagrees with Grayson's characterization of the State's position as a call to ignore this factor.  In fact, the State specifically reminded the jury that age was a factor they should consider." (Tab. 56 at 47)(*citing* R. 1027). This factual finding is correct as the prosecutor's comments read:

> But lets talk about age because, remember, that was the very first thing we talked about . . .  The first thing I talked to you about when I stood up was about an eighty-two year old Congressman who was on trial in a case and how a juror in that case refused to convict based on his age and that was the wrong thing to do.

> The judge has given you age of the defendant as a factor that you're to consider. But in the same way that it was wrong for that juror to arbitrarily decide based totally on the age of the defendant he would not convict, in this case, it be wrong to say arbitrarily he was nineteen, I'm just not going to send him to the electric chair.  That's a factor the judge has told you you should consider.

(Vol. 9 at 1027).

argument was a "valid argument for the State to make."[32]  The trial court found that, because there was nothing wrong with this argument, defense counsel had no basis to object[33] and, therefore, could not be considered ineffective for failing to raise an issue that lacked merit.  *Coral v. State*, 900 So.2d 1274 (Ala. Crim. App.  2004).

(Tab. 57 at 12-13).

After careful examination, this court finds that the state court did not make an unreasonable determination of the facts in light of the evidence before it.  Neither is the state court's decision contrary to or an unreasonable application of clearly established federal law.  Accordingly, this claim is due to be denied.

     **c.**     **Trial Counsel Failed to Argue Motions Adequately or Failed to Present Necessary Motions Altogether (Doc. #36 at 20-23)**

     **1.**     **Counsel Inadequately Argued the Motion to Suppress**

Grayson contends that counsel ineffectively argued for suppression of his confession during various pre-trial intervals and during the trial itself because counsel did not allege and support a theory that the combination of Grayson's Bipolar Disorder and ingestion of Elavil rendered his statement involuntary.  (*Id.* at 20-21).  Respondent argues that Grayson cannot show that he is entitled to § 2254(d) relief from the state court's denial of the claim on the merits.  (Doc. #40 at 20).

On collateral appeal, the Alabama Court of Criminal Appeals made findings of fact and conclusions of law, which read:

---

[32]  The trial court then went on to hold: "Just as Grayson's petition illustrates his belief that this should have been a very important mitigating factor in the eyes of the jury, the State had every right to ask the jury to put the age of the defendant into perspective, considering all of the evidence."  (Tab. 56 at 47) (*citing* R. 1028).

[33]  Defense counsel also argued to the jury that Alabama required that it consider Grayson's age in determining punishment, stating "It says you must consider it.  And I'm sorry.  We just don't execute folks who are young, no prior criminal history and laboring under this mental disease or defect, not in exculpation but in mitigation."  (Vol. 10 at 1053).

The appellant argues that trial counsel was ineffective for failing to adequately litigate the motion to suppress his involuntary statement. In support of his motion, he contends that trial counsel should have argued facts showing that he had taken Elavil prior to giving a statement to law enforcement, the fact of his alleged bipolar disorder, and should have cross-examined a witness about the appellant's statement.

. . . . This court determined on direct appeal that these [underlying] arguments were without merit based on the record. . . . The appellant has failed to show deficient performance or prejudice.

Additionally, the trial court properly found that the appellant had failed to present any facts tending to show that he was prejudiced by trial counsel's failure to cross-examine Agent Flippo concerning his statement. The trial court specifically found that the appellant failed to offer anything in his petition to show how cross-examining Agent Flippo would have affected the outcome of the suppression motion. Rule 32.3, Ala. R. Crim. P.; *Boyd v. State*, *supra*.

(Tab. 57 at 11-12).

Grayson is not entitled to relief on this claim. Although Grayson has raised a substantive claim that the trial court erred when it allowed his statement to be admitted (*see* Claim Four E, *infra*) for the detailed reasons set out in that portion of the opinion, his substantive claim is without merit. (*Id.*) Moreover, the Alabama Court of Criminal Appeals' finding that Grayson failed to offer what beneficial information would have been revealed had counsel conducted an adequate cross-examination of Agent Flippo and how that information would have changed the outcome of the suppression hearing is entitled to deference. Grayson has failed to show that the state court's rejection of this claim is contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before it. Accordingly, this claim is due to be denied.

## 2.    Counsel Inadequately Argued a Motion for Continuance

Grayson contends that his trial counsel failed to argue and support adequately a motion to continue the trial for the purpose of providing Dr. Ackerson, the State's mental health expert, with more information concerning his family history. (Doc. #36 at 21-22).

When the claim was raised on collateral review, the Alabama Court of Criminal Appeals affirmed the trial court's summary dismissal of it. (Tab. 57 at 5-7). The Rule 32 court found that the trial record showed this claim was due to be denied on the merits. (Tab. 56 at 42). As the court wrote:

> The record of trial shows that Grayson's attorneys made a valiant attempt at obtaining a continuance, arguing many of the grounds pleaded in Grayson's petition. (R. 334-54) This Court, however, decided against granting the continuance, as Dr. Ackerson never stated in her report that evidence of a family history of bipolar disorder would change her opinion that, even if Grayson suffered from bipolar disorder, it did not render him legally insane during the commission of the murder. In fact, Grayson's own experts at trial testified consistent with Dr. Ackerson's report that Grayson knew the difference between right and wrong at the time of the murder.

> Dr. Goff, the defense expert who testified that there was a higher incidence of bipolar disorder in patients with a familial link to the disease, did not apparently alter his opinion that Grayson was sane at the time of the murder, based on his testimony at trial. Thus, the evidence that trial counsel wished to supply Dr. Ackerson prior to trial - the basis for seeking a continuance - would not have affected her ultimate opinion. Accordingly, the lack of a continuance did not prejudice Grayson.

> The arguments Grayson asserts. . . should have been argued by trial counsel would not have altered the Court's denial of the requested continuance. This fact strengthens the Court's conviction that Grayson suffered no prejudice in this regard.

> Finally, the Court notes that after failing to obtain the requested continuance, trial counsel capitalized on Dr. Ackerson's lack of information from Grayson's family members by cross-examining her on the issue during the penalty phase. Trial counsel were able to use this factor to argue to the jury that the defense experts had more information available to them, making their diagnosis and conclusions more reliable that [sic] Dr. Ackerson's. This ability to take adverse rulings from this Court

and use them for whatever advantage they could gain demonstrates the high level of advocacy provided to Grayson by his attorneys.

Based on the foregoing, this claim is denied.

(Tab. 56 at 42-43).

Grayson's claim is without merit. This court has examined those portions of the trial record referred to by the Rule 32 court and finds that its characterization of defense counsel's effort to seek a continuance as valiant is well supported. The fact that the Rule 32 judge, who was also the trial judge, would not have granted the continuance–even with the benefit of his post-conviction hindsight–defeats this claim. Also, the trial court was correct in holding that trial counsel used the information to cross-examine Ackerson vigorously and effectively.[34]

For the foregoing reasons, Grayson cannot show that his counsel was ineffective for failing to present a stronger argument for a continuance. The motion was not going to be granted, as the trial judge himself stated. Neither was the petitioner prejudiced, because counsel was able to challenge the state's expert with the information during a vigorous examination before the jury. Accordingly, this claim is due to be denied.

### 3.    Inadequate Argument of Under-Representation in Grand Jury

This claim, which is identical to its Rule 32 counterpart, reads in its entirety, "[c]ounsel failed to argue adequately a motion to dismiss for systemic under-representation of cognizable groups in the composition of the grand jury. By failing to argue the motion adequately, counsel's performance

---

[34] The trial court indicated that, if Grayson's information had been given to Ackerson, it would not have changed her opinion, for the same reason it did not change Dr. Goff's opinion. While that may or may not be the case, the key point here is that Grayson had a full and fair opportunity to question Ackerson about the information in question.

was deficient, and prejudiced Petitioner because he was indicted by grand jury that did not represent all cognizable groups." (*See* Vol. 15, Tab. 42 at 34 and Doc. #36 at 23).

This claim is so vague, general, and conclusory that it is due to be dismissed for failing to comply with the Federal Rules Governing Habeas Corpus proceedings. Alternatively, it is procedurally defaulted because the Rule 32 court summarily dismissed it for lack of specificity pursuant to Rule 32.3 and 32.6(b), and its summary dismissal decision was affirmed by the Alabama Court of Criminal Appeals.   (Tab. 56 at 43-45 and Tab. 57 at 7 respectively).

For the foregoing reasons, this claim is due to be dismissed.

### 4.    Motion to Limit Evidence of Post-Mortem Mutilation

Grayson's counsel argued in a pre-trial motion that evidence of the victim's post-mortem mutilation was inadmissible because it was unduly prejudicial. However, Grayson asserts that counsel's argument to the trial court was inadequate (Doc. #36 at 22) because counsel failed to inform the court that "the jury was sure to use this evidence" to find the existence of the "heinous, atrocious, or cruel" (HAC) aggravating factor, a factor that applies only to violence that was committed while the victim was alive. (*Id.*) Grayson contends that as no post-mortem evidence was relevant to this factor, "[b]y failing to object at trial, and failing to make the correct argument, counsel's representation was ineffective." (*Id.*).

The Rule 32 court's dismissal of this claim, as affirmed by the Alabama Court of Criminal Appeals, states:

> As noted . . . above, this evidence was admissible.  Thus, trial counsel were not ineffective in preventing its admission.
>
> As for prejudice, Grayson argues prejudice because the failure to succeed in having this (admissible) evidence excluded, "there can be no doubt that, once the jury

heard this evidence, it was used in support of that aggravating circumstance." (Pet. at 67, para. 111)  To the contrary, the State argued to the jury, "But what we need to focus on in looking at this aggravating circumstance is what happened before death." (R. 1037)  Defense counsel followed up the State's argument b[y] reiterating the requirement that the jury consider only the wounds inflicted prior to the death of the victim.  (R. 1052-57)  Finally, this court's sentencing order reflects that the heinous, atrocious and cruel aggravating circumstance existed without any evidence of post-mortem mutilation and injuries. (Supp. C. 16-17[35]).  Accordingly, Grayson cannot establish prejudice under *Strickland*, as to this claim.  Thus, this claim is denied.

(Tab. 56 at 76).

Grayson does not contend that the state court made an unreasonable determination of the facts in light of the evidence before it.  Furthermore, since he does not dispute the state court's factual findings and those findings clearly refute the allegations in his petition, Grayson cannot show that the state court's rejection of this claim was contrary to or an unreasonable application of clearly established federal law.  Accordingly, this claim is due to be denied.

### 5.      Failure to File a Motion for Change of Venue

In his Rule 32 petition, which as it relates to this claim is substantially similar[36] to his habeas claim, Grayson alleged that counsel:

were ineffective for failing to file a motion for change of venue, despite considerable prejudicial publicity surrounding the case.  The prejudicial effect of this is apparent: thirty-seven of the fifty-six venire members - fully sixty-six percent of the potential jurors - had heard about the case, some had recently seen prejudicial articles about the case and some could recall specific adverse facts about the case that were inadmissible at trial.  Further, of the fifty-six potential jurors, nine testified that they

---

[35] *See* Vol. 22, Tab. 52 for a copy of the sentencing order.

[36] In the last sentence of this claim as presented in the habeas petition, Grayson adds the conclusory assertion, "Even though it was apparent the venire had been tainted by the extensive pretrial publicity, counsel failed to follow up with any jurors as to the specifics of what they had read and whether they could set it aside.  *See Jordan v. Lippman*, 763 F.2d 1265, 1278 (11th Cir. 1985)."  (Doc. #36 at 22-23).  Such a general allegation is due to be dismissed because it is insufficient to satisfy federal pleading requirements. Moreover, it is procedurally defaulted because it was not presented to the state court.

were aware of the verdicts in the trials of Mr. Grayson's co-defendants. *See* (R. 105, 136, 147, 170, 182, 187, 193, 210, 228.)  Had such a motion been made, the trial court would have been obligated to grant it under controlling Alabama law.  (*See infra*, ¶¶ 223, 224,[37] [referring to the substantive claim] incorporated here by reference.)  By failing to move for a change of venue, trial counsel's performance was deficient and prejudiced Mr. Grayson because he was convicted and sentenced to death in a county where he could not get a fair trial.

(Vol. 16 at 70).  The Rule 32 court examined these allegations and rejected them on the merits, making the following findings of fact and conclusions of law:

As the Alabama Court of Criminal Appeals has noted:

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.  This is particularly true in criminal cases.  To hold that the mere existence of any preconceived notion as to the guilt or innocence of the accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient that the juror can lay aside his impression or opinion and render a verdict based on the evidence presented.

*Primm v. State*, 475 So. 2d 1149, 1154 (Ala. Crim. App. 1985) (*quoting*, *Irvin v. Dowd*, 366 U.S. 717 (1961)).  It is well-settled that widespread publicity is not sufficient to require a change of venue.  *Mullins v. State*, 545 So. 2d 205 (Ala. Crim. App. 1989).  Also, the jury does not have to be ignorant of the case, but:

> The relevant question is not whether the community remembered the case, but whether the jurors at [the accused's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant.

*Fortenberry v. State*, 545 So. 2d 129, 141 (Ala. Crim. App. 1988).  Based on the law as set forth by the Court of Criminal Appeals, this Court concludes that Grayson's assertion that the media extensively covered this crime is not dispositive in this collateral attack, and would not have been dispositive at Petitioner's trial.  *See*

---

[37] Referring to the substantive claim that Grayson could not receive a fair trial in Jefferson County because of pretrial publicity, which now appears as Claim Seven in the habeas petition.

*McWhorter v. State*, 781 So.2d 257, 299 (Ala. Crim. App. 1999) (*citing*, *Beddow v. State*, 96 So. 2d 175 (1956)) (Newspaper articles, without more, are not evidence on a motion for change of venue; their effect must be shown).

There are no facts pleaded in this petition showing the effect of this media coverage on the jury.  The record made, all Petitioner had to do was go through the record of voir dire and make allegations concerning any jurors affected by pretrial publicity.  Instead, Grayson plays a numbers game without establishing from the voir dire that the 12 jurors who sat on his case were impartial  [sic] as a result of media coverage.

Generally, newspaper articles that objectively report the commission of a crime, do not carry inflammatory headlines, and do not editorialize on the facts in a manner to inflame the community or create an atmosphere or prejudice are an insufficient basis on which to grant a motion for change of venue.  *Gray v. State*, 319 So.2d 750 (Ala. Crim. App. 1975).  Instead, the defendant must prove to the satisfaction of the trial court that the community was so saturated by the publicity that the defendant cannot receive a fair trial.

Again, Grayson's short one-paragraph claim has failed to create a material issue of fact, as he does not allege that the newspaper articles created an atmosphere of prejudice.  Grayson's petition is silent as to whether the alleged reports engaged in improper editorializing, failed to objectively report the facts, or carried inflammatory headlines.

Based on the foregoing, Grayson has failed to establish a material issue of law or fact.  Thus, this claim is due to be dismissed pursuant to Rule 32.7(d).  In addition, this claim is properly dismissed pursuant to Rule 32.6(b), as Grayson failed to demonstrate that the voir dire conducted by this Court served as an insufficient safeguard.

(Tab. 56 at 82-84).

On collateral appeal, the Alabama Court of Criminal Appeals' opinion affirmed the trial

court's procedural dismissal of this claim, holding:

Although the appellant specifically identified the omissions on the part of his trial counsel that he believed constituted deficient performance, he failed to include in his petition any specific facts tending to indicate how those omissions prejudiced his defense.  The record indicates, that the trial court, accepting all of the allegations as true, founds [sic] that the appellant had not provided the "full disclosure of the factual basis" of his claims necessary to satisfy the specificity requirements of Rule

74

> 32.6(b), Ala. R. Crim. P., and the pleading requirements of Rule 32.3, Ala. R. Crim.
> P.  *See Boyd v. State*, 746 So. 2d 364, 406 (Ala. Crim. App. 1999).  In addition to
> finding that the claims were not pleaded with specificity, the trial court found that
> they were procedurally precluded from review pursuant to Rule 32.2(a)(3), and (5),
> Ala. R. Crim. P., because they could have been, but were not, raised at trial or on
> direct appeal.  The trial court was correct in dismissing the claims.

(Tab. 57 at 14-15).

This claim is procedurally defaulted because the state court dismissed it based upon adequate

and independent state procedural rules.  Furthermore, even if the state court's opinion were to be

considered so intertwined with federal law such that it should be considered a decision on the merits,

Grayson has not protested the court's factual findings, much less set out allegations that overcome

the deference of correctness owed to those factual findings.  Neither has he shown that the state

court's reliance on *Irvin* is contrary to or an unreasonable application of clearly established federal

law.  For these reasons, this claim is due to be dismissed or, in the alternative, denied.

### 6. Failure to File a Motion for Jury Instructions That Would Have Presented Grayson with Two Mental Health Defenses

This claim, which is identical to its Rule 32 predecessor, reads in its entirety: "[c]ounsel were

ineffective for failing to request jury instructions to allow the jury to consider Petitioner's two

separate mental health defenses at the guilt phase of trial.  Counsel's performance was deficient and

prejudiced Petitioner by allowing the jury that convicted and sentenced him to death to do so without

appropriate instructions on how to consider his two separate and distinct mental health defenses."

(*See* Vol. 15, Tab. 42 at 67) and (Doc. #36 at 23).

First, this claim is vague, general, and conclusory; therefore, it is due to be dismissed for

failure to comply with the Federal Rules Governing Habeas Corpus proceedings. Alternatively, it

is procedurally defaulted because the Rule 32 court summarily dismissed it for lack of specificity

pursuant to Rule 32.3 and 32.6(b), and that decision was affirmed by the Alabama Court of Criminal Appeals. (Tab. 56 at 80-81 and Tab. 57 at 7 respectively). Contrary to Grayson's contention (Doc. #44 at 26-32), and as more fully explained above, the state court's decision was certainly not an arbitrary application of Alabama Rule of Criminal Procedure 32.3 and 32.6, nor did it improperly intertwine substantive federal law. For the foregoing reasons, this claim is due to be dismissed.

> **7.    Failure to Move for a Jury Instruction Regarding the Heinous, Atrocious or Cruel Aggravating Factor**

This claims reads in its entirety, "[c]ounsel were ineffective for failing to request a jury instruction telling the jurors that their decision whether the crime had been especially heinous, atrocious, or cruel, had to be based on conduct that occurred before the victim's death. *See Bradley*, 494 So. 2d at 770." (Doc. #36 at 23). This claim is procedurally defaulted because Grayson failed to appeal the Rule 32 court's rejection of the claim on collateral appeal.[38]

> **8.    Failure to Move for a Competency Hearing, and Hearings on Motion for Preliminary Hearing and Proposed Jury Instructions**

Grayson contends his counsel should have requested a competency hearing, filed a motion for a preliminary hearing, and a motion for proposed jury instructions. (Doc. #36 at 23). The latter two claims are procedurally defaulted because they were properly dismissed by Rule 32 court in accordance with adequate and independent state procedural rules, Alabama Rule of Criminal Procedure 32.3 and 32.6(b). The Alabama Court of Criminal Appeals affirmed that summary dismissal on collateral appeal. (Tab. 56 at 80-81, 83 and Tab. 57 at 7, respectively).

---

[38] This claim is also without merit. For several reasons the Rule 32 court found Grayson could not establish constitutional ineffectiveness. Among those were the court's findings that the jury was given an instruction regarding the heinous, atrocious, or cruel aggravating factor—"the State conceded that this factor had to be based on wounds inflicted prior to the victim's death"—and that the HAC factor in Grayson's case existed "without considering the post-mortem injuries inflicted upon the victim." (Tab. 56 at 81).

As for counsel's purported ineffectiveness for failing to move for a competency hearing, the state court found there were "no facts pleaded that counsel would establish that trial counsel would have had reason to request such a hearing." (Tab. 56 at 83). Grayson's habeas petition suffers from the same deficiency. (Doc. #36 at 23). Therefore, Grayson cannot show that he is entitled to habeas relief, and this claim is due to be denied.

> ### d. Trial Counsel's Inadequate Preparation Rendered Them Ineffective in Their Presentation of Petitioner's Mental Health Defense (Doc. #36 at 23-32)

> #### 1. Ineffective Assistance at the Guilt Phase of Trial and

> #### 2. Ineffective Assistance at the Penalty Phase

Grayson alleges that his trial counsel were ineffective in their investigation and presentation of a mental health defense at the guilt and penalty phases of his trial. (*Id.* at 24-302). This eight-page claim can be divided into three categorical complaints concerning counsel's performance: (1) counsel failed to "uncover evidence to support an insanity defense," (2) counsel utilized a defense strategy that "improperly combined the defenses of voluntary intoxication and insanity," and (3) counsel failed adequately to examine lay and experts witnesses for the defense. (*Id.*). Ultimately, Grayson's claims that trial counsel failed to effectively present a defense based on his bi-polar disorder is the common denominator in all three complaints.

In a lengthy opinion on collateral review, the Rule 32 court summarily dismissed this claim on the merits. (Tab. 56 at 84-121). The Alabama Court of Criminal Appeals affirmed the trial court's decision, and made the following findings of fact and conclusions of law:

> The appellant argues that trial counsel was ineffective due to its inadequate presentation of a mental health defense. Specifically, he argues that trial counsel misled the jury by arguing a "non-existent diminished capacity defense" and failed

to present sufficiently a defense that his voluntary intoxication negated the intent required for capital murder.

The trial court, in its order, found that the appellant incorrectly opined that voluntary intoxication alone was a superior defense to the intertwined mental health and voluntary intoxication defense offered at trial.  The trial court found that the appellant argued this position without pleading facts to support such a claim.  Rule 32.6(b), Ala. R. Crim. P.; *Boyd v. State*, *supra*.  Additionally, the trial court specifically stated that "[a]lthough neither of these defenses was perfect, the record of trial indicates that it was all defense counsel had to offer . . . Grayson obviously had a very good recall of what occurred during the murder and the hours following it, destroying his new belief that voluntary intoxication alone would have been a more reasonable defense."

. . .

The appellant argues that trial counsel was ineffective due to its inadequate examination of defense witnesses regarding the appellant's family history of mental illness.

In its order, the trial court stated that the appellant did not suffer prejudice from defense counsel's failure to present a full family history of mental illness, because expert testimony was presented that the appellant suffered from bipolar disorder.  Additionally, trial counsel presented evidence that bipolar disorder was in the appellant's family, and that there was a strong genetic link within families.  Rule 703 Ala. R. Evid.  Because the appellant suffered no prejudice on the facts pleaded, the trial court correctly dismissed his ineffective assistance claim.  See *Williams v. State*, 783 So. 2d 108, 119 (Ala. Crim. App. 2000) ("Prejudice cannot merely be alleged; it must be affirmatively approved.")

. . .

The appellant argues that trial counsel was ineffective due to its inadequate cross-examination of one the State's experts, Dr. Ackerson.

The trial court, in its order, specifically found that it was of the opinion that:

"no reasonable person could read this cross-examination and find it the product of ineffective assistance of counsel.  The cross-examination of Dr. Ackerson fit directly into the defense argument that the State wanted to keep the jury from learning all of the facts and that Dr. Ackerson did not inform herself of all facts before making a diagnosis."

The trial court further found that Dr. Ackerson was provided with a complete family history of mental illness by defense counsel during an effective cross-examination. The trial court found that the facts pleaded by the appellant did not establish ineffective assistance of counsel and, therefore, denied the claim.  Rule 32.2, Ala. R. Crim. P.; *Boyd v. State*, *supra*.

(Tab. 57 at 12-14).

Although Grayson attacks the performance of his counsel at the guilt phase of trial, he has not established that the state court's rejection of this claim on collateral review is contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before it.  Grayson devotes many pages of his petition stating legal arguments that he asserts should have been made but were not, or which were made but should not have been made.  (*Id.*).  He also complains that if expert witnesses and lay witnesses had been questioned differently, there would have been a different result.  (*Id.*).

The court will not set out every single assertion by Grayson.  Neither will it set out the complete state court opinion that thoughtfully and in detail rejects Grayson's litany of errors.[39]  The appellate court's opinion adequately speaks to the essence and correctness of the trial court's order, which is that counsel had to work with the unfortunate facts presented to them. Moreover, counsel fit those facts to the defense's legal theories as well as reasonably could be expected.  Indeed, if the jury had believed Grayson's version of the facts, it could have rendered a verdict of not guilty.

Furthermore, Grayson has not shown that if additional information had been afforded the expert witnesses or if different questions had been asked of them that their opinions would have been more favorable to Grayson.  A review of the trial record and the Rule 32 court's opinion satisfies this

---

[39] The court incorporates by reference, the pertinent portion of the state court opinion, which is located at Vol. 22. Tab 56, at pages 80-117.  The clerk is DIRECTED to make a copy of pages 80 through 117 of this opinion, mark it as Court's Exhibit A, and enter it into the court record as such.

court that defense counsel elicited the most favorable expert testimony for Grayson, and that counsel vigorously fought the State's attempts to discredit Grayson's experts.  Also, defense counsel intensely examined Dr. Ackerson, the State's expert. The record shows that trial counsel adequately and clearly presented the evidence that was available and that supported Petitioner's defenses.

Finally, Grayson complains that counsel did not question the lay witnesses and his own expert witnesses in sufficient detail regarding the effects of his bipolar disorder.  However, virtually every single piece of evidence Grayson alleges should have been elicited was in fact presented.

The factual findings made by the trial court are entitled to the presumption of correctness. Grayson cannot show that the state court's rejection of this claim is contrary to or an unreasonable application of clearly established law.  Thus, this claim is due to be denied.

> **e.    Trial Counsel Were Ineffective for Making Only Perfunctory Arguments and Failing to Present Relevant Evidence to the Court During Petitioner's Sentencing (Doc. #36 at 33)**

Grayson asserts that trial counsel were ineffective for summarizing "the evidence presented during trial" and for failing to place additional mitigating evidence before the trial judge at sentencing hearing. (Doc. #36 at 33).  He contends that counsel "should have presented the testimonies of Roper, Wiley, and Hufford, and experts to discuss Petitioner's mental illnesses, drug use and painful childhood and how these factors impacted him." *Id.*  Finally, he argues that counsel should have objected to the trial court's "failure to consider and find several mitigating circumstances." (*Id.*).

This claim is wholly without merit.  The trial judge at Grayson's sentencing is the same judge who presided over his post-conviction proceedings. The sentencing order and post-conviction opinion make clear that the judge considered the mitigating evidence presented by Grayson.  The

judge even assumed that Grayson's post-conviction presentation of additional mitigating evidence

concerning his background and childhood were true.  The trial judge simply found that Grayson's

evidence was not significant or mitigating.  This claim is therefore due to be denied.

> ### f.    Trial Counsel Were Ineffective for Failing to Make Appropriate Objections (Doc. #36 at 33-36)

> #### 1.    Failure to Object to the Trial Court's Complicity Instruction

Grayson alleges that counsel were ineffective for failing to object when

> "[t]he trial court repeatedly and erroneously instructed the jury that it could convict
> Petitioner of capital murder if it found that he 'or someone in which he was acting
> with complicity' intended to kill the victim" because "[u]nder the instruction given
> the jury could have returned a finding of guilty after finding only that one of
> Petitioner's co-defendants possessed the requisite intent to kill."  *Id.* at 33. (citing
> Vol. 9, R. 851, 853, 859 862, 863 and *Enmund v. Florida*, 458 U.S. 782 (1982)[40]).

The trial court's denial of this claim, as affirmed by the Alabama Court of Criminal Appeals on

collateral appeal, states:

> Grayson's argument is without merit. Reading this Court's instructions as a
> whole, it is clear the jury was properly instructed in this regard. On page 848, this
> Court instructed the jury that "the law provides that a defendant is responsible for the
> criminal acts of another person, if, with the intent to promote or assist the
> commission of that offense, he aids or abets such other person in committing that
> offense."  The Court went on to state:

>> The words aid or abet includes all assistance rendered by acts or
>> words of encouragement or support or presence, either actual or
>> constructive, with the intent to render assistance should it become
>> necessary.

>> The mere presence of a defendant who intends to assist with the
>> criminal act should it become necessary is aiding and abetting if and

---

[40]   To the extent Grayson has actually cited any Supreme Court cases in support of his nine sub-claims underlying Claim Two, Section F, he provides no explanation as to how these decisions apply as to any particular sub-claim.

only if the one who commits the act knows of the defendant's presence and his intent to assist in that offense.

. . . There need not be a plan contemplated and agreed upon in advance of the offense, however there must be a specific intent to promote, aid or assist the principal in the commission of that offense. And of course the state has the burden of proving beyond a reasonable doubt he do so.

The law also says that the mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that a defendant aided and abetted the crime. The state must prove beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator.

. . . The state must prove that he had a particularized intent to kill Ms. Deblieux.

(R. 848-50) Because this Court instructions [sic] were accurate and correct, there was no valid basis for trial counsel to lodge an objection. As such, this Court does not find that trial counsel were ineffective in this regard. *See Card v. Dugger*, 911 F. 2d 1494, 1520 (11th Cir. 1990)("Counsel cannot be labeled ineffective for failing to raise issues which have no merit.").

(Tab. 56 at 48-49).

Although the claim now before this court is whether trial counsel were ineffective for failing to raise objections to the court's instructions at trial, the Rule 32 court's opinion also dealt with the propriety of the instruction now claimed to be objectionable. In resolving that aspect of the claim, the determinations made by the state court are entitled to deference under § 2254(d), even with respect to the now-pending ineffective assistance claims, unless they are clearly contrary to, or an unreasonable application of, Supreme Court precedent. *See Williams v. Taylor*, 529 U.S. 362, 404 (2000); *Brown v. Payton*, 544 U.S. 133 (2005); *Miller-El v. Dretke*, 545 U.S. 231 (2005); *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001). "[A] state court's factual determinations are presumed correct unless rebutted by clear and convincing evidence." *McNair v. Campbell*, 416 F.3d

1291, 1297 (11th Cir. 2005) (citing 28 U.S.C. § 2254(e)(1)), *cert. denied*, 126 S. Ct. 1828 (2006).

This standard of review is strict, and federal courts are required to give "greater deference to the

determinations made by state courts than they were required to under the previous law." *Verser v.*

*Nelson*, 980 F. Supp. 280, 284 (N.D. Ill. 1997) (*quoting Spreitzer v. Peters*, 114 F.3d 1435, 1441 (7th

Cir. 1997)).

Grayson cannot meet this standard. Other than pointing to one small aspect of the complicity

instruction at issue, Grayson has failed specifically to express why the instruction as a whole was

constitutionally flawed. It is not this court's duty to comb through pages of blanket citations to the

trial record in an attempt to discern a petitioner's argument. *See Resolution Trust v. Dunmar Corp*.,

43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden on the district court to distill every potential

argument that could be made based upon the materials before it on summary judgment."). Thus,

based on his failure to articulate (much less demonstrate) why the jury instruction was a violation

of his rights, Grayson is not entitled to habeas relief from the state court's determination that the

complicity instruction was proper.

Moreover, in light of the overwhelming evidence against Grayson at the guilt phase of trial,

even if his isolated complaint about one part of the court's instruction had some merit, and even if

counsel should have objected to it, there is no reasonable probability that the jury convicted him of

the capital offense because they believed only one of the co-defendants possessed the intent to kill.

As the Supreme Court has said, in the context of jury instructions:

> [t]he only question for [the habeas court] is "whether the ailing instruction by itself
> so infected the entire trial that the resulting conviction violates due process." *Cupp*
> *v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400-01, 38 L. Ed. 2d 368 (1973); *see*
> *also Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736-37, 52 L. Ed. 2d
> 203 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40

L. Ed. 2d 431 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some [constitutional right]'"). It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. *Cupp v. Naughten*, *supra*, 414 U.S., at 147, 94 S.Ct., at 400-01. In addition, in reviewing an ambiguous instruction such as the one at issue here, we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L. Ed. 2d 316 (1990).[FN4] And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 674, 107 L. Ed. 2d 708 (1990). "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Ibid*.

> FN 4  In *Boyde*, . . . we made it a point to settle on a single standard of review for jury instructions-the "reasonable likelihood" standard-after considering the many different phrasings that had previously been used by this Court.  494 U.S., at 379-380, 110 S.Ct., at 1197-1198 (considering and rejecting standards that required examination of either what a reasonable juror "could" have done or "would" have done).  So that we may once again speak with one voice on this issue, we now . . . reaffirm the standard set out in *Boyde*.

*Estelle v. McGuire*, 502 U.S. 62, 73 (1991); *see also*, *Jones v. U.S.* 527 U.S. 373, 389-390 (1999).

As Grayson has failed to show the instruction given was constitutionally suspect, much less so faulty that the jury might have applied it in such a way that he was unjustly convicted of a capital offense, he also has failed to show that counsel was ineffective for failing to object to the instruction. Grayson has not shown that his counsel made an error that deprived him of a fair trial when they failed to object to the trial court's complicity instruction.

The state court's adjudication of this claim is neither contrary to nor an unreasonable application of clearly established federal law, or an unreasonable determination the facts in light of the evidence before it.  Accordingly, this claim is due to be denied.

### 2. Failure to Object to Prosecutor's Improper Comment on His Decision Not to Testify

Next, Grayson contends the State violated his constitutional right to remain silent when it acknowledged that Grayson had informed Agent Flippo that he did not know why he committed the crime, but then nonetheless proceeded to argue, without objection from his counsel, "what Petitioner did not say to Flippo: 'he didn't say I was so drunk I didn't know what I was doing. So he wasn't claiming manslaughter. Notice that he didn't say I had some kind of mental disease or defect and I didn't know was I was doing. And he didn't say I didn't mean to kill her it was an accident.'" (Doc. #36 at 33-34) (*citing Griffin v. California*, 380 U.S. 609 (1965) (citation omitted)). Grayson argues that his counsel were ineffective for failing to object to this line of argument. (*Id.* at 33).

On collateral review, the Rule 32 court denied this claim because it found the prosecutor's argument was neither a direct nor indirect comment on Grayson's failure to testify. (Tab. 56 at 49-50) (citations and quotations omitted). "Instead, the comment was a permissible argument concerning inferences that could be made from the defendant's responses to questions during his statement to law enforcement officers. The State did not ask the jury to consider why Grayson did not offer testimony on his behalf at trial." (*Id.* at 49). In short, the state court found that the prosecutor's comments were proper because they were reasonable inferences drawn from the evidence. (*Id.* at 49-50). The Alabama Court of Criminal Appeals affirmed the trial court's decision. (Tab. 57 at 7).

Here, Grayson cannot show that the state court's rejection of this claim entitles him to habeas relief. The Eleventh Circuit described the proper manner in which to evaluate a *Griffin* claim:

> The Fifth Amendment prohibits a prosecutor from commenting directly or indirectly on a defendant's failure to testify.

85

> A prosecutor's statement violates the defendant's right to remain silent if either (1) the statement was manifestly intended to be a comment on the defendant's failure to testify; or (2) the statement was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify. The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury necessarily would have done so. The defendant bears the burden of establishing the existence of one of the two criteria. The comment must be examined in context, in order to evaluate the prosecutor's motive and to discern the impact of the statement. . . .

*United States v. Knowles*, 66 F.3d 1146 (11th Cir.1995) (citations, quotations, and footnotes omitted). *See also United States v. LeQuire*, 943 F.2d 1554, 1565 (11th Cir.1991) (same); *Solomon v. Kemp*, 735 F.2d 395, 401 (11th Cir.1984).

> In applying *Griffin*, we have strictly enforced the requirement that a defendant show that the allegedly offensive comment was either manifestly intended to be a comment on the defendant's silence or that the comment naturally and necessarily related to the defendant's silence.

*Isaacs v. Head*, 300 F.3d 1232, 1270 (11th Cir. 2002).

After examining the state court's opinion and the actual prosecutorial comment that is the subject of this claim, the court concludes that the state court's opinion is due to be accorded deference. The prosecutor was commenting on factual inferences that could be drawn from the substance of Grayson's statement to the police, and was in no way commenting on Grayson's constitutional right to remain silent. For these reasons, this claim is due to be denied.

### 3.   Failure to Object to the State's Explanation of Reasonable Doubt During Voir Dire and the Trial Court's Reasonable Doubt Instruction

This claim in its entirety asserts: "Counsel were ineffective for failing to object to the State's definition of reasonable doubt during voir dire (Vol. 3, R. 67) and to the court's reasonable doubt instruction. (Vol. 9, R. 867-68)" because both "lowered the State's burden of proof." (Doc. #36 at

34) (*citing Cage v. Louisiana*, 498 U.S. 39 (1990); *In re Winship*, 397 U.S. 358, 364 (1970)).  This

claim is due to be dismissed for failure to comport with the specificity requirements of the Federal

Rules Governing Habeas Proceedings.  Alternatively, this claim is devoid of any factual or legal

reasoning supporting Grayson's claim that he is entitled to § 2254(d) relief from the state court's

rejection of the claim on the merits.[41]  Therefore, this claim is due to be dismissed, or, in the

alternative, denied.

### 4.    Failure to Object to Inflammatory Testimony by the Pathologist, Dr. Embry

Grayson alleges that counsel failed to object when Dr. Embry stated that "this was the worst

case he had seen in more than 4000 autopsies"[42] and listed the victim's post-mortem wounds in

---

[41]  In denying this claim during post-conviction proceedings, the Rule 32 court held:

> As for the State's questioning during voir dire on the issue of reasonable doubt, the State asked the jurors about a definition of reasonable doubt that "I expect the Judge will tell you."  (R. 67)  The State did not assert to be instructing the jury on the law. Furthermore, there was nothing misleading about the State's questioning on the issue of reasonable doubt.  (R. 67-68)  Finally, this Court correctly instructed the jurors that what the attorneys said to them was not evidence and that this Court would be the party that instructed them on the principles of law they were to apply in this case.  (R. 271-72)

> As for this Court's jury instructions, this Court determines that the instruction given were appropriate and clear.  The instructions did not violate *Cage v. Louisiana* or *In re Winship*.  This Court would respond in a more detailed manner, but the second amended petition lacks any argument or facts that support the Petitioner's conclusion that the Court's instruction effectively lowered the State's burden of proof.

> There was not error in regard to either of the issues raised by Grayson in this sub-claim.  As such, there was no valid basis for counsel to lodge an objection.  This Court, then, denied Grayson's claim.  *See Card*, 911 F.2d at 1520 ("Counsel cannot be labeled ineffective for failing to raise issues which have no merit.").

(Tab. 56 at 50-51).

[42]  Actually, the prosecutor asked Dr. Embry if he had ever seen injury to the tongue in the approximately 4000 autopsies he had performed, to which Dr. Embry responded, "I've seen it occasionally, yes, sir."  (Vol. 6 at 353-54).  The prosecutor then asked if Embry had "seen it to this degree of severity,"

detail. (Doc. #36 at 34) (*citing* Vol. [6] at 354; 356-64).  Grayson asserts that Embry's inflammatory testimony and "impermissible personal opinion" were then "highlighted" by the State during its closing arguments at both phases of the trial.  (*Id.*) (*citing* Vol. 8 at 763; Vol. 9 at 1038).

On collateral review, the Rule 32 court rejected Grayson's argument:

> Far from being irrelevant, this testimony was very relevant.  First, it allowed the jury to distinguish between the wounds that contributed to her cause of death and those wounds that did not contribute to the victim's death.  Second, the details of the extensive nature of these wounds, inflicted several hours after the victim's death, allowed the State to establish that Grayson was a willing participant in the crime, and not simply someone who was in the wrong place at the wrong time.  The very fact that Grayson went back to the site where the victim's body had been dumped and was present while the victim's body was mutilated served to strengthen the State's argument that Grayson was very involved in the group of people who committed this terrible crime.  Thus, the evidence was relevant and admissible.  Nothing pleaded in the petition, if true, alters this fact.

> . . . Grayson asserts [ineffective assistance of counsel] based on trial counsel's failure to object to Dr. Embry's testimony that the damage and hemorrhaging to the victim's tongue was the worst he had ever seen in more than 4,000 autopsies.  This evidence was admissible, thus trial counsel had no valid basis for lodging an objection.  The witness's statement was made in support of his testimony that the victim was still alive while the wounds were inflicted, based on the nature of the wounds.  It was also admissible as evidence supporting an inference that the nature and severity of the wounds, and the viciousness of the attack that must have caused them, demonstrated that the attack was intentional.

> Because an objection to this testimony would have been overruled, Grayson cannot establish prejudice under *Strickland*.  Because counsel had no basis for lodging an objection, the Court does not find that they were ineffective for failing to do so.  *See Card*, 911 F.2d at 1520 ("Counsel cannot be labeled ineffective for failing to raise issues that have no merit.").

(Tab. 56 at 52-53).

Contrary to Grayson's suggestion, the manner in which the questions at issue were asked and answered by Dr. Embry does not indicate that he was expressing an emotional opinion that the

---

and Embry answered, "No, sir."  (*Id.* at 354).

injuries to the victim were the worst he had ever seen. Embry was asked about the nature and severity of the wounds in the context of his previous professional medical experience. As more than adequately expressed by the state court, this information was highly relevant to the jury's determination of both ante-mortem and post-mortem injuries. The severity of the injuries was relevant also to show intent behind the attack, and that Grayson was a willing participant.

The state court's rejection of this claim is neither contrary to nor an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence before it. Accordingly, this claim is due to be denied.

### 5. Failure to Object to Admission of Evidence Not Linked to Grayson

Grayson contends that counsel's failure to object to certain testimony and physical evidence caused him to be "convicted in part on irrelevant, inadmissible evidence." (Doc. #36 at 34). When this claim was examined by the Rule 32 court, it considered the items of evidence complained about, and made the following findings of fact and conclusions of law:

> Grayson asserts [ineffective assistance of counsel] based on trial counsel's failure to object to evidence that Grayson incorrectly alleges was never linked to him. This evidence consisted of the blue truck seized when co-defendants Loggins and Duncan were arrested, the victim's finger seized from Mangione, and clothing items seized from the blue truck.
>
> All of this evidence was linked to Grayson during trial. Grayson's statement acknowledged the involvement of his co-defendants in the murder of Ms. Deblieux. The State, in fact, established that the defendants acted in concert during the murder of the victim. Further, the State demonstrated to the jury how the evidence collected after Ms. Deblieux led them to Grayson. Thus, this evidence was relevant for at least one, and in several instances two, purposes. Any reasonable lawyer would see the connection between the items singled out by Grayson's counsel and its relevance to his capital murder trial. . . .

89

Because counsel had no valid grounds for an objection on this basis, the Court does not find that they were ineffective for failing to do so.  *See Card*, 911 F.2d at 1520 ("Counsel cannot be labeled ineffective for failing to raise issues that have no merit.").

(Tab. 56 at 53-54).

Grayson's allegations are without merit.  The evidence about which he complains was clearly linked to him.  In fact, defense counsel was able to argue that forensics showed the blood evidence found on the clothes belonged to his co-defendants, not to Grayson. Defense counsel was not ineffective for failing to engage in repetitive, fruitless objections. The state court's rejection of this claim is neither contrary to nor an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence before it.  Therefore, this claim is due to be denied.

> **6.    Failure to Object to Court's Failure to Repeatedly Instruct the Jurors Not to Expose Themselves to Media Coverage During the Trial**

Grayson contends that his counsel were ineffective because they did not object to the trial court's failure continually to instruct the jury not to expose themselves to media coverage prior to trial recesses or to inquire whether the jurors had been exposed to such coverage upon after proceedings resumed.  (Doc. #36 at 35).  According to the petitioner, this failure allowed "the jury to be contaminated by" extraneous influences.  (*Id.*) (*citing Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966)).  Grayson's only factual support for this contention is that "one of the reporters covering the trial was the son of Juror Tooson."  (*Id.*) (*citing* Vol. 4 at 241).

The trial court rejected this claim on collateral review.  It held:

> While this Court did not instruct the jury to avoid press account at every recess, Grayson is incorrect when he asserts that this Court did so only once.  On page 331

90

of the record, this Court instructed the jurors not to discuss the case and not to allow anyone to discuss it in their presence. A discussion of the case on the news would have fallen under the Court's instruction and the jurors were instructed to report such an incident. (R. 331). No juror did so during the course of this trial.

Again, at the end of the first day, this Court again admonished the jurors to avoid discussing the case and to not anyone to discuss it with them or around them. As noted above, a discussion of this case on the news or in the newspaper would have been covered by this instruction. On page 749 of the record, the Court again cautioned the jury in this regard. Again, at no time did any juror report having this case discussed in their presence by anyone.

Based on the record, this Court cannot reach the conclusion that no reasonable attorney would have failed to object, because the Court's instructions adequately protected Grayson. Further, this Court notes that Grayson has offered nothing but speculation in his second amended petition to support a prejudice claim. There are no pleaded facts in the petition which, if true, would establish that Grayson was prejudiced. Accordingly, this claim is denied.

(Tab. 56 at 54-55).

Grayson has made no allegations that overcome the presumption of correctness owed to the state trial court's factual findings. The jury was instructed not to listen to or read media accounts of the case, and was directed to notify the court if such event occurred. Any objection that a juror was related to one of the news reporters in the courtroom, absent any specific allegation of exposure, has no merit. As there are no allegations that any juror was exposed to any impermissible media during the trial, defense counsel was not ineffective for failing to insist that the court constantly instruct and question the jurors about possible media influence. Neither does Grayson point to any Supreme Court precedent holding that such judicial instruction and questioning must occur. Therefore, the state court's rejection of this claim is neither contrary to nor an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence before it. This claim is due to be denied.

7.   **Failure to Object to the Court's Random Dismissal of Two Alternate Jurors**

This claim reads in its entirety: "Counsel failed to object when the trial court violated [Alabama] law by choosing to randomly dismiss two jurors as alternate, which undermined their own ability to exercise their peremptory strikes strategically." (Doc. #36 at 35-36). Grayson offers no factual support or case law–and certainly no Supreme Court precedent–to support his one-sentence allegation. This claim is grossly insufficient for federal pleading purposes and is due to be dismissed.

Moreover, on collateral review, the post-conviction court observed:

In its opinion on application for rehearing, the Court of Criminal Appeals disapproved of this Court's method for selecting alternate jurors, finding that this Court violated Rule 18.4 of the Alabama Rules of Criminal Procedure. The fact that this Court committed error, however, does not mean that Grayson's counsel were ineffective. First, the Court of Criminal Appeals found that this Court's error did not rise to the level of plain error. *Grayson*, 824 So. 2d at 848. . . .

Further, as noted by the Court of Criminal Appeals, any injury suffered by Grayson was also suffered by the State. Thus, trial counsel could have reasonably concluded that the procedure was not worth raising an objection, considering the equity of the situation. *See Thomas*, 766 So. 2d at 876 ("[E]ffectiveness of counsel does not lend itself to measurement by picking through the transcript and counting the places where objections might be made."); *Id.* ("Even though there were several instances where counsel could have objected, 'that does not automatically means that the [appellant] did not receive an adequate defense in the context of the constitutional right to counsel.'") *Chandler*, 218 F. 3d at 1319 ("Counsel is not required to present every nonfrivolous defense.").

Because this claim can be resolved on the basis of the record, there is no need for any further proceedings. This claim, then, is denied.

(Tab. 56 at 55-56).

When the state court's opinion is compared to Grayson's general and conclusory claim, it is apparent that he is not entitled to habeas relief. There is no indication that counsel was objectively

deficient for failing to object to the manner in which alternate jurors were released.  Neither is there evidence to indicate that Grayson was prejudiced by the release of those jurors.

This claim is due to be dismissed or, in the alternative, due to be denied.

### 8.    Failure to Object to Admission of a Prescription Bottle

Grayson claims counsel were ineffective for failing to object to the admission of a prescription vial bearing the victim's name.  (Doc. #36 at 36).  However, he failed properly to appeal from the Rule 32 court's summary dismissal of the claim for lack of specificity, and, therefore, it is procedurally defaulted in this court.  This claim is due to be dismissed.

### 9.    Failure to Object to Hearsay Testimony Elicited from Agent Flippo

This claim is substantially the same as that made by Grayson in his Rule 32 petition.  The post-conviction court reviewed this issue and found that the testimony of Agent Flippo was not inadmissible hearsay, because it was not offered to prove the truth of the matter asserted but was "used to explain why law enforcement officers took subsequent steps during their investigation, an investigation that ultimately led them to Grayson." (Tab. 56 at 56).  Thus, the court concluded that counsel was not ineffective for failing to raise an objection that was without merit.  (*Id.* at 56-57).

Although Grayson argues that the testimony of Agent Flippo was hearsay, he makes no specific argument that the state court's decision concerning a state hearsay question was incorrect. Therefore, even if counsel had objected to the testimony, there is no basis upon which to believe that such an objection would have been sustained. The state court's rejection of this claim is neither contrary to nor an unreasonable application of clearly established federal law, or an unreasonable

determination of the facts in light of the evidence before it.  Accordingly, this claim is due to be denied.

### g.        Counsel Failed to Object Adequately (Doc. #36 at 36-37)

Grayson alleges that counsels' objections were unfruitful because counsel were "unprepared to support their position with relevant case law and thus failed to argue their position properly." (Doc. #36 at 36).  He then asserts that "[t]hese errors both individually and cumulatively caused both a lack of funding for experts and allowed evidence to be presented to the jury which was either repetitive, cumulative and inflammatory, or inadmissible hearsay statements in violation of Petitioner's right to confrontation, due process, a fair trial and a reliable sentencing hearing as guaranteed by the 5th, 6th, 8th, and 14th Amendments to the U.S. Constitution."  (*Id.*).  The only even remote discernable factual basis for this claim is Grayson's assertion that while counsel properly supported with argument and case law a motion to suppress cumulative and inflammatory photographs during pre-trial proceedings, (1) his trial objection on the same ground was "perfunctory" and (2) he did not remind the court of his previous argument.  (*Id.* at 37).  Finally, Grayson complains that counsel failed to cite relevant case law during pretrial proceedings in support of an *ex parte* application for funds.  (*Id.*) (*citing Ake v. Oklahoma*, 470 U.S. 68, 83 (1985)).

This claim is grossly insufficient for federal habeas purposes.  Grayson completely fails to identify the "errors" counsel purportedly made, what case law counsel should have cited to support their position, and how any such argument or objection would have been successful.  Moreover, he admits that counsel properly supported a pre-trial motion to suppress inflammatory photographs (but that motion was denied by the trial court).  Grayson also admits that counsel objected again at trial, but he makes no effort to explain why the objection was merely perfunctory.  Indeed, the trial court

already had denied what Grayson acknowledges was a well-supported pretrial effort to prevent the admission of the photographs. Therefore, there was no need to do anything other than preserve an objection to that pre-trial ruling.  Trial counsel accomplished that.  Finally, Grayson's reference to *Ake,* following his vague and conclusory assertion regarding his *ex parte* application for funding, clearly does not merit discussion.

Respondent correctly asserts that the claim was summarily dismissed by the post-conviction court pursuant to Rule 32.3 and 32.6(b).  (Doc #40 at 28-29). This claim is due to be dismissed because, pursuant to the Rules Governing Federal Habeas Proceedings, it is insufficiently pled. Alternatively, it is due to be dismissed as procedurally defaulted because the state court dismissed it in accordance with adequate and independent state procedural rules.

> **h.    Counsel Failed to Adequately Challenge Petitioner's Capital Murder Conviction (Doc. #36 at 37)**

Grayson alleges that counsel were ineffective because, although "they advanced a theory that there was insufficient evidence to support the kidnaping [sic] element of capital murder" and elicited testimony that the victim had drugs and alcohol in her system to explain why the victim voluntarily went with Petitioner, counsel failed to explain effectively to the jury how that evidence showed that the State could not prove kidnapping beyond a reasonable doubt.  (Doc. #36 at 37).

The Rule 32 court denied this claim when it was raised during post-conviction proceedings, and referred to the Alabama Court of Criminal Appeals' rejection of the substantive claim on direct appeal. (Tab. 56 at 75-76) (*citing Grayson v. State*, 824 So.2d at 818)("[t]he State presented sufficient evidence in the present case from which the jury could infer that the victim was restrained without her consent and that the appellant was guilty of kidnapping in the first degree.").

95

As set out further in this court's discussion of Claim Four *infra*, Grayson is not entitled to habeas relief from the substantive claim. Moreover, the court has examined defense counsel's closing argument at the penalty phase of the trial and finds that counsel clearly explained the theory that Grayson was not guilty of kidnapping because the victim voluntarily went with the defendants to "party." (Vol. 18 Tab. 19 at 789, 791, 799).  This claim is without merit and it is due to be denied.

      **i.**      **Trial Counsel Were Ineffective at Jury Selection, Thereby Denying Petitioner His Right to Be Tried and Sentenced Before a Fair and Impartial Jury (Doc. #36 at 37-41)**

      **1.**      **Failure to Adequately Question the Venire and Request a Jury Questionnaire**

Grayson contends that his trial counsel's voir dire was inadequate because "counsel scarcely asked the venire members any questions at all, failed to completely question numerous jurors" concerning the substance of any admitted press exposure, and "only requested individual voir dire" about pretrial publicity and the death penalty.  Grayson argues that counsel should have requested individual voir dire examination on the subject of the petitioner's "mental illness and his mental state at the time of the crime." (*Id.* at 37-38).  Grayson also asserts that counsel did not "argue adequately Petitioner's right to a jury questionnaire." (*Id.* at 38).

In its affirmation of the Rule 32 court's denial of this claim on the merits, the Alabama Court of Criminal Appeals made the following findings of fact and conclusions of law:

> The appellant argues that trial counsel was ineffective for failing to obtain a juror questionnaire and to conduct adequate voir dire.  In support of his argument, he argues that the "trial court failed to weed out those jurors who harbored biases against the defenses they would raise at both stages of the trial. . . ."
>
> The record reveals that the trial court accepted the appellant's pleading as true for purposes of deciding whether the claim warranted an evidentiary hearing, and

further found that the appellant failed to state facts that would entitle him to relief. In its order denying relief, the trial court stated that it

> decided against allowing the use of a juror questionnaire because it was not a valid use of court resources, including time. Once this Court decided the matter, there is nothing trial counsel could have done to alter this decision. There is certainly nothing pleaded in the second amended petition that causes it to second-guess its decision.

Because the record failed to show any abuse of the trial court's discretion in the conduct of the voir dire examination, the appellant's argument is without merit. *Harris v. State*, 632 So. 2d 503 (Ala. Crim. App. 1992).

With regard to the appellant's claim that the trial court failed to request individual voir dire on the issue of mental illness and mental defenses, the trial court found that it was responsible for the conduct of voir dire, and that it, not being convinced that individual voir dire was needed on this issue, would not have allowed it. *See Harris v. State*, *supra*. *See also George v. State*, 717 So. 2d 827, 834 (Ala. Crim. App. 1996). ("Even in capital cases, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination. . . .").

Lastly, the trial court stated that the appellant could not fault his trial counsel for not asking the "right questions" during voir dire. The trial court stated that the appellant argued only that trial counsel could have asked more questions. The trial court stated that it was left with the firm conviction that trial counsel's voir dire far exceeded the bare minimum required by the Constitution and was, therefore, effective. Thus, the appellant's argument is without merit.

(Tab. 57 at 9-11).

Grayson fails to identify any Supreme Court case that supports this claim, and (with good reason) has failed to cite any case holding that a juror questionnaire or individual voir dire is constitutionally required. For these reasons, and the reasons clearly set out in the appellate court's affirmance of the trial court's opinion, Grayson cannot show that the state appellate court's adjudication of this claim was contrary to or an unreasonable application of clearly established federal law. The Rule 32 court clearly examined Grayson's allegations in the habeas petition and

97

held that, even if trial counsel had made such arguments, the court would not have allowed a juror

questionnaire and individual voir dire.  Thus, counsel was not objectively deficient, nor is there any

possibility that Grayson was prejudiced by the lack of a juror questionnaire and individual voir dire.

This claim is due to be denied.

### 2.        Failure to Challenge Jurors for Cause

This claim reads in its entirety:  "Counsel also failed to challenge jurors for cause, despite

the fact that it was clear that these jurors could not be fair and impartial."  (Doc. #36 at 38).  Such

a statement fails to satisfy the pleading requirements for habeas cases.  *See*, *e.g.*, *McFarland v. Scott*,

512 U.S. 849, 856 (1994).  Grayson is required to state the facts supporting each ground in his

petition pursuant to Rule 2(c) of the *Rules Governing Section 2254 Cases in the United States*

*District Courts*; however, as it relates to this claim, he has not described how he was prejudiced by

counsel's purported deficiencies.  The lack of any factual support requires that this claim be

dismissed.

Alternatively, other than allegations surrounding juror T. Jackson, this claim was expressly

deemed abandoned by the Alabama Court of Criminal Appeals.  (Tab. 57 at 11).  Therefore, with

the exception of juror T. Jackson, this claim is procedurally defaulted and due to be dismissed.  The

pertinent portions of the appellate court's opinion read:

> The record indicates that the trial court, in its order, erroneously dismissed
> this claim based on the trial record showing the exclusion for cause of potential juror
> R. Jackson, a different venire member.  Initially, the record does not reveal that
> potential juror T. Jackson, who stated in his voir dire that his recollection was that
> the crime at issue "was a 'particularly brutal murder,'" had formed such an opinion
> as to the heinous, atrocious and cruel aggravating circumstance.  Additionally, the
> record indicates that potential juror T. Jackson stated that he could base his decision
> solely on the evidence that came from the witness stand.  Moreover, the record
> indicates that potential juror T. Jackson did not serve on the jury and therefore, any

failure to remove the juror for cause is harmless. *See Giles v. State*, [Ms. CR-00-0376, April 30, 2004] ___ So. 2d ___ (Ala. Crim. App. 2004). Because the trial court's dismissal of this claim was correct, even though not for the reason stated, this Court will affirm the trial court's judgment. *See Reed v. State*, 666 So. 2d 91 (Ala. Crim. App. 1995).

Because the appellant does not dispute the propriety of the trial court's disposition of his other claims regarding other potential jurors, these claims have been abandoned on appeal. *Brownlee v. State*, 666 So. 2d 91 (Ala. Crim. App. 1995).

(Tab. 57 at 11).

Grayson cannot show the state court's decision regarding juror T. Jackson is contrary to or an unreasonable application of clearly established federal law. In addressing Grayson's assertion that the trial court erroneously denied his motion to strike juror T. Jackson for cause, it must first be recognized that Grayson enjoys only a constitutional right to an impartial jury, not an impartial jury venire or jury panel. *Ross v. Oklahoma*, 487 U.S. 81, 85-91 (1988).

[E]ven if a veniremember should have been struck for cause, the Supreme Court in *Ross v. Oklahoma*, 487 U.S. 81, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988), held that there is no constitutional violation where the biased veniremember does not eventually sit on the jury. The Court in *Ross* held that a habeas petitioner's constitutional rights were not violated when he was forced to waste a peremptory challenge to remove a veniremember whom the court should have removed for cause. Therefore, in this habeas petition, [a petitioner] can raise only the trial court's denials of [his] challenges for cause of those veniremembers who eventually sat on the jury.

*Heath v. Jones*, 941 F.2d at 1126, 1132-33 (11th Cir. 1991); *see also, Spivey v. Head*, 207 F.3d 1263, 1273 (11th Cir. 2000).

For the foregoing reasons, this claim is due to be dismissed for failure to comply with the heightened pleading requirements for federal habeas petitions. Alternatively, the claim is due to be dismissed as procedurally defaulted, with the exception of the claim concerning Juror T. Jackson, and that claim is due to be denied.

99

3.        **Failure to Raise a *J.E.B. v. Alabama*, 511 U.S. 127 (1997) Claim**

Grayson's only allegation with respect to this claim is that trial counsel failed to object to "the State's use of ten of its 14 [or seventy-one percent] peremptory strikes to exclude women, which raised an inference of prima facie gender discrimination pursuant to *Cochran*, [and] was presumptively prejudicial to Petitioner." (Doc. #36 at 38) (*citing J.E.B. v. Alabama*, 511 U.S. 127 (1997) and *Cochran v. Herring*, 43 F.3d 1404, 1410 (11th Cir. 1995)) (citation omitted).   Grayson is a male, and his victim was a female.

When Grayson raised this claim in his Rule 32 petition, the trial court dismissed it for lack of specificity.   On appeal from the denial of his Rule 32 petition, the Alabama Court of Criminal Appeals held that the trial court was correct in dismissing the claim:

> Although the appellant specifically identified the omissions on the part of his trial counsel that he believed constituted deficient performance, he failed to include in his petition any specific facts tending to indicate how those omissions prejudiced his defense. The record indicates, that the trial court, accepting all of the allegations as true, found[] that the appellant had not provided the "full disclosure of the factual basis" of his claims necessary to satisfy the specificity requirements of Rule 32.6(b), Ala. R. Crim. P., and the pleading requirements of Rule 32.3, Ala. R. Crim. P.  *See Boyd v. State*, 746 So. 2d 364, 406 (Ala. Crim. App. 1999).   In addition to finding that the claims were not pleaded with specificity, the trial court found that they were procedurally precluded from review pursuant to Rule 32.2(a)(3), and (5), Ala. R. Crim. P., because they could have been, but were not, raised at trial or on direct appeal. The trial court was correct in dismissing the claims.

(Tab. 57 at 15-16).

Respondent maintains that this claim is procedurally barred from review in this court because the Alabama Court of Criminal Appeals found it to be barred from review on appeal from the denial of the Rule 32 petition.   Grayson's only response to that argument is a reference to his general argument that Rule 32.6(b) is not an adequate and independent state procedural rule.  (Doc. #44 at

100

26).  For the reasons set out earlier in this opinion (*see supra*, IV.B.1), the court rejects this

contention by Grayson.

Moreover, even assuming that the claim had not been defaulted, Grayson's claim fails for two

reasons.  First, he simply has not shown that there was any *Batson* violation that his trial counsel

should (or could) have challenged.  The record does not indicate the gender of anyone who was

struck.  The only "information" before the court about the gender of the prosecutor's strikes is

Grayson's blanket, unsupported statistical claim.  Such a vague and conclusory allegation in the face

of a silent record, simply fails to establish a prima facie case of discrimination.  Thus, Grayson

cannot show that counsel was objectively deficient for failing to raise a *J.E.B.* objection.  But even

assuming that Grayson could make a showing on the record that ten of the 14 persons struck by the

prosecution were women (and again he cannot), any claim that counsel were ineffective for failing

to raise a *J.E.B. v. Alabama* claim at trial, does not rise to the level of constitutional error.  In *Reed*

*v. Norris*, 195 F.3d 1004 (8th Cir. 1999), the Eighth Circuit was faced with a question very similar

to the one before this court.  That court held that the petitioner's ineffective assistance of counsel

claim was defaulted, and then stated that, even if there had been no default, the petitioner could not

have shown that he suffered actual prejudice as a result of counsel's failure to press a *Batson*

objection. The court held:

> According to Reed, his counsel should have sought a ruling from the court as to
> whether Reed had established a prima facie case of discrimination under *Batson*.
>
> The district court found that Reed had not presented this particular ineffective
> assistance claim to the state courts and was thus procedurally barred from raising
> it in this federal habeas petition. We need not belabor the point of whether Reed has
> previously raised an ineffective assistance claim on the *Batson* point he now argues
> because, even assuming there were no procedural obstacle, we find that Reed's claim

that counsel failed to press the *Batson* point at trial does not rise to the level of constitutional error. *See Evans v. Lock*, 193 F.3d 1000, 1002 (8th Cir. 1999).

> To prevail on an ineffective assistance of counsel claim, a defendant must show both that his attorney's performance fell below an objective standard of reasonableness and that he was prejudiced by that deficient performance. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Prejudice exists only when there "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694, 104 S.C. 2052. We find it unnecessary to discuss the reasonableness of counsel's conduct because, given the overwhelming evidence of Reed's guilt presented at trial, we find that it would be impossible for him to demonstrate prejudice under *Strickland*. *See Strickland*, 466 U.S. at 697, 104 S.C. 2052 ("[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed"). For the same reasons, we reject Reed's second claim that trial counsel's failure to request a prima facie ruling also deprived him of the effective assistance of appellate counsel by preventing him from properly presenting the *Batson* issue on appeal to the Arkansas Supreme Court.

*Id*. at 1006 (footnote omitted).

As in *Reed*, it is unnecessary to discuss the reasonableness of counsel's performance in Grayson's case, because given the overwhelming evidence of his guilt presented at trial, it would be impossible for him to demonstrate that he suffered prejudice as a result of that performance. Indeed, even if this claim were not procedurally barred, it would be due to be denied on the merits, since Grayson cannot possibly meet the prejudice prong of *Strickland*.

### j.    Trial Counsel Were Ineffective in Not Requesting Funds for Numerous Experts (Doc. #36 at 41-42)

Grayson alleges that counsel was ineffective because they failed to ask for numerous experts, including his own pathologist, who could have testified as "to what extent the victim suffered before she died." (*Id*. at 42). He also asserts that counsel were ineffective for not requesting funds for a mental health expert "concerning Petitioner's ability to live peaceably in prison." (*Id*.). Grayson

102

also contends his counsel also should have hired a child psychologist who would have testified to the effect upon Grayson of the death of his mother and his lack of a relationship with his father. (*Id.*). He also claims that counsel was deficient for not seeking funds for a clinical social worker who could have testified about his childhood and its effect on him. (*Id.*). He also blames his trial counsel for failing to request a psycho-pharmacologist who could have testified about his combined drug use and bipolar disorder, and not requesting an expert to assist with jury selection. (*Id.*).

Grayson did not appeal from the post-conviction court's denial of this claim as it pertains to the juror psychologist. Therefore, that part of his claim is procedurally defaulted and is due to be dismissed. As for the remaining parts of the claim, the Rule 32 court made the following findings of fact and conclusions of law:

> Grayson's petition fails to plead facts that establish that reasonably competent counsel would have requested these types of experts.
>
> Trial counsel retained the services of two expert psychologists and an investigator. Trial counsel also requested a neurological examination, a statistician, a sociologist, a jury selection expert, and a DNA/serology expert. (C. 214-25; 245-57; 311-12). Thus, it is clear that defense counsel were competent, capable attorneys and knew how to request and obtain expert services. Grayson's wish list simply demonstrates that had collateral counsel defended Grayson, he would have differed on what experts to request. Defense counsel, however, fulfilled their constitutional mandate and sought what they believed were necessary expert witnesses. Thus, the record demonstrates that trial counsel were not deficient in this regard.
>
> In addition, Grayson's petition does not plead facts that, if true, would have led this Court to fund the proposed dream team of expert witnesses. Although the petition makes it clear Grayson believes these witnesses would have been helpful or useful, the pleadings do not allege facts that, if true, would demonstrate that denial of these experts would have deprived Grayson of a fair trial. Further, the petition does not explain why Doctors Rebert and Goff could not have provided some of the assistance. . . .
>
> Assuming that Doctors Goff and Rebert were not qualified to render such assistance, this Court notes that trial counsel could have reasonably relied on these

expert's representations of whether any additional expert mental health workers were needed. The record does not indicate that any such suggestion was ever made, and the petition does not plead facts alleging counsel were ever told that they needed to seek out such assistance.

The pleadings in the petition, taken as true for purposes of solving this summarily, fall far short of what would be needed to establish necessity of these experts under *Ake* or *Moody*. Accordingly, Grayson was not prejudiced when defense counsel failed to request these experts prior to trial when defense counsel asked for its own wish list of experts. For this reason, this claim is denied.

(Tab. 56 at 68-69).

Grayson has failed to set forth any facts or Supreme Court precedent to show that the state court's adjudication of this claim is contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before it. Thus, to the extent the claim is not procedurally defaulted, it is due to be denied.

> **k.    Trial Counsel Were Ineffective in Cross-examining the State's Witnesses, and Even Appeared to Be Engaged in a Strategy of Slandering the Victim (Doc. #36 at 42-43)**

This claim is without merit for reasons already explained in this opinion. Counsel made it clear in the closing argument that the defense's questions about the victim's use of drugs and alcohol, and the amount of drugs and alcohol in her system, had not been asked for the purpose of implying that she was a bad person or that she deserved to die. (Vol. 18 Tab. 19 at 789, 791, 799). Rather, the questions were asked to show that she was not kidnaped because she voluntarily went with the defendants to drink alcohol and tale drugs. (*Id.* at 792, 799). Grayson is not entitled to habeas relief from the state court's denial of this claim.

C.      **Claim Three** The Prosecutor Engaged in Egregious Misconduct Which Denied
        Petitioner a Fair Trial and Sentencing Determination (Doc. #36 at 43-51)

Grayson alleges many instances in which the prosecutor purportedly engaged in improper

conduct that violated his constitutional right to a fair trial.  (Doc. #36 at 43-51).  However, with the

exception of alleged improper argument concerning Satanism, all of the claims are procedurally

defaulted because they were either raised at trial but not on direct appeal or were never raised at trial

or on direct appeal.  On collateral review, the Alabama Court of Criminal Appeals affirmed the Rule

32 court's procedural bar of the claims pursuant to Alabama Rules of Criminal Procedure

32.2(a)(2),(3) and (5).  (Tab. 56 at 144-51 and Tab. 57 at 18).  As the state court dismissed the claims

in accordance with adequate and independent state procedural rules, the claims are procedurally

defaulted for federal review purposes.  Grayson's assertion (Doc. #44 at 37) that appellate counsel's

ineffectiveness provides the cause and prejudice necessary to overcome the default of these claims

is without merit because the independent ineffectiveness claim is itself procedurally defaulted.  (*See

infra,* Claim V).

As a preliminary matter, Grayson complains about two Satanism comments in his habeas

petition.  Only one of those comments is an underlying allegation in this claim.[43]  During closing

argument at the guilt phase of trial, Grayson asserts that the prosecutor, "apparently reading from a

book, argued: 'One day this book will be found by someone blinded by society and the spell here will

---

[43]  The other Satanism comment is examined in Claim Four, Section C of this Memorandum Opinion
because, *i.e.*, that claim, as raised in the habeas petition, mirrors the way the second comment was raised on
direct appeal, as part of a claim of trial court error regarding the evidentiary admissibility of occult evidence.
(Doc. #36 at 53-54). Specifically, Grayson claimed the trial court erred when it ruled that testimonial and
physical evidence of Grayson's interest in the occult was admissible, and, buried within that claim, is a one-
sentence allegation that the prosecutor improperly argued that the victim perhaps was a sacrifice to Satan.
*Id.* at Claim III, p. 21.

free them from its grip.  Come to our covendom via our high priestess.  [Who will be our victim?] If he's not guilty of capital murder, nobody is.'"  (Doc. #36 at 50)(*quoting* R. 842-43) (bracketed portion redacted by Grayson but restored by this court after review of the trial record).

Contrary to Respondent's answer[44] and state court rulings on collateral review,[45] the allegation underlying this claim was raised for the first time in the Rule 32 petition.  (Vol. 16 at 142-43).  Since Alabama Rules of Criminal Procedure 32.2(a)(3) and (5) required Grayson to raise the underlying allegations for this claim at trial or on direct appeal and he failed to do so, the claim is procedurally defaulted.  Alternatively, and for the reasons detailed in the discussion of Claim Four, Section C, *infra*, the claim is without merit.[46]  The claim fails because the occult evidence was admitted to show a motive for the horrific murder, and the prosecutor's argument was proper as it was relevant to that purpose. In any event, the circumstances surrounding the peculiar brutality of the crime, combined with Grayson's confession, reveal an overwhelming capital case was presented against him at the guilt phase of the trial.  Thus, Grayson was not prejudiced by the Satanism argument because there is no reasonable probability that the jury would have acquitted him of the capital offense even were it not made.

For the foregoing reasons, this entire claim is procedurally defaulted and due to be dismissed. Alternatively, the claim regarding the Satanism comment quoted in this section is without merit and is due to be denied for that reason.

---

[44]  (Doc. #40 at 41).

[45]  (Tab. 56 at 148-49 and Tab. 57 at 17-18).

[46]  This determination is the same whether the claim is examined *de novo* or pursuant to 2254(d) requirements.

D.   <u>Claim Four</u>   **The Trial Court Violated Petitioner's Constitutional Rights (Doc. #36 at 51-64)**

Grayson alleges the state trial court violated several of his constitutional rights. These claims will be discussed in turn.

### 1.   The Trial Court Erred by Allowing Admission of Petitioner's Co-defendants' Statements Through the State's Cross-examination of a Defense Expert

Grayson alleges that the trial court, over defense counsel's objections and contrary to a previous ruling, allowed the prosecutor to cross-examine Dr. Goff[47] repeatedly with a co-defendant's hearsay statements during the penalty phase of the trial.  (*Id*. at 51) (*citing* Vol. 9 at 950, 956-58, 960-66, 972-73).  According to Grayson, through this tactic, "the prosecution presented the jury with the substance of the statements of Petitioner's co-defendants, including their accusations that he was the 'leader of the pack' and that he 'was the one who proposed killing someone.'" (*Id.*) (*quoting* Vol. 9 at 972-73). Grayson argues that this examination violated his Sixth Amendment right to confront witnesses, and denied him to due process, and to a fair trial.  (*Id.*).

Respondent concedes that Grayson raised a similar state law claim on direct appeal, but asserts that the habeas claim is unexhausted and procedurally defaulted because Grayson failed to present it as a constitutional claim in state court. (Doc. #40 at 42-43). Grayson counters that the federal claim was fairly raised on direct appeal because appellate counsel *implicated* the

---

[47]  Grayson additionally contends that trial counsel were unaware that the prosecution had provided the co-defendants' statements "to Dr. Goff prior to his evaluation."  This argument is refuted by his own citation to the record.  (Doc. #36 at 51) (*citing* Vol. 9, R. 960).  Moreover, the page of the record cited by Grayson shows only that Dr. Goff, in response to prosecutorial inquiry, answered that he had read "some but perhaps not all of the co-defendants' statements."  (Vol. 9 at 960).  Defense counsel objected, argued the statements were presented by the district attorney's office, and stated, "And again, we've already discussed the propriety of letting [the prosecutor] just ask questions based on things that we don't have an opportunity to cross-examine these people about."  (*Id.*).

107

confrontation clause in her initial brief to the Alabama Court of Criminal Appeals when she specifically referenced Alabama Code § 13A-5-45(d) ALA. CODE (1975), which provides:

> Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, <u>provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the State of Alabama</u>.

(Doc. #44 at 40) (underlined emphasis by Grayson).

Grayson's argument is incorrect. Appellate counsel did not *reference* §13A-5-45(d) in her brief on direct appeal, rather she *quoted* it, and, in so doing, excluded the last sentence that is now emphasized. *See* Vol. 11, Tab. 32 at 40). If any inference is to be drawn from such an omission, it is that the claim was not intended to be of a constitutional nature.

Further, Grayson's reliance on *Lilly v. Virginia*, 527 U.S. 116, 123 (1999), as support for his assertion that the federal claim was fairly raised, is unpersuasive. The petitioner in *Lilly* also "focused on state hearsay law" in his initial brief to the state supreme court, but, unlike Grayson, he "*expressly* argued . . . that the admission of the statements violated his Sixth Amendment right to confrontation." *Lilly*, 527 U.S. at 123 (emphasis added).

Finally, the record shows that Grayson's post-conviction counsel took the position that appellate counsel was constitutionally ineffective because she failed to raise this matter as a federal claim on direct appeal. (Vol. 16 at 117). The Rule 32 claim read:

> While appellate counsel raised the issue that the statements of Mr. Grayson's co-defendants should not have been admitted during the cross-examination of Dr. Goff, the grounds for this were incomplete. Appellate counsel argued only that the statements were hearsay and that Mr. Grayson did not have a fair opportunity to rebut it. She failed to argue that Mr. Grayson's Sixth Amendment right to confront the witnesses against him was violated.

(*Id.*)[48]

For all of the foregoing reasons, Grayson did not fairly raise this issue as a federal claim in state court on direct appeal. As such, he is not entitled to a *de novo* review because the Alabama Court of Criminal Appeals "narrowly construed [the claim] . . . to omit consideration of the Sixth Amendment issue." (*Id.* at 41). The state court focused on the claim raised by Grayson, and held that under Alabama evidentiary rules, as well as supporting case law, the prosecutor's line of questioning was not hearsay. Rather, it was proper cross-examination of an expert to test the validity of his factual assumptions, credibility, and possible biases. *Grayson v. State,* 824 So.2d 804, 837-38 (Ala. Crim. App. 1999). The appellate court wrote:

> In the present case, the State was using the factual information from the accomplices' statements in order to challenge the expert witness's basis for his diagnosis, rather than to prove the truth of the matter asserted. Because the State could properly test the credibility of the expert's diagnosis by questioning him concerning the information upon which he based his diagnosis, the prosecutor's questions were introduced for a permissible purpose. "'[N]ot only is there allowable great latitude on cross-examination of a witness, but this latitude is enlarged as to [an] expert witness.'" *Clements v. Stewart*, 595 So.2d 858, 864 (Ala.1992), *quoting Louisville and N.R.R. v. Martin*, 240 Ala. 124, 132, 198 So. 141, 147 (1940).

*Id.* at 838. The Alabama Supreme Court summarily affirmed the state appellate court's decision. *Ex parte Grayson*, 824 So.2d 844, 845 (Ala. 2001).

For these reasons, this claim is procedurally defaulted. Grayson does argues that the ineffectiveness of his first appellate counsel to raise this issue as a federal claim on direct appeal

---

[48] Grayson did obtain new appellate counsel after the Alabama Supreme Court affirmed his conviction and sentence on direct appeal. New counsel filed an application for rehearing before the Alabama Supreme Court. (Vol. 13, Tab. 37). In that application, and for the first time during the appeal process, Grayson characterized this issue as a violation of due process and the Confrontation Clause. (*Id.* at 7-20). The Alabama Supreme Court did not consider this issue when it overruled the application, and denied rehearing. *Ex parte Grayson*, 824 So.2d 844, 847-48 (Ala. 2001).

supplies the cause and prejudice necessary to overcome the procedural default. (Doc. #44 at 41). However, an ineffective counsel claim must be both exhausted *and* not defaulted in state court before it can be asserted as cause to overcome the procedural default of a substantive claim. *Hill v. Jones*, 81 F.3d 1015, 1030 (11th Cir. 1996)("[P]rocedurally-defaulted claims of ineffective assistance cannot serve as cause to excuse a default of a second claim."). Consequently, Grayson's independent claim of ineffective appellate counsel is itself procedurally defaulted (*see infra*, Claim Five discussion), and any alleged ineffectiveness of appellate counsel cannot be used as cause to overcome the procedural default of this claim. This claim is due to be dismissed.

**2.      The Trial Court Erred in Refusing to Supply Petitioner's Trial Counsel with Copies of the Transcripts from His Co-Defendants' Trials (Doc. #36 at 52-53)**

Next, Grayson contends his constitutional right to a fair trial was violated when the state appellate court affirmed the trial court's denial of his "motion requesting the transcripts of [his] co-defendants." (Doc. #36 at 52). His claim here is that the transcripts were valuable to the defense because "the prosecution's arguments at the trials of Petitioner's co-defendants were inconsistent with the evidence put forth at Petitioner's trial," and, since "[t]he witnesses at the four trials overlapped to great extent," counsel could have used their prior testimony for cross-examination. (*Id.* at 52-53). Also, some of the information was exculpatory in that the prosecution "contended that each of the defendants was the 'leader of the pack,'" and another witness testified that defendant Loggins told her that Loggins and defendant Mangione had been talking about killing someone for a while. (*Id.* at 53). Finally, Grayson asserts that the "[t]he trial court's unreasonable and untenable suggestion that Petitioner's trial attorneys should attend each of the co-defendants' trials that

preceded Petitioner was not an adequate alternative" considering the lack of funding afforded his appointed capital counsel.  (*Id.*).

Grayson cites *Britt v. North Carolina*, 404 U.S. 226 (1971) to support his position.  In *Britt*, the Supreme Court held that there are "two factors that are relevant to determination of an indigent defendant's need for a transcript: (1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript." *Id.* at 227-28.  Grayson acknowledges that the state court properly identified *Britt* as providing the legal standard for this issue, but argues that the court "unreasonably refused to extend the principle in *Britt* to a new context to which it should have applied."  (Doc. #44 at 44).

According to the Alabama Court of Criminal Appeals on direct appeal:

the record indicates that before any accomplices in this case were tried, the trial court held a hearing to discuss various motions filed by several of the accomplices.  During the discussion between the trial court and the appellant's defense counsel concerning the status of certain of his motions, the following transpired:

[DEFENSE COUNSEL]: . . .  I filed a motion last week for trial transcripts.  There are four defendants charged in this case.  We're the fourth to be charged, and we would anticipate that - I mean the fourth one to be tried-certain exculpatory information coming out in the first three trials.  And we would like to have transcripts of those trials prior to going to trial on our case.  I had spoken to Your Honor a couple of weeks ago, and you mentioned that we would try and work something out with some tapes or something.  We would prefer some way to be able to have typed transcripts of those portions of the case that may be exculpatory as to Mr. Grayson.  Now how that can be achieved, I'm not sure.  Because we're talking about a very short time frame in trying these four cases.  And it would - the testimony is the only thing we're after.  You know, we're not after the voir dire and the openings and closings or anything like that.  The only thing we're after is the actual testimony.

111

*Grayson v. State*, 824 So. 2d 804, 822-23 (Ala. Crim. App. 2000).

The appellate court also observed from the record that the trial court denied Grayson's wholesale request for all transcripts, but simultaneously informed counsel that the court would consider "a request in regard to particular testimony." *Id.* at 823. In response, counsel stated that it was impossible for him to make such a request: "I didn't know what all will come out in the first three cases. And I don't know how I'm going to be able to provide you that information without either sitting down here listening to the tapes for each trial or obtaining the transcript." *Id.* The trial court again indicated that if Grayson were asking that the transcripts of all three trials be provided before his case was tried, the motion was denied. *Id.*

> After noting these historical facts, the appellate court found:

> in the instant case, there was no error in the trial court's failure to apply *Britt v. North Carolina* to a situation where a defendant is seeking to obtain the transcripts of the trials of his codefendants. If these transcripts were to contain exculpatory information, then the appellant would certainly be entitled to that information under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed. 2d 215 (1963). There is no indication on appeal, however, that these transcripts contained any exculpatory information. Moreover, the trial court suggested that the appellant could have used tapes of these proceedings as an alternative. The appellant has made no showing of any particularized need for these transcripts, and as they were not completed prior to the appellant's trial, they were not available to either party at any price. For these reasons, there was no error by the trial court in denying the appellant's motion.

*Grayson v. State*, 824 So.2d 804, 827 (Ala. Crim. App. 1999).

Grayson does not dispute the factual findings made by the state appellate court. Although he contends that the appellate court unreasonably refused to extend *Britt*, he does not argue with any specificity the underlying rationale for an expansion of *Britt's* application. In any event, *Britt* does not afford Grayson habeas relief. The defendant in *Britt* was denied a free transcript of a prior mistrial

needed to defend himself during retrial for the same offense.  The Supreme Court looked to its own precedent, and wrote:

> *Griffin v. Illinois* [351 U.S. 12 (1956),] and its progeny establish the principle that the State must, as a matter of equal protection, provide indigent prisoners with the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners.  While the outer limits of that principle are not clear, there can be no doubt that the State must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed for an effective defense or appeal.[49]  The question here is whether the state court properly determined that the transcript requested in this case was not needed for an effective defense.

*Britt v. North Carolina*, 404 U.S. at 227.

Applying the two-pronged test to Britt's case, the court assumed that the transcript would be of value to the defendant.  *Id.* at 228 ("Our cases have consistently recognized the value to a defendant of a transcript of prior proceedings, without requiring a showing of need tailored to the facts of the particular case.").  Nevertheless, the court found that the second prong of the test was not satisfied because the "petitioner conceded that he had available an informal alternative which appear[ed] to be substantially equivalent to a transcript."  *Britt*, 404 U.S. at 230.  The Court further remarked that:

> [t]he trials of this case took place in a small town where, according to petitioner's counsel, the court reporter was a good friend of all the local lawyers and was reporting the second trial.  It appears that the reporter would at any time have read back to

_____

[49] At this juncture the Supreme Court included footnote 1, which lists the following cases: *Williams v. Oklahoma City*, 395 U.S. 458, 89 S.Ct. 1818, 23 L. Ed. 2d 440 (1969); *Gardner v. California*, 393 U.S. 367, 89 S.Ct. 580, 21 L. Ed. 2d 601 (1969); *Roberts v. LaVallee*, 389 U.S. 40, 88 S.Ct. 194, 19 L. Ed. 2d 41 (1967); *Long v. District Court of Iowa*, 385 U.S. 192, 87 S.Ct. 362, 17 L. Ed. 2d 290 (1966); *Draper v. Washington*, 372 U.S. 487, 83 S.Ct. 774, 9 L. Ed. 2d 899 (1963); *Eskridge v. Washington State Bd. of Prison Terms and Paroles*, 357 U.S. 214, 78 S.Ct. 1061, 2 L. Ed. 2d 1269 (1958); *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956).  To the extent the Supreme Court has applied *Griffin* in a purely criminal context, it has done so in the spirit of providing a defendant a fair and equal opportunity to access the appellate process in the same manner as a defendant with the financial means to pay for a defense.

counsel his notes of the mistrial, well in advance of the second trial, if counsel had simply made an informal request.

*Britt*, 404 U.S. at 229.

Grayson's case is markedly different from the *Britt* decision in several ways. First, Grayson was not seeking transcripts from his *own* proceedings, rather he was attempting to gain access to other transcripts. Even if, as Grayson suggests, he had to show only a particular need for transcripts of cases not his own, the transcripts Grayson desired could not have been made readily available before his trial. Third, and most importantly, Grayson misrepresents the alternatives the trial court made available to him. The record clearly shows that there was a viable alternative available to him, which was to listen to the tapes of the other three trials. If, after listening to those tapes he discovered some allegedly exculpatory/impeachment evidence,[50] the trial court expressly told him he could make a request for a transcript of that specific testimony. Grayson never did so.

Grayson has failed to show that the state court's rejection of this claim was an unreasonable application of clearly established federal law. This claim is due to be denied.

      **3.**      **Petitioner's Constitutional Rights Were Violated by the Admission of Irrelevant and Highly Prejudicial Evidence Concerning Satanism (Doc. #36 at 53-54)**

Grayson predicates this claim with the assertion that there was "no evidence presented linking Satanism to the murder," and, in fact, that "the prosecutor noted [during the closing arguments of the

---

[50] The information Grayson complains about not receiving would not have exculpated him or provided him any powerful impeachment evidence. First, the allegedly exculpatory evidence is a rehash of Claim One (*see infra*) in that it is actually a complaint that the prosecutor improperly argued inconsistent 'ringleader' theories at each of the co-defendants' trials. Additionally, the information concerning defendants Mangione and Loggins lacks any real impeachment value because, when combined with other evidence at trial, it simply would have shown that Grayson, Mangione, and Loggins had all expressed an interest in finding someone to kill. In other words, there was nothing in Mangione's or Loggins' statements to indicate that Grayson had not expressed a desire to kill someone.

penalty phase that] Petitioner told Lila Busby he was not a Satanist."  (*Id.* at 54) (*citing* Vol. 10 at

1082).  Yet, over defense counsel's objection, the trial court allowed a witness to testify that several

days after the murder she overheard Grayson "reading from a book which she characterized. . . as

'satanic,'" and the court allowed law enforcement to testify that drawings of a pentagram and devil's

head were found in Grayson's car.  (*Id.*) (*quoting* Vol. 7 at 555-61).  Petitioner also alleges that the

prosecutor made an improper comment at sentencing about sacrificing the victim to Satan.  (*Id*. at 54)

(quote omitted, *but see* (Vol. 10 at 1083)).

Grayson argues that in order for evidence of Satanism to be constitutionally admissible, the

State must "show that there is a direct link between the satanic activity and the crime." (Doc. #36 at

53) (*citing Dawson v. Delaware*, 503 U.S. 159 (1992)(First and Fourteenth Amendments prohibit

introduction of evidence that the defendant was a member of the Aryan Brotherhood in a capital

sentencing proceeding where his membership had no relevance to the issues being decided).

Respondent alleges that the evidentiary aspect of this claim is procedurally defaulted because

Grayson did not fairly present it as a federal claim on direct appeal. (Doc. #40 at 45-46). In the

alternative, Respondent contends that "to the extent that Grayson raised this federal issue for the first

time in his Rule 32 petition, the [appellate] court properly [affirmed the Rule 32 court's] order

denying relief" pursuant to Rule 32.2(a)(4) because a similar claim was raised and addressed on direct

appeal. (*Id.* at 46). Actually, the post-conviction court simply found that the claim was "procedurally

barred [pursuant to Rule 32.2(a)(4)] as it was raised and addressed during the direct appeal." (Tab.

56 at  at 142) (*citing Grayson v. State*, 824 So. 2d at 827-83).

Grayson counters that he fairly raised a federal claim regarding the admissibility of the

evidence on direct appeal because "[t]he state court, in deciding this issue in a 403 analysis, was

essentially making a due process determination about whether or not the admission of this evidence compromised Mr. Grayson's due process rights." (Doc. #44 at 47). Grayson concludes that his Fourteenth Amendment right "to a fundamentally fair trial" was violated by the admission of "irrelevant and highly prejudicial evidence that he was somehow involved in satanic activities." (*Id.* at 53-54). Grayson repeatedly admits that this claim is grounded exclusively on due process grounds. He even concedes that a Supreme Court case he relies on for support is grounded in the First Amendment, a federal claim he did not fairly raise on direct appeal. (Doc. #44 at 48 ) (*citing Dawson v. Delaware*, 503 U.S. 159 (1992). Nonetheless, Grayson argues that because the facts in his case are materially indistinguishable from *Dawson*, he should be allowed to rely on *Dawson* to show the state court's rejection of his claim is contrary to clearly established federal law. (*Id.*).

### a.      Presentation and Resolution of the Claim on Direct Appeal

To peel back the various layers of this two-fold claim, the court begins with a review of the claim as raised on direct appeal. On direct appeal, the record shows that Grayson alleged in his brief that the trial court violated "Rule 401,402, 403 and 404 of the Alabama Rules of Evidence," in that the satanic information was irrelevant and, therefore, inadmissible, or, in the alternative, its prejudice outweighed its probative value and it was impermissible character evidence. (Vol. 11, Tab. 32 at 21-24). He also inserted a one-sentence allegation concerning the same improper prosecutorial argument subject to review in the present claim. (*Id.*). Grayson's admissibility argument on direct appeal centered exclusively around the state evidentiary question.

The Alabama Court of Criminal Appeals addressed the admissibility argument only as a state court evidentiary question. However, the court also considered the alleged improper argument about

116

satanic information, since Grayson presented both claims together.  *See Grayson v. State*, 824 So.2d

804, 821-822 (Ala. Crim. App. 1999).  The pertinent portions of its opinion state:

> The appellant argues that the trial court committed reversible error by allowing books and drawings that were characterized as "satanic" into evidence; he argues that this evidence was irrelevant and highly prejudicial to the appellant.  In raising this argument, the appellant specifically refers to satanic drawings found in the trunk of his vehicle that were admitted into evidence, testimony from a State's witness that he had been reading from a satanic book at her home, and argument by the prosecutor during the sentencing phase of the trial that the victim's murder had been satanic.  The appellant argues that this evidence was irrelevant to the present crime, that it was inadmissible because its probative value was greatly outweighed by its prejudicial effect on the jury, and that it was an impermissible attack on his character.

> The record indicates that, before trial, the appellant filed a motion to suppress certain drawings (presumably drawings of a pentagram and devil's head) and a diary kept by the appellant, which were found during the search of the appellant's vehicle.  The appellant argued that this evidence was unduly prejudicial, but the State responded that the drawings and the diary were admissible as evidence of motive.  The trial court denied the appellant's motion and the drawings and notebook were admitted into evidence.  A book found in the appellant's room following the murders entitled *Never on a Broomstick*, which recounted the history of witches, was also held to be admissible as relevant to prove the appellant's interest in the occult.  The testimony the appellant objects to was that of the sister of one his friends, who testified that, shortly after the murder, the appellant was present with her brother and other friends at her home.  She testified that, at one point, the appellant walked out to his car and returned with a blue book, from which he began to read.  The witness testified that the book was a "satanic book" and testified that she and others were offended by the reading.  She testified that the appellant had left a book at her house, which she gave to an investigating officer.  This book was admitted into evidence and apparently dealt with the subject matter of witchcraft.  The argument by the prosecutor to which the appellant refers occurred during the prosecution's closing argument at the sentencing phase of this trial.  During his argument, the prosecutor indicated that this offense was possibly some sort of ritual or offering.  The prosecutor's argument was as follows:

> > It's true that not everyone convicted of capital murder deserves the death penalty.  Capital murder is typically somebody goes into the Quik-Mart, puts a gun in the face of the cashier and gets forty or fifty dollars and the cashier resists somehow and shoots them or kills them, or even worse, kills them to eliminate a witness, or even worse than that, like the Lindbergh kidnapping, takes the baby and when the ransom is not forthcoming then kills the baby.  Those are typical

117

capital murder cases.  And although there is no good reason, there is in that mind some rational basis.

[The appellant] tells Lila Busby, no, I'm not a Satanist and I don't know anything about this case.  But he enjoyed everything that he did to Vicki for absolutely no reason other than to perhaps to sacrifice her to Satan.  And that's how you know it's especially heinous, atrocious, and cruel, not just that he was indifferent to the suffering, but that he enjoyed it.

*Grayson v. State*, 824 So.2d 804, 818-819 (Ala. Crim. App. 1999).

After further discussion of comparative cases, the appellate court concluded:

In the present case, the evidence concerning the appellant's interest in Satanism was admissible as relevant to show the motive for this brutal and senseless killing.  It was properly introduced as an exception to the rule prohibiting evidence of a defendant's character in order to prove his guilt in the present case.  *Campbell v. State*, 718 So.2d 123, 128 (Ala.Cr.App.1997); *Willis v. State*, 449 So.2d 1258, 1260 (Ala.Cr.App.1984).  Moreover, the probative value of this evidence outweighed its potential prejudicial effects.

"'Prejudicial" is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.'  [Citation omitted.]  'Of course, "prejudice, in this context, means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.'"  *Averette v. State, supra*, at 1374.

*Robinson v. State*, 528 So.2d 343, 347 (Ala.Cr.App. 1986) (emphasis in original).  *See also Campbell v. State, supra*, at 128.  Thus, in *State v. Waterhouse*, 513 A.2d 862, 864-65 (Me. 1986), the Supreme Court of Maine determined that evidence of Satanism and the defendant's belief therein was relevant toward proving his intent as well as being probative of motive.  The Court then undertook the balancing of the probative value of this evidence against the danger of its unfair prejudice to the defendant. The Court stated:

We acknowledge that evidence of defendant's Satanic beliefs carried with it the potential for creating unfair prejudice.  Nevertheless, the evidence was relevant and probative on the issues of both motive and

> intent, and since the challenge to this evidence is based on Rule 403
> [M.R.Evid.,] for error at all to exist that probative value must be
> substantially overbalanced by the danger of unfair prejudice.
> Weighing these factors, we conclude that the admission of evidence
> regarding Satanism was not so highly prejudicial, nor did it so taint
> defendant's trial, as to amount to obvious error.

*Id.* at 865.

> As to the appellant's claims concerning the prosecutorial argument made
> during the closing argument at sentencing, those comments must be evaluated in the
> context of the entire trial. *Duren v. State*, 590 So.2d 360, 364 (Ala.Cr.App. 1990),
> *aff'd*, 590 So.2d 369 (Ala. 1991), *cert. denied*, 503 U.S. 974, 112 S.Ct. 1594, 118 L.
> Ed. 2d 310 (1992). Moreover, such arguments are to be viewed as delivered in the
> heat of debate and it should be assumed that such statement are valued by the jury at
> their true worth and are not expected to "become factors in the formation of the
> verdict." *Bankhead v. State*, 585 So.2d 97, 106 (Ala.Cr.App. 1989), *remanded on
> other grounds*, 585 So.2d 112, 127 (Ala. 1991), *aff'd*, 625 So.2d 1141 (Ala.Cr.App.
> 1992).

> A review of the record in the present case, including the specific details of the
> torture of the victim and the brutality of the killing, clearly demonstrates that the
> evidence concerning Satanism did not have an undue tendency to move the jury to
> convict the appellant on an improper basis. There was no error as to admission of this
> evidence.

*Grayson v. State*, 824 So.2d 804, 821-822 (Ala. Crim. App. 1999).

### b.    Presentation and Resolution of the Claim on Collateral Review

In his Rule 32 petition, Grayson alleged:

> his federal and state constitutional rights were violated by the introduction of
> irrelevant and highly prejudicial evidence that he was somehow involved in satanic
> activities. The admission of evidence of this type is flatly unconstitutional unless the
> State can show that there is a direct link between the satanic activity and the crime.
> *See Dawson v. Delaware*, 503 U.S. 159 (1992)(reversing where evidence of
> defendant's beliefs, including that he was one of Satan's disciples, was admitted
> although they had no relevance to the issues being decided in the proceeding). Here,
> the State did not come close to making such a showing. The admission of this
> evidence violated Mr. Grayson's rights under the Fourth, Fifth, Sixth, Eight [sic] and

Fourteenth Amendments to the Federal Constitution, the Alabama Constitution and
Alabama law.[51]

(Vol. 16 at 123-24).  The Rule 32 court found the claim "procedurally barred as it had been raised and

addressed during the direct appeal.  *Grayson*, 824 So. 2d at 822; *A.R.Cr. P.* 32.2(a)(4)."  (Tab. 56 at

142).  Its decision was affirmed by the Alabama Court of Criminal Appeals.  (Tab. 57 at 5-7).

### c.  Presentation of a Federal Claim in State Court

The evidentiary aspect of this claim, as raised in Grayson's brief on direct appeal, shows that

no federal claim was presented.  Instead, on direct appeal, any error regarding the admissibility of the

evidence was predicated solely on the Alabama Rules of Evidence.  Nonetheless, since the Rule 32

court found that the claim was "procedurally barred [pursuant to Ala. R. Crim. P. 32.2(a)(4) because]

it was raised and addressed during the direct appeal," this court must examine Grayson's due process

and First Amendment claims.  It is understood that:

> [t]he standard of review for state evidentiary rulings in federal habeas corpus
> proceedings is a narrow one.  Only when evidentiary errors "so infused the trial with
> unfairness as to deny due process of law" is habeas relief warranted.  *Lisenba v.*
> *California*, 314 U.S. 219, 228, 62 S.Ct. 280, 286, 86 L.Ed. 166 (1941), *quoted and*
> *applied in*, *Estelle v. McGuire*, 502 U.S. 62, 75, 112 S.Ct. 475, 484, 116 L. Ed. 2d 385
> (1991); *accord Baxter v. Thomas*, 45 F.3d 1501, 1509 (11th Cir.) (evidentiary ruling
> claims reviewed only to determine whether the error "was of such magnitude as to
> deny fundamental fairness"), *cert. denied*, 516 U.S. 946, 116 S.Ct. 385, 133 L. Ed. 2d
> 307 (1995); *Kight v. Singletary*, 50 F.3d 1539, 1546 (11th Cir. 1995), *cert. denied*,
> 516 U.S. 1077, 116 S.Ct. 785, 133 L. Ed. 2d 735 (1996).  Such a determination is to
> be made in light of the evidence as a whole.

*Felker v. Turpin*, 83 F.3d 1303, 1311 -1312 (11th Cir. 1996).

Therefore, the threshold question for this court is whether the trial court committed an

evidentiary error under Alabama law. If it did not, the court need go no further in analyzing this

---

[51]  The court notes that Grayson admits he did not advise the state court of his desire to present
*Dawson* as a First Amendment claim.

claim.[52]  Even if the state court did erroneously admit into evidence the items about which Grayson complains, he still is not entitled to relief unless the errors deprived him of a fundamentally fair trial. After careful review, this court finds that the state court did not violate its own evidentiary principles and certainly did not violate Grayson's right to due process of law by admitting the evidence.

The record shows that Grayson's contention that there was no evidence linking the murder to satanic activity is simply not true. The manner in which the crime was carried out, and the perpetrators' behavior and demeanor after the murder, including but not limited to the mutilation of the deceased and the prideful glee associated with the crime, is extremely bizarre, sadistic, and evil. Admission of the trappings of the occult was relevant to show a possible motive for the atrocity, not to lambast Grayson's character.  Moreover, any possible prejudice to Grayson was outweighed by the probative value of the evidence. The court finds no error in the state court's admission of the evidence, and Grayson's trial was not rendered fundamentally unfair as a result.  No violation of his right to due process occurred.

_____

[52]  Such an analysis was performed in *Williams v. Kemp*, wherein the Eleventh Circuit held:

We conclude that Williams was not deprived of fundamental fairness because the peace warrant evidence objected to was properly admitted.  *See Amadeo v. Kemp*, 816 F.2d 1502, 1504-05 (11th Cir.) (where Georgia Supreme Court expressly ruled that evidence was, under state law, properly admitted, "we cannot say that its admission denied Amadeo fundamental fairness. . . ."), *cert. granted*, 484 U.S. 912, 108 S.Ct. 257, 98 L. Ed. 2d 214 (1987). Under  O.C.G.A. sec. 24-2-2 (1982 & Supp. 1987) evidence of "prior difficulties between the accused and the victim is admissible to illustrate the accused's motive, intent, or bent of mind toward the victim"; therefore, the peace warrant was clearly relevant to show Williams' motive and "bent of mind" towards Lane.  *See Hales v. State*, 250 Ga. 112, 113, 296 S.E.2d 577, 579 (1982).  Accordingly, we conclude its admission into evidence did not violate Williams' due process rights.

*Williams v. Kemp*, 846 F.2d 1276, 1281-1282 (11th Cir. 1988).

Grayson's reliance on *Dawson v. Delaware*, 503 U.S. 159 (1992) also misses the mark. Dawson, a member of the Aryan Brotherhood, was convicted of capital murder while on escape from a Delaware prison.  Prior to the sentencing phase of the trial, the prosecutor and defense stipulated that evidence concerning the group would be limited to the following:  "that an Aryan Brotherhood prison gang originated in California in the 1960s, that it entertains white racist beliefs, and that a separate gang in the Delaware prison system calls itself the Aryan Brotherhood." *Id.* at 165. The Supreme Court found the stipulation was so narrowly tailored that it rendered the information irrelevant to Dawson's sentencing hearing.  *Id*. at 165-68.  The Brotherhood also was deemed to be irrelevant because the murder had no racial overtones and the prosecution presented no evidence showing that the Brotherhood had committed or endorsed violent acts that would pertain to future dangerousness.  Because of these two factors, the court found that the prosecutor could not use Dawson's membership in the Aryan Brotherhood as evidence of bad character in order to rebut mitigating evidence presented by Dawson of his own good character.  *Id*. at 167-68.

No such stipulation occurred in Grayson's case. Moreover, as already explained, the occult was relevant to explain a motive for and the depravity associated with the crime.  Therefore, the state court's rejection of the claim is not contrary to *Dawson*.

For these reasons, this claim is without merit and due to be denied.

### d.     Improper Prosecutorial Argument Concerning Satanism

Inasmuch as evidence pertaining to the occult was properly admitted at trial, it was not improper for the prosecutor to comment upon or to draw a reasonable inference from it during the penalty phase.  Neither was it prejudicial, because there is no reasonable probability that the result of the sentencing hearing would have been altered otherwise.

Arguments delivered while wrapped in the cloak of state authority have a heightened impact on the jury. For this reason, misconduct by the prosecutor ... must be scrutinized carefully." *Drake v. Kemp*, 762 F.2d 1449, 1459 (11th Cir. 1985) *(en banc)*, *cert. denied*, 478 U.S. 1020, 106 S.Ct. 3333, 92 L. Ed. 2d 738 (1986). Improper prosecutorial arguments will not compel habeas corpus relief, however, unless they rendered the defendant's sentencing proceeding "fundamentally unfair." *Brooks v. Kemp*, 762 F.2d 1383, 1400 (1985) *(en banc)*, *vacated on other grounds*, 478 U.S. 1016, 106 S.Ct. 3325, 92 L. Ed. 2d 732 (1986), *reinstated*, 809 F.2d 700 (11th Cir.) *(en banc)*, *cert. denied*, 483 U.S. 1010, 107 S.Ct. 3240, 97 L. Ed. 2d 744 (1987). In making this inquiry, we must determine whether the improper comments "were so egregious as to create a reasonable probability that the outcome was changed because of them." *Brooks*, 762 F.2d at 1403. A "reasonable probability" is one sufficient to undermine confidence in the outcome. *Wilson v. Kemp*, 777 F.2d 621, 623 (11th Cir. 1985), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2258, 90 L. Ed. 2d 703 (1986). "If a reviewing court is confident that, absent the improper remarks, the jury's decision would have been no different, the proceeding cannot be said to have been fundamentally unfair." *Tucker v. Kemp*, 802 F.2d 1293, 1296 (11th Cir. 1986) *(en banc)*, *cert. denied*, 480 U.S. 911, 107 S.Ct. 1359, 94 L. Ed. 2d 529 (1987).

In applying this standard, we remain aware of the primary importance of examining the entire context of the trial proceeding. *Brooks*, 762 F.2d at 1413. Thus, a reviewing court should not assess prosecutorial comments in isolation, shorn of their context. *See Johnson v. Wainwright*, 778 F.2d 623, 631 (11th Cir. 1985) (evaluating challenged comments in light of "the rest of the prosecutor's speech"), *cert. denied*, 484 U.S. 872, 108 S.Ct. 201, 98 L. Ed. 2d 152 (1987). "In this regard, isolated or ambiguous or unintentional remarks must be viewed with lenity." *Brooks*, 762 F.2d at 1400. We also consider the lack of an objection in examining the impact of a prosecutor's closing argument, as the omission "may demonstrate defense counsel's belief that the live argument, despite its appearance in a cold record, was not overly damaging." *Brooks*, 762 F.2d at 1397 n. 19; *see also Davis v. Zant*, 36 F.3d 1538, 1551 n. 20 (11th Cir. 1994) ("The failure to object can sometimes serve to clarify an ambiguous record as to whether a particular argument was in fact misleading or prejudicial."). This court also evaluates whether "defense counsel's closing argument ... ameliorate[d] the damage done to the defense by the prosecutor's [statements]." *Davis*, 36 F.3d at 1551; *see also Brooks*, 762 F.2d at 1397-98. Moreover, we consider the trial court's instructions to the jury, as they "may remedy effects of improper comments." *Brooks*, 762 F.2d at 1400. And, of course, we consider the evidence of guilt and the weight of aggravating and mitigating factors. *See Brooks*, 762 F.2d at 1415-16. "A court need not determine whether specific arguments are proper or improper if, taken as a whole, they would not require relief." *Brook*s, 762 F.2d at 1403 n. 31.

*Cargill v. Turpin,* 120 F.3d 1366, 1379 (11th Cir. 1997).

It is clear that the state court properly applied the above standard to the pertinent facts surrounding this particular claim of prosecutorial misconduct. Since its application was not unreasonable, there is no basis upon which Grayson is entitled to habeas relief.

Accordingly, this claim is due to be denied.

### 4.   Petitioner's Federal and State Constitutional Rights Were Violated When the Fruits of an Illegal Search Were Admitted Against Him at Trial (Doc. #36 at 54-55)

Grayson alleges that during a pre-trial suppression hearing, Agent Sweatt admitted that in order to obtain a warrant to search Grayson's car, he presented an affidavit indicating that the vehicle was located in Jefferson County, Alabama, when, in fact, Sweatt knew the car was located in St. Clair County, Alabama.  (Doc. #36 at 54).  He further asserts that even though Sweatt testified that he verbally "told the judge that the car was going to be moved to Jefferson County so forensics would not have to go to St. Clair County, the affidavit did not reflect that," and, therefore, the affidavit "was clearly false."  (*Id.*) (*citing* Vol. 4 at 306-25).  Moreover, Grayson asserts that H.T. West, the individual who gave consent for the police to transport the car from St. Clair County to Jefferson County, had no proprietary interest in the car and, therefore, no legal authority to consent.  (*Id.*). Based on the foregoing, Grayson declares that the search of his vehicle was unlawful, and that the admission of "allegedly satanic" items found in his vehicle violated his "federal rights to due process and a fair trial."  *Id.* at 54-55.

In *Lawhorn v. Allen*, 519 F.3d 1272, 1287-288 (11th Cir. 2008), the Eleventh Circuit recently explained the general parameters of federal review of unconstitutional search and seizure claims.

> We are generally barred from hearing Fourth Amendment claims in a federal habeas corpus proceeding.  In *Stone*, the Supreme Court held that

> where the State has provided an opportunity for full and fair litigation
> of a Fourth Amendment claim, a state prisoner may not be granted
> federal habeas corpus relief on the ground that evidence obtained in an
> unconstitutional search or seizure was introduced at his trial.

428 U.S. at 494, 96 S.Ct. at 3052.

> An "opportunity for full and fair litigation" means just that: an
> opportunity. If a state provides the processes whereby a defendant can
> obtain full and fair litigation of a fourth amendment claim, *Stone v.
> Powell* bars federal habeas corpus consideration of that claim whether
> or not the defendant employs those processes.

*Caver v. State of Ala.*, 577 F.2d 1188, 1192 (5th Cir. 1978). "'[F]ull and fair
consideration' in the context of the Fourth Amendment includes 'at least one
evidentiary hearing in a trial court and the availability of meaningful appellate review
when there are facts in dispute, and full consideration by an appellate court when the
facts are not in dispute.'" *Bradley v. Nagle*, 212 F.3d 559, 565 (11th Cir. 2000)
(*quoting Caver*, 577 F.2d at 1191). Although "sometimes 'full and fair consideration'
means consideration by two tiers of state courts[;] sometimes it requires consideration
by only one." *O'Berry v. Wainwright*, 546 F.2d 1204, 1213 (5th Cir. 1977).

> For a claim to be fully and fairly considered by the state courts,
> "where the facts are in dispute, full and fair consideration requires
> consideration by the fact-finding court, and at least the availability of
> meaningful appellate review by a higher state court. Where, however,
> the facts are undisputed, and there is nothing to be served by ordering
> a new evidentiary hearing, the full and fair consideration requirement
> is satisfied where the state appellate court, presented with an
> undisputed factual record, gives full consideration to defendant's
> Fourth Amendment claims."

*Tukes v. Dugger*, 911 F.2d 508, 513-14 (11th Cir. 1990) (*quoting O'Berry*, 546 F.2d
at 1213). Although a defendant cannot show a Fourth Amendment violation if "[t]he
state of the law at the time of his trial did not deprive [the defendant] of an
opportunity for full and fair litigation" of his claim, *Caver*, 577 F.2d at 1194, the
situation is different if the claim did not exist at the time of his trial. Where the
"particular Fourth Amendment claim did not even exist until years after [the
defendant's] arrest and trial [ ], . . . he did not benefit from the 'opportunity for fair
and full litigation' of it in [the state's] court[ ] to which he was entitled." *Anderson
v. Calderon*, 232 F.3d 1053, 1068 (9th Cir. 2000). A claim argued at trial and on
appeal but "ignored" by the state appellate court has not received full and fair

consideration, and our consideration of it is thus not barred by *Stone*.[53] *Agee v. White*, 809 F.2d 1487, 1490 (11th Cir. 1987).

*Lawhorn v. Allen*, 519 F.3d 1272, 1287-288 (11th Cir. 2008).

Grayson argues that, contrary to Respondent's assertion, *Stone v. Powell* does not bar federal review of this claim because he did not get a full and fair hearing during the state court process.  (Doc. #44).  He reasons that "the state court made factual determinations without support in the record and reached legal conclusions that were objectively unreasonable under the appropriate Supreme Court precedent.  (*Id.*).

Grayson's complaint has no relation to the habeas question that this claim actually presents–whether he was afforded a full and fair hearing on his Fourth Amendment claim.  The record shows that Grayson did receive such consideration in state court; he simply disagrees with the outcome.  If Grayson's reasoning were adopted, then any petitioner could bypass *Stone v. Powell* simply by alleging that, regardless of how full and fair his state court opportunity to litigate the claim, he believes the state court's rejection of it is contrary to § 2254(d).  That approach would result in a complete circumvention of *Stone v. Powell* in every habeas petition. For the foregoing reasons, this court is precluded from further review of this claim.

---

[53]  At this juncture, the Eleventh Circuit included footnote 21, which reads:

Where, however, the issue was presented to the state trial, intermediate appellate, and state supreme courts, each court rejected the issue, the intermediate appellate court stated that it had "carefully examined the record and determined" the merits of the issue, and a dissent from the denial of rehearing before the intermediate appellate court was written on that issue, the petitioner "cannot successfully argue that he did not receive full consideration of his claim." *Swicegood v. State of Ala.*, 577 F.2d 1322, 1324 (5th Cir. 1978).

5.    **Petitioner's Rights Were Violated by Admission of His Involuntary Statement (Doc. #36 at 55-56)**

Grayson alleges that his statement to police was involuntary because he has bipolar disorder,[54] and "[t]he statement at issue had been taken at approximately 4:30 a.m., after [he] had taken Elavil to help him sleep." (*Id.* at 55). Also, he was "questioned in a small room for an undetermined amount of time, before" the 5:38 a.m. administration of a *Miranda* warning. (*Id.*).[55] Further, Grayson alleges that Agent Flippo informed him that his co-defendants had made statements implicating Grayson as the ringleader of the crime. Then Agent Flippo remained in the room with Grayson while he made his statement. (*Id.*). However, Grayson does not allege that any coercive tactics were used to obtain his statement. (*Id.*).[56] Based on the foregoing, Grayson alleges that the admission of his statement violated his "5th, 6th, 8th, and 14th Amendment" constitutional rights. (*Id.* at 55-56) (*citing Miranda v. Arizona*, 384 U.S. 436 (1966)).

Respondent answers that Grayson is not entitled to § 2254(d) relief because the "Alabama Court of Criminal Appeals correctly found that Grayson was read his *Miranda* warnings and voluntarily gave a statement." (Doc. #40 at 51). On direct appeal, the Alabama Court of Criminal Appeals thoughtfully examined this claim and devoted a lengthy portion of its opinion to discussing

---

[54] Grayson expressly stated that "it is unknown what, if any, coercive tactics were used to obtain his statement." (*Id.*). Grayson also alleges that he suffered from Attention Deficit Hyperactivity Disorder (ADHD) as well, but this assertion is presented for the first time in this habeas petition, and is procedurally defaulted.

[55] Grayson did not testify in support of his motion to suppress, at pre-trial or at trial. Therefore, this blanket assertion cannot even be considered. Moreover, at a pre-trial suppression hearing, Investigator Sweatt testified that Grayson was asked no questions whatsoever prior to the reading of a *Miranda* waiver. (Vol. 3, Tab. 4 at 39).

[56] Again, there has never been any testimony by Grayson– or any evidence presented from any other source in support of Grayson's assertion–that two officers remained in the room with him while he made a statement.

both its factual findings and the legal basis for its conclusions of law.  *Grayson v. State*, 824 So.2d

831-36 (Ala. Crim. App. 1999).  This court does not find it necessary to recite the decision in its

entirety.  The findings of fact and conclusions of law at the heart of the claim, however, are as

follows:

> The appellant argues that the trial court committed reversible error by failing
> to suppress his statement; he alleges the statement was involuntary because he did not
> knowingly and intelligently waive his *Miranda* rights.  *Miranda v. Arizona*, 384 U.S.
> 436, 86 S.Ct. 1602, 16 L. Ed. 2d 694 (1966).  Specifically, the appellant alleges that
> his statement was involuntary.  He says that he was approached by the investigating
> officers while he was incarcerated on unrelated charges and was questioned at 4:00
> a.m., after being told that his codefendants had made statements to the authorities
> indicating that he had been the "ring leader" in the murder.  The appellant also argues
> that his waiver of his *Miranda* rights was ineffective because, he says, it was not
> knowingly and intelligently entered; he says the investigating officer merely testified
> that the appellant "indicated that he understood the waiver" without testifying as to
> how the appellant had indicated this understanding and also testified that the appellant
> "appeared to understand the rights" without testifying as to the basis for this belief.

> However, the record indicates that, during the investigation, the appellant was
> in the Jefferson County Jail.  He was brought down to an interview room where three
> officers were waiting.  There was testimony that the appellant was advised that the
> officers wanted to speak to him pertaining to the murder in St. Clair County and the
> appellant agreed to talk to them.  He was then read his *Miranda* rights.  Agent Flippo,
> of the Alabama Bureau of Investigation, testified that "he stated he understood" these
> rights and that he signed the warnings.  Agent Flippo was subsequently asked if the
> appellant indicated that he understood his rights; he answered affirmatively.  Agent
> Flippo was also asked if the appellant indicated that he wished to have an attorney
> present before speaking to the officers, and the officer indicated that he did not.  Agent
> Flippo was asked if the appellant indicated that he wished to remain silent, to which
> Agent Flippo answered, "No."  He was subsequently asked, "Did he [the appellant]
> indicate that he understood the waiver portion of the form?"  Agent Flippo responded
> that he did.  He testified that neither he nor anyone in his presence indicated that
> things would be better for the appellant if he cooperated and that neither he nor
> anyone in his presence threatened the appellant in any way before he signed the form
> or spoke to them.  He was then asked, "Did he appear to understand the rights that you
> explained to him?"  Agent Flippo responded affirmatively and testified that the
> appellant had spoken voluntarily.

Another of the officers who was present during the questioning, Investigator Joe Sweatt of the St. Clair County Sheriff's Department, testified that Agent Flippo advised the appellant of his *Miranda* rights while in his presence. Investigator Sweatt testified that Agent Flippo asked the appellant if he understood all of his rights and the appellant "responded with yes." He further testified that the waiver section of the form was also read to the appellant by Agent Flippo and that the appellant signed the waiver. Investigator Sweatt further testified that the appellant did not appear groggy, but rather appeared to be alert and awake and that he did not seem to be under the influence of any medication.

After the appellant waived his rights, he apparently made a statement indicating that his accomplices were not going to "hang this thing on me." He was left alone, and made a handwritten statement.

The State provided sufficient evidence that the appellant's waiver of his *Miranda* rights was undertaken knowingly. The appellant appears to take issue with the term "indicated" as it was used in relation to the appellant's affirmation of his understanding. However, this term was included in the questions posed by the prosecutor, rather than in the officer's responses. Moreover, as long as there is sufficient supporting testimony, there is no impropriety in the use of such a term. *See, e.g.*, *Drinkard v. State*, 777 So.2d 225 (Ala.Cr.App. 1998) (use of "indicated" concerning the appellant's knowingly waiving his rights to a sentencing hearing before a jury); *Abernathy v. State*, 642 So.2d 519, 521 (Ala.Cr.App. 1994) (where appellant alleges that his statement was improperly admitted because his mental condition rendered him incapable of waiving his *Miranda* rights, the Court found no impropriety as "the evidence is unrefuted that [the officer] read the appellant his *Miranda* rights and that the appellant indicated that he understood those rights and signed a waiver"). *Pardue v. State*, 661 So.2d 263, 266 (Ala.Cr.App. 1993) ("The unrefuted evidence shows that the officers read a waiver of rights form to the appellant, that the appellant indicated that he understood his rights and the contents of the waiver form, and that the appellant signed the waiver of rights before he gave his statement.").

As to the claims by the appellant that his statement was involuntary, he bases these allegations on the fact that the officers approached him at approximately 4:00 a.m. or 5:00 a.m. and that he had allegedly taken medication to help him sleep. Although the appellant claims that his being interrogated between 4:00 a.m. and 5:00 a.m. caused his statement to be involuntary, such alleged fatigue is only a factor to be considered by the jury in determining whether it finds a statement to be involuntary. . . .

"(1) The test for voluntariness, involves a consideration of the totality of the circumstances. *Haynes v. Washington*, 373 U.S. 503, 513-14, 83 S.Ct.

1336, 1342-43, 10 L. Ed. 2d 513 (1963).  (2) "The admissibility of confessions is for the court, their credibility is for the jury." *Phillips v. State*, 248 Ala. 510, 520, 28 So.2d 542 (1946).  (3) Where the voluntariness inquiry presents conflicting evidence and the trial judge finds that the confession was voluntarily made, great weight must be given his judgment. "(W)here there is a genuine conflict of evidence great reliance must be placed upon the finder of fact." *Blackburn v. Alabama*, 361 U.S. 199, 208, 80 S.Ct. 274, 281, 4 L. Ed. 2d 242 (1960).  (4) This finding will not be disturbed on appeal unless the appellate court is convinced that the conclusion is palpably contrary to the great weight of the evidence and manifestly wrong. *Harris v. State*, 280 Ala. 468, 470-71, 195 So.2d 521 (1967).  (5) Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial court need only be supported by substantial evidence and not to a moral certainty. *Thompson v. State*, 347 So.2d 1371, 1375 (Ala.Cr.App.), *cert. denied*, 347 So.2d 1377 (Ala.1977), and cases cited therein. "Review of the court's action is limited to determining whether its finding was clearly erroneous." *United States v. Greer*, 566 F.2d 472, 473 (5th Cir. 1978).'"

*Whittle v. State*, 518 So.2d at 796, quoting *Musgrove v. State*, 519 So.2d at 576.

*Jackson v. State*, *supra*, at 1327. . . .

. . . in the present case, there was no evidence other than the appellant's argument that he was groggy because he was awakened at an early hour, to support this claim.  The officers testified that the appellant appeared to be alert and coherent.

Moreover, the appellant's claim that his statement was involuntary because he had taken sleeping pills given to him by medical personnel at the hospital before giving his statement, is only a factor to be considered in determining the weight and credibility, because there is no indication that the appellant was intoxicated to the point of mania. . . .

. . . .

130

> In the present case, the State presented sufficient evidence that the appellant's statement was knowingly and voluntarily given.  Therefore, despite the appellant's claims concerning the lateness of the hour, as well as the fact that he had been given sleeping pills, the statement was properly admitted into evidence.

*Grayson v. State*, 824 So.2d 804, 831-35 (Ala. Crim. App. 1999).

Grayson contends that he is entitled to habeas relief because the Alabama Court of Criminal Appeals' rejection of the claim on direct appeal is the product of unreasonable factual determinations based on the evidence before it, and upon an unreasonable application of clearly established federal law. (Doc. #44 at 55-59).  However, for the most part Grayson supports this assertion simply by repeating the same historical facts set out by the appellate court and reciting the same constitutional standards applied to those facts.  (*Id.*).  He does, however, make certain specific assertions that must be addressed.

First, Grayson alleges that the state appellate court made a factual error when it found that Grayson was left alone in a room for approximately forty minutes while he wrote his statement.  To support that allegation, Grayson points out that Investigator Sweatt testified that "he left Agent Flippo in the room with Mr. Grayson for 35 to 40 minutes." (Doc. #44 at 56)(*citing* Vol. 3, Tab. 4 at 37). A review of Sweatt's testimony, which took place during a pre-trial suppression hearing, shows that Sweatt testified that when he left the interview room, Agent Flippo was still in the room. (Vol. 3, Tab. 4 at 37).  Sweatt was not asked where he and Agent Flippo were located during the time Grayson was writing his statement, but he did not dispute that he was unaware of what happened after he left Flippo and Grayson for the time period in question.  (*Id.* at 37-38).  Agent Flippo did not testify at the pre-trial suppression hearing.

At trial, Investigator Sweatt was not asked any questions about the circumstances surrounding Grayson's statement. (Vol. 6 at 429-45 & Vol. 7 at 446-49). However, Agent Flippo testified that after he asked Grayson if he would be willing to write a statement, Grayson indicated that he would, and Flippo got him a pencil and a piece of paper. (Vol. 7 at 520). Flippo testified that he "then left the room along with Investigator Dixon and Mr. Sweatt and went and got a cup of coffee. [Grayson] was allowed to remain in the room by himself at this point." (*Id.*). About thirty to forty minutes later, Flippo could see through a window that Grayson had finished writing and returned to the room. (*Id.*). Based on the foregoing testimony, which represents the only evidence concerning the matter, the state appellate court's finding that Grayson was left alone in a room to write his statement is not an unreasonable determination of the facts in light of the evidence before the court.

Next, Grayson complains that the appellate court's decision was constitutionally unreasonable because it did not specifically mention "bipolar disorder" in its opinion. (Doc. #44 at 56). He contends that, because the illness was not mentioned, it necessarily follows that the state appellate court failed to include his condition in its analysis of whether his statement was knowingly, intelligently, and voluntarily given. (*Id.*). This court rejects that proposition. Grayson did assert in his brief on direct appeal that he had been diagnosed with bipolar disorder. (Vol. 11, Tab. 32 at 36). However, he did not allege or describe symptoms indicating that he was in a manic or hypomanic state, or that he was unable to remember, comprehend, or understand what was happening to him because of the illness. (*Id.* at 36). In fact, all he alleged was that he had taken some medication to sleep, had been awakened early from a sound sleep, and was groggy and surrounded by officers. (*Id.* at 35).

All of these facts must be considered. However, the testimony provided by law enforcement officers (to the effect that Grayson was alert and communicative) is also to be considered as well. Although Grayson is correct that the appellate court did not specifically refer to the term "bi-polar disorder" in its opinion, the court spent an extensive amount of time setting out and reviewing cases pertaining to a variety of factors in an obvious effort to decide whether, by itself or under the totality of all circumstances presented, Grayson's statement was knowingly, intelligently, and voluntary given. Those cases included discussions of the fatigue factor and the levels of intoxication, including intoxication as a result of alcohol, drugs, and medications for nervous conditions. *Grayson v. State,* 824 So. 2d at 831-36. The findings of fact made by the appellate court are entitled to a presumption of correctness, and Grayson has not overcome that presumption. As such, the state court's decision was not based on an unreasonable determination of historical facts in light of the evidence before it. The state court's findings and its conclusion that the petitioner's statement was voluntary are not contrary to or an unreasonable application of federal law, or an unreasonable determination of the facts in light of the evidence before it. Accordingly, this claim is due to be denied.

**6.     Trial Court's Failure to Grant Motion for Acquittal Violated Petitioner's Rights (Doc. #36 at 56)**

Grayson asserts that "the trial court failed to grant a motion for acquittal, despite the fact that the State had not proven beyond a reasonable doubt that the victim had been killed during the course of a kidnapping [in the first degree]." (*Id.* at 56). He asserts that there was no evidence presented at trial establishing that he "abducted the victim with the intent to injure or abuse her," as required by Alabama's kidnapping statute. (*Id.*). In his reply brief, Grayson concedes that he incorrectly set out

Alabama law in his petition,[57] and that the State "set out an additional ground that allows for a conviction in regard to kidnapping in the first degree." (Doc. #44 at 59). He nevertheless insists that the trial evidence was insufficient to prove kidnapping, and, therefore, his capital conviction was obtained in violation of due process. (Doc. #36 at 56) (citing Jackson v. Virginia, 443 U.S. 307, 314 (1979)). Grayson refers to his own statement and argues that "[t]he State's evidence showed the victim voluntarily went with Petitioner and the co-defendants to the Pipeline, and participated in events which, unfortunately resulted in her death." (Id.) (citations to trial record omitted).

Respondent argues that Grayson cannot show that he is entitled to habeas relief from the state court's rejection of the claim on direct appeal. (Doc. #40 at 52). The pertinent portions of that opinion read:

> The appellant argues that the trial court committed reversible error by denying his motion for a judgment of acquittal on the capital offense of murder during the course of a kidnapping because, he says, there was insufficient evidence to establish the underlying offense of kidnapping in the first degree. Specifically, the appellant argues that there was insufficient evidence to establish the necessary element of abduction and that the evidence indicated that the victim had been neither abducted nor restrained, but rather went with the appellant and his friends voluntarily.
>
> Kidnapping in the first degree is defined in Alabama by § 13A-6-43(a), Ala.Code 1975, in pertinent part, as follows:

---

[57] In its answer, Respondent asserted:

> This Court should note that Grayson has misrepresented Alabama law in relation to kidnapping in the first degree. . . .Grayson asserts that "[t]o support a charge of kidnaping [sic] in the first degree, Alabama law requires an abduction with intent to '[i]nflict physical injury upon [another] or to violate or abuse him sexually. . . ." (Doc. #36 at 56) quoting Ala. Code § 13A-6-43(a). Contrary to Grayson's representation to this Court, Section 13A-6-43(a)1-6 provides six alternate methods by which to establish kidnapping in the first degree, such as kidnapping the victim to terrorize that person or commit a felony.

(Doc. #40 at 52, n.5).

A person commits the crime of kidnapping in the first degree if he abducts another person with intent to

. . . .

(4)   Inflict physical injury upon him or to violate or abuse him sexually. . .

"To abduct," for purposes of kidnapping and related offenses in Alabama, is defined as "[t]o restrain a person with intent to prevent his liberation by either . . . [s]ecreting or holding him in a place where he is not likely to be found, or . . . [u]sing or threatening to use deadly physical force."  § 13A-6-40(2).  Thus, in order to be abducted, a person must be restrained, which is defined as follows:

To intentionally or knowingly restrict a person's movements unlawfully and without consent, so as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved.  Restraint is 'without consent' if it is accomplished by:

a.  Physical force, intimidation or deception. . . .

Therefore, in order to restrain and kidnap a person, it must be without consent; thus, the person's participation is not voluntary.  However, it is not necessary that this element exist from the beginning of the course of conduct as long as it is present during the course of conduct.  *But see* § 13A-6-43(b), Ala.Code 1975 (addressing the affirmative defense of voluntary safe release.)  Such a situation, where the initial consent is withdrawn and the victim becomes an involuntary participant, would be true particularly where the victim, as was the case here, was a hitchhiker.  Moreover, where the initial consent is obtained by fraud, such as agreeing to take the hitchhiker to a particular destination with no intent of doing so, then the consent was never lawful.  In *In the Matter of the Appeal in Maricopa County* Juvenile Action No. J-72472-S, 25 Ariz.App. 377, 543 P.2d 806 (1975), two juvenile girls were hitchhiking home when they were picked up by the appellant and an accomplice, who indicated that they would take the girls home.  Instead, they took the girls to a park to smoke marijuana.  The girls asked not to go to the park, but after threats were made on their life, they pretended to smoke the marijuana and continued to ask to be taken home.  While they were at the park, one of the girls was raped.  The appellant argued on appeal that he was not guilty of kidnapping because the girls "admittedly initially entered the car voluntarily rather than as a result of force," and "[u]nder appellant's theory, once an initial consent to accompany a person for a particular purpose is established, he may detain the person consenting for whatever time or other purpose

135

he desires." 25 Ariz.App. at 379, 543 P.2d at 808.  The Court of Appeals of Arizona did not "believe this to be the law in Arizona or the effect of this particular statute." The court held:

> However, consent procured by fraud is not legal consent. . . . Furthermore, '"it is not necessary that the involuntariness exist from the beginning of the transaction, if subsequently there is an enforced detention or restraint of liberty."' *Ibid. citing People v. Trawick*, 78 Cal.App.2d 604, 178 P.2d 45 (1947).

In *State v. Gough*, 257 N.C. 348, 126 S.E.2d 118 (1962), annotated at 257 N.C. 348, 126 S.E.2d 118, 95 A.L.R.2d 441, the Court points out:

> ""According to the authorities we have cited, the crime of kidnapping by its very nature cannot ordinarily be committed by an act to which a person, being capable in law of consenting, consents in a legally valid manner. But where false and fraudulent representations or fraud amounting substantially to a coercion of the will of the kidnaped person are used as a substitute for force in effecting kidnapping, there is, in truth and in law, no consent at all on the part of the victim. In brief, under those circumstances the law has long considered fraud and violence as the same in the kidnapping of a person."' 126 S.E.2d at 124.

The Court there equated fraud with force as an equally condemned manner of carrying out a kidnapping, which it characterized as an unlawful interference with the freedom or personal liberty of the victim, under a statute which merely employed the word 'kidnap.'  The Court also declared that limiting the kidnapping statute only to forcible takings, as distinguished from fraudulent ones, would be too narrow a construction and would render the statute 'useless' in many cases.  Appellant's contention here would put every hitchhiker indefinitely at the whim or mercy of the driver offering him a ride, merely because of his original, limited consent.  This certainly could not have been the intent of the legislature in enacting § 13-491, and such a construction would not make any more sense in Arizona in 1975 than it did in North Carolina in 1962.

The young victims 'consented' to be given a ride to their home; instead, over their objections and pleas, and under threats of death,

136

they were driven to a far distant place, where one of them was raped. Even if the original 'taking' was not forcible, and even if we omit consideration of a 'fraudulent' initial taking, an unlawful detention ('taking') commenced when the appellant refused to carry out his promise to drive the girls home and instead proceeded further away therefrom against their wills.

*Id.*, 25 Ariz.App. at 379-80, 543 P.2d at 808-09.

Similarly, in *People v. Brown*, 622 P.2d 109 (Colo.App. 1980), the appellant argued that, because the hitchhiker-victim voluntarily entered his truck, the State failed to prove the lack-of-consent element of kidnapping. However, the Court held this claim to be without merit because "it is not necessary to show that involuntariness exists from the beginning of the transaction if subsequently the victim is forcibly detained." *Id*. at 110, *citing People v. Camden*, 16 Cal.3d 808, 129 Cal.Rptr. 438, 548 P.2d 1110 (1976). The Court held that because there was testimony indicating that the victim "was restrained from leaving the truck when it turned off the road in a direction contrary to his destination and his efforts to get away once the truck stopped were thwarted," a jury could have inferred "that the initial consent had expired." *People v. Brown*, *supra*, at 110-11.

In *State v. Barbour*, 278 N.C. 449, 180 S.E.2d 115 (1971), a driver offered a hitchhiker a ride, which he accepted, but four miles down the road, the hitchhiker held a knife to the driver's throat. The hitchhiker was subsequently charged with kidnapping, but argued that he was an invitee and that there was no unlawful carrying away by force against the victim's will at the inception of the offense, and that, therefore, a kidnapping did not occur. However, although the Court stated that "[i]t may be conceded that there was no unlawful taking and no unlawful carrying away of [the victim] by force and against his will at the inception and during the first four miles or so or defendant's travel[,] . . . there was an unlawful taking and carrying away . . . from the time defendant held a knife against the throat and chest of [the victim] and, under threat of killing him, commanded and caused him against his will to abandon his own plans and drive the truck as directed by defendant." *State v. Barbour*, 278 N.C. at 456, 180 S.E.2d at 119.

Moreover, while it is true that an initial consent may be withdrawn during the course of a kidnapping, in the present case, the initial consent was obtained by fraud when the appellant and his accomplices indicated that they would take the victim to Louisiana. Their intent was clearly to return to the Pipeline, where they planned to restrain the victim.

At common law, kidnapping generally involved forcibly stealing people and shipping them into another country. 3 Blackstone,

137

> *Commentary on the Laws of England*, Book IV, Ch. 15, p. 219 (1769).
> In the United States the requirement of forcible restraint was expanded
> to include 'some form of enticement or deception.'  Note, *From
> Blackstone to Ignis: A Judicial Search for a Definition of Kidnapping*,
> 16 Suffolk U.L.R.Ev. 367, 372 n. 27 (1982).

> *State v. Amell*, 303 Or. 355, 358, 736 P.2d 561, 563 (1987) (wherein the defendant had
> argued that "once his hitchhiker victim had consented to enter defendant's car and be
> taken from one place to another, no subsequent action by defendant could turn the
> incident into a kidnapping").  *See also Ervin v. Superior Court, Contra Costa County,*
> 119 Cal.App.3d 78, 173 Cal.Rptr. 208 (1981).

> The State presented sufficient evidence in the present case from which the jury
> could infer that the victim was restrained without her consent and that the appellant
> was guilty of kidnapping in the first degree.

*Grayson v. State*, 824 So.2d 804, 816-18 (Ala. Crim. App. 1999).

This court has reviewed the trial record and observed the careful attention paid by the appellate court in its factual and legal decision-making process. The findings of fact made by the appellate court are entitled to a presumption of correctness, which is simply overcome by Grayson's reference to his own confession and blanket citations to the trial record.  There was more than sufficient evidence to convict Grayson of kidnapping in the first degree under a variety of theories. The state court's decision is neither contrary to nor an unreasonable application of federal law, or an unreasonable determination of the facts in light of the evidence before it.  This claim is without merit and due to be denied.

### 7.    Petitioner's Constitutional Rights Were Violated When the State's Witnesses Were Allowed to Testify to Extensive Hearsay (Doc. #36 at 56-57)

Although he refers to witnesses (plural) in the title of this section, Grayson actually argues that the trial court violated his rights by allowing a single witness, Sweatt, who was "one of the State's key witnesses, to testify to extensive hearsay." (Doc. #36 at 56-57).  Respondent argues that this claim

138

is procedurally defaulted because it was dismissed in accordance with adequate and independent state procedural rules. (Doc. #40 at 6). Grayson replies that Respondent's "contention fails to recognize that ineffective assistance of appellate counsel can serve both as cause and prejudice for failure to raise a claim during direct appeal." (Doc. #44 at 8) (citation and quotation omitted).

While Grayson has raised an independent ineffective assistance of appellate counsel claim (*see* Claim Five in his habeas petition), for reasons set out in this court's discussion of that claim, *infra*, it too, is procedurally defaulted. As the ineffective assistance of appellate counsel claim is itself procedurally defaulted, it cannot serve as cause to overcome the procedural default of this substantive claim. Accordingly, this claim is procedurally defaulted and due to be dismissed.

8.    **Trial Court Erred in Sustaining the State's Objections to the Defense's Expert Testimony (Doc. #36 at 57-59)**

Grayson alleges that during the guilt phase of trial, the trial court erroneously sustained prosecutorial objections that prohibited mental health experts for the defense from testifying about "the relationship between bipolar disorder and voluntary intoxication." (*Id.* at 58). Respondent argues that this claim is procedurally defaulted because it was dismissed in accordance with Rule 32.2(a), an adequate and independent state procedural rule. (Doc. #40 at 7). Grayson replies that Respondent's "contention fails to recognize that ineffective assistance of appellate counsel can serve both as cause and prejudice for failure to raise a claim during direct appeal." (Doc. #44 at 8). However, a careful review of the record shows that the neither the substantive claim nor an assertion of ineffective assistance of counsel was ever raised during post-conviction proceedings. Therefore, it is procedurally defaulted. *Teague v. Lane*, 489 U.S. 288, 297-98 (1989) (claims not raised at all in state court are procedurally barred). Accordingly, this claim is due to be dismissed.

**9.   The Trial Court Erred in Not Allowing Trial Counsel to Question a Witness for the State Concerning a Civil Suit Involving the Wrongful Death of the Victim (Doc. #36 at 59-60)**

Grayson alleges that his constitutional right to a fair trial was violated when the trial court limited defense counsel's cross-examination of a witness' financial interest in a civil suit pertaining to the victim.  (*Id*. at 59-60) and ( Doc. # 44 at 60).  He contends that his inability to explore fully the partiality of the victim's mother violated the Confrontation Clause.  (*Id.* at 60) (citing *Delaware v. Van Arsdall,* 475 U.S. 673 (1986)*; Davis v. Alaska*, 415 U.S. 308, 316-17(1974); *Smith v. Illinois*, 390 U.S. 129, 131 (1968)).

Respondent argues that Grayson cannot show that he is entitled to habeas relief from the Alabama Court of Criminal Appeal's rejection of the claim on direct appeal, as affirmed by the Alabama Supreme Court.  (Doc. #40 at 53-54).

Before setting out the pertinent portions of the appellate court's opinion, this court notes that the victim's mother, Mrs. Deblieux, was *twice* called to the stand to testify at the guilt phase of trial. She was initially called as the State's witness.  (*See* C.R. Vol. 6, Tab. 16).  The prosecution questioned Mrs. Deblieux, a resident of Louisiana, and she testified that she was the mother of the victim and the grandmother of the victim's two children.  (*Id.* at 283, 286).  Mrs. Deblieux also testified (over the hearsay objections of counsel) that the victim had called her on February 21st and told Mrs. Deblieux that she was traveling to Louisiana the next day because she was tired of living in Tennessee and wanted to come home.  (*Id.* at 284-85).  Mrs. Deblieux never heard from her daughter again.  (*Id.* at 285).  During the State's case in chief, defense counsel then declined to cross-examine Mrs. Deblieux.  (*Id.* at 287).

Mrs. Deblieux was called to testify a second time by Grayson's counsel as part of his case in chief.  (*See* C.R. Vol. 8 at 737-45).  Counsel first asked Mrs. Deblieux if she knew Ed Hardin, and she responded that he "was an attorney my daughter's estranged husband hired."  (*Id.* at 738).  She also testified that she did not participate in the hiring of Mr. Hardin and had never met with him. (*Id.*). When asked about the nature of the lawsuit, Mrs. Deblieux stated that she had "received a pack like this [indicating a stack of papers], which I have no idea what it means."  (*Id.* at 738).

Grayson's counsel then marked a copy of the lawsuit for identification purposes as Exhibit 2.  (*Id.* at 737-43).  When defense counsel showed Mrs. Deblieux Exhibit 2 and asked her if she recognized it, the prosecution objected to the question on the ground of "relevance," and defense counsel replied, "Hasn't been offered yet."  (*Id.* at 738-39).  The trial judge sustained the objection. (*Id.* at 739).

Defense counsel then asked to make a proffer and the trial court sent the jury into recess to address the matter.  (*Id.* at 739).  Defense counsel's proffer was as follows:

> MR. BOUDREAUX:  Your Honor, I have a certified copy of the lawsuit filed here in Jefferson County naming not only this defendant but the co-defendants in this case and the lawsuit of course of the family of Ms. Deblieux who have filed it though Terry Sanders indicating that they hold Miller Brewing Company responsible because of drinking Ice House beer, that they became intoxicated and that is the cause of death rather than some Satanic ritual as Mr. Brown has tried to portray.  And I think the jury needs to know all the facts concerning this case, that part of her testimony here today is in furtherance - - convicting these defendants is in furtherance of a lawsuit, and it goes to her bias and credibility that she has a financial interest in the outcome of this case [since she had a financial interest in the estate.]

(*Id.* at 740) (bracketed portion added).

Defense counsel agreed with the prosecutor that Mrs. Deblieux was "a corpus witness [in] that the victim called her and said she was coming home and she never heard from her again," and also

141

contended that "she was trying to portray her daughter in a favorable light." (*Id.* at 742-43). Counsel continued to insist "she has a financial interest in this case and that [goes to] bias and credibility." (*Id.* at 743). The trial court then refused to allow Exhibit 2 to be admitted. (*Id.*). The court also refused to entertain any more[58] argument about whether Mrs. Deblieux's testimony regarding her conversation with her daughter was hearsay.[59] (*Id.*). Thereafter, the defense rested its case.

On direct appeal, the Alabama Court of Criminal Appeals acknowledged that there was a "rule of law that a witness in the prosecution of a criminal case may be cross-examined concerning a civil action for damages against the accused based on actions involved in the instant criminal case." *Grayson v. State*, 824 So.2d at 814 (state court citations omitted). It found, however, that "the appellant in the present case was not prevented from questioning the witness concerning the civil suit; moreover, the witness's testimony in this case was not the sort that would be affected by bias." *Id.* at 814.

The appellate court also confirmed that "'[a]n accused should be allowed wide latitude in showing any fact which would tend to establish bias or interest on the part of any witness testifying against him.'" *Id.* at 814-15 (quoting *Mullins v. State*, 699 S.W. 2d 346, 351 (Tex.App. 1985)(additional citations omitted by appellate court). However, this latitude was to be tempered by the trial judge's discretion to "restrict a cross-examination to evidence which is competent, material and relevant, and when the examination has been carried as far as will serve to develop the issues

---

[58] The trial court already had overruled defense counsel's objections to this testimony when it was presented during the State's case in chief. The appellate court affirmed the trial court's ruling, and held that the testimony was not hearsay because it was not introduced to prove the truth of the matter asserted, but to show the daughter's intentions, plans, and motive. *Grayson v. State*, 824 So.2d at 813-815.

[59] A synopsis of these events is also set out in the opinion of the Alabama Court of Criminal Appeals. *See Grayson v. State*, 824 So.2d at 811-813.

142

involved and aid the search for truth, we approve of the trial court curtailing the length and limit of

the examination." (*Id.* at 815) (quoting *State v. Ballas*, 180 Conn. 662, 676, 433 A.2d 989, 996-97

(1980)(internal quotation marks omitted).  The appellate court then determined that:

> In the present case, the victim's mother testified that an action had been brought by
> the decedent's estate arising out of this same conduct against the Miller Brewing
> Company and that she had received the paperwork on the suit.  There was no error in
> the trial court's excluding the copy of the complaint in the wrongful death action or
> any further questioning concerning the action as the appellant had already been
> allowed "to place his theory of bias before the jury on cross-examination."  *Mullins
> v. State*, *supra*, at 351 ("if the victim had denied filing a civil lawsuit arising out of the
> assault, it then might have been proper to allow [further testimony]").

*Grayson v. State,* 824 So.2d 804, 815 (Ala. Crim. App. 1999).  The Alabama Supreme Court affirmed

the appellate court's decision.  *Ex parte Grayson*, 824 So.2d 844, 846 (Ala. 2001).

Before addressing the crux of Grayson's claim, it is important first to correct two

misstatements made by the Alabama Court of Criminal Appeals.[60]  First, the Miller Brewing

Company was not mentioned by Mrs. Deblieux, nor did she testify about the subject matter of the

lawsuit.  Therefore, the jury was not aware of the specifics of defense counsel's bias theory.

Second, the appellate court incorrectly characterized the trial judge's evidentiary ruling.  The

trial court did not limit defense counsel's *examination* of Mrs. Deblieux regarding the subject matter

---

[60]  There was also a misstatement in the special concurring opinion by Justice Johnstone:

> This Court should not approve the rationale that "the subject matter of this testimony is not
> the sort that bias, even if present, would affect."  I agree with the Court of Criminal Appeals,
> however, that the particular impeachment offered by the defendant - testimony about a
> wrongful death suit filed by the victim's ex-boyfriend - was appropriately allowed but
> limited by the trial court.  In other words, I agree that the trial court properly exercised its
> discretion in allowing the impeachment to the extent that it was probative on the issue of
> bias and in limiting the impeachment to the extent that it would be irrelevant or not
> probative.

*Ex parte Grayson*, 824 So.2d 844, 846 (Ala. 2001).  Actually, Mrs. Deblieux testified that the lawsuit had
been filed by the victim's estranged husband, not her ex-boyfriend.

of the lawsuit.  The record shows that the only definitive rulings made by the trial court were (1) that Exhibit 2 would not be admitted into evidence and (2) the ruling the trial court had made earlier in the trial–that Mrs. Deblieux's testimony regarding her conversation with her daughter was not hearsay (because it was not offered to prove the truth of the matter asserted but to show the victim's mental operations)–would not be revisited.  Certainly, Mrs. Deblieux's testimony was interrupted while defense counsel was attempting to refresh her memory with the substance of the lawsuit.  However, the colloquy that took place outside the presence of the jury became focused upon Exhibit 2 itself, and ultimately, the trial court's *only* ruling with regard to the attempt to impeach Mrs. Deblieux pertained *exclusively* to the admissibility of that exhibit, not any additional cross-examination of her as to the subject matter of the lawsuit.  After this side bar and conference outside the presence of the jury, defense counsel made no further efforts to renew his examination of Mrs. Deblieux.  Instead, Grayson proceeded to rest the defense case.

Because counsel's examination of Mrs. Deblieux was not limited by any ruling made by  the trial judge, Grayson cannot complain that he was precluded from further *questioning* Mrs. Deblieux.  Therefore, the appellate court was factually correct when it found that defense counsel was not prevented from questioning Ms. Deblieux regarding the civil suit.  Grayson had a full and fair opportunity to cross-examine Mrs. Deblieux after she testified on direct during the State's case in chief.  In Grayson's case in chief, after the trial court refused to allow Exhibit 2 into evidence, defense counsel made no other attempt (or request) to refresh Mrs. Deblieux's recollection as to any specifics concerning the suit or otherwise ask her questions.

Having set out the correct procedural and historical facts upon which this claim is predicated, the court turns its attention to the constitutional standard of review applicable to Confrontation Clause

claims.  This standard is set out in *Delaware v. Van Arsdall*, 475 U.S. 673 (1986).  As to the existence

of a constitutional error in claims of this sort, the United States Supreme Court held:

> The Confrontation Clause of the Sixth Amendment guarantees the right of an
> accused in a criminal prosecution "to be confronted with the witnesses against him."
> The right of confrontation, which is secured for defendants in state as well as federal
> criminal proceedings, *Pointer v. Texas*, 380 U.S. 400 (1965), "means more than being
> allowed to confront the witness physically."  *Davis v. Alaska*, 415 U.S., at 315.
> Indeed, "'[t]he main and essential purpose of confrontation is *to secure for the
> opponent the opportunity of cross-examination*.'"  *Id.*, at 315-16 (quoting 5 J.
> Wigmore, Evidence § 1395, p. 123 (3d ed. 1940)) (emphasis in original).  Of
> particular relevance here, "[w]e have recognized that the exposure of a witness'
> motivation in testifying is a proper and important function of the constitutionally
> protected right of cross-examination."  *Davis*, *supra*, at 316-17 (citing *Greene v.
> McElroy*, 360 U.S. 474, 496 (1959)).  It does not follow, of course, that the
> Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing
> any limits on defense counsel's inquiry into the potential bias of a prosecution
> witness.  On the contrary, trial judges retain wide latitude insofar as the Confrontation
> Clause is concerned to impose reasonable limits on such cross-examination based on
> concerns about, among other things, harassment, prejudice, confusion of the issues,
> the witness' safety, or interrogation that is repetitive or only marginally relevant.  And
> as we observed earlier this Term, "the Confrontation Clause guarantees an opportunity
> for effective cross-examination, not cross-examination that is effective in whatever
> way, and to whatever extent, the defense might wish."  *Delaware v. Fensterer*, 474
> U.S. 15, 20 (1985) (per curiam) (emphasis in original).

*Delaware v. Van Arsdall*,  475 at 678-79 (parallel citations omitted).

Grayson did not suffer any constitutional error because the trial record shows that defense

counsel's *examination* of Mrs. Deblieux was not limited in any fashion.  But even if this court were

to assume (and, to be clear, it does not) that the trial court did limit the examination of Ms. Deblieux

to such an extent that the jury was unable to discern the nature and content of the defense's bias

theory, it was well within the trial court's discretion to do so.  Any bias that the best impeachment

of Ms. Deblieux could have shown would be marginally relevant at best, and reasonably falls within

at least one of the exclusions afforded to the trial court's discretionary authority.  This same reasoning

applies to the outright refusal to admit a copy of the lawsuit itself.

None of the Supreme Court cases upon which Grayson relies–*Delaware v. Van Arsdall*, 475 U.S. 673 (1986); *Davis v. Alaska*, 415 U.S. 308 (1974); *Smith v. Illinois*, 390 U.S. 129 (1968)–support his claim that he suffered a Confrontation Clause violation. First, in *Delaware v. Van Arsdall*, the trial court precluded the defense from cross-examining a principal prosecution witness, Robert Fleetwood, about an agreement that he had made to speak with the prosecutor about the murder in question in exchange for the dismissal of an unrelated drunk driving charge. *Delaware v. Van Arsdall,* 475 U.S. at 673. The Supreme Court described Fleetwood's connection and knowledge concerning facts underlying the murder of the victim as follows:

> The State's case against respondent was based on circumstantial evidence, and proceeded on the theory that respondent had either killed Epps or assisted Pregent in doing so. Several of the partygoers testified about the party and the scene after the killing. The party, which lasted from late in the morning of December 31, 1981, until shortly before midnight, was held in the adjacent apartments of Pregent and Robert Fleetwood. Respondent, who was one of at least a dozen guests who attended the party during the course of the day, had stopped in for two brief periods in the late afternoon and early evening and then returned for a third time at about 11:30 p.m. By that time the party was over, Pregent had quarreled with a female guest, kicked a hole in a hallway wall and had to be restrained. An intoxicated Epps had been placed on a sofa bed in Pregent's apartment after passing out. And shortly before 11 p.m., a second altercation of some kind occurred, prompting Fleetwood to close the party in his apartment to everyone except his two friends, Alice Meinier and Mark Mood. When respondent returned to Pregent's apartment at about 11:30, only Pregent and Epps were present.

> Robert Fleetwood was the 10th of 16 prosecution witnesses. In addition to recounting uncontroverted facts about the party, he testified that sometime between 11 and 11:30 p.m. he walked across the hall, looked into Pregent's living room from the doorway, and saw respondent sitting on the edge of the sofa bed next to Pregent's feet. Fleetwood, who did not have a complete view of the bed, did not see Epps or anyone else in the apartment. Upon returning to his own apartment, Fleetwood stayed awake long enough to hear nearby bells ring in the New Year, at which point he passed out. App. 82-85.

> Meinier, who with Mood had remained awake in Fleetwood's apartment, testified that at roughly 1 a.m. respondent knocked at Fleetwood's door. Respondent's shirt and hands were spattered with blood, and he was holding a long, blood-covered

146

> knife.  According to Meinier, respondent stated that "he had gotten in a fight" but that he "got them back."  *Id.*, at 130.  After turning the knife over to Mood and washing his hands, respondent said "I think there's something wrong across the hall."  *Id.*, at 132.  Meinier went to Pregent's apartment and discovered Epp's body lying in a pool of blood on the kitchen floor.   Mood then summoned the police, who found respondent in Fleetwood's apartment and Pregent asleep on the blood-splattered sofa bed in his living room.

*Delaware v. Van Arsdall*,  475 U.S. at 674-76 (1986).

In *Van Arsdall*, defense counsel was entirely precluded from delving into Fleetwood's potential bias based upon his agreement with the prosecutor.  Nevertheless, in *Van Arsdall*, even when the defendant was not allowed the opportunity to examine for potential bias,  the Supreme Court held that the denial of that opportunity was, like other alleged Confrontation Clause errors, subject to a harmless error analysis.  As already discussed, in this case, Grayson had the opportunity to explore Mrs. Deblieux's bias, he was simply not allowed to introduce a copy of the lawsuit.

Next, in *Davis v. Alaska*, defense counsel was prohibited from asking the state's star witness any questions concerning his juvenile probationary status even though

> counsel made it clear that he would not introduce Green's juvenile adjudication as a general impeachment of Green's character as a truthful person but, rather, to show specifically that at the same time Green was assisting the police in identifying petitioner he was on probation for burglary.  From this petitioner would seek to show-or at least argue-that Green acted out of fear or concern of possible jeopardy to his probation.  Not only might Green have made a hasty and faulty identification of petitioner to shift suspicion away from himself as one who robbed the Polar Bar, but Green might have been subject to undue pressure from the police and made his identifications under fear of possible probation revocation.  Green's record would be revealed only as necessary to probe Green for bias and prejudice and not generally to call Green's good character into question.

*Davis*, 415 U.S. at 311.

As a result of the trial court's ruling, defense counsel was limited to cross-examining Green about his state of mind during the time he purportedly witnessed the offense, and the time he was

questioned and identified Davis as the individual who committed the burglary.  *Id.* at 313.  Green's

answers indicated that he was unconcerned by the incident and the police interview.  *Id.*  The last

question counsel asked Green was whether he had ever been questioned by the police.  Green

answered, "[n]o."  *Id.*  Thereafter, the prosecutor objected, and counsel was allowed to go no further

with his line of questioning.  *Id.*  In finding serious flaws with defense counsel's ability to effectively

confront and expose fully the credibility and bias of the witness, the Supreme Court reasoned:

> Since defense counsel was prohibited from making inquiry as to the witness'
> being on probation under a juvenile court adjudication, Green's protestations of
> unconcern over possible police suspicion that he might have had a part in the Polar
> Bar burglary and his categorical denial of ever having been the subject of any similar
> law-enforcement interrogation went unchallenged.  The tension between the right of
> confrontation and the State's policy of protecting the witness with a juvenile record
> is particularly evident in the final answer given by the witness.  Since it is probable
> that Green underwent some questioning by police when he was arrested for the
> burglaries on which his juvenile adjudication of delinquency rested, the answer can
> be regarded as highly suspect at the very least.  The witness was in effect asserting,
> under protection of the trial court's ruling, a right to give a questionably truthful
> answer to a cross-examiner pursuing a relevant line of inquiry; it is doubtful whether
> the bold 'No' answer would have been given by Green absent a belief that he was
> shielded from traditional cross-examination.  It would be difficult to conceive of a
> situation more clearly illustrating the need for cross-examination.  The remainder of
> the cross-examination was devoted to an attempt to prove that Green was making his
> identification at trial on the basis of what he remembered from his earlier
> identifications at the photographic display and lineup, and not on the basis of his
> February 16 confrontation with the two men on the road.

*Id.* at 313-14.

Finally, in *Smith v. State of Illinois*, 390 U.S. 129, 131 (1968), the defense "was denied the

right to ask the principal prosecution witness either his name or where he lived, although the witness

admitted that the name he had first given [on direct examination by the prosecutor] was false."

(brackets added).  This individual had acted as an undercover informant and purchased narcotics from

the defendant, the crime for which the defendant was being tried.  *Id.*  Due to the location of the

purchase, only the informant and the defendant had actual knowledge of whether a drug transaction took place.  *Id.*  The *Smith* Court held that, "when the credibility of a witness is in issue, the very starting point in 'exposing falsehood and bringing out the truth' through cross-examination must necessarily be to ask the witness who he is and where he lives.  The witness' name and address open countless avenues of in-court examination and out-of-court investigation."  *Id.*

Grayson contends that, but for the exclusion of evidence at issue, he could have shown that Mrs. Deblieux was biased because, as a potential heir to her daughter's estate, she might have had a financial interest and thus testified sympathetically that her daughter told her she wanted to go home to Louisiana.  However, Grayson has not provided any legal theory which does anything other than speculate that Mrs. Deblieux actually held an interest (or even thought she held an interest) in the estate under any applicable state law.  Furthermore, Andy Smith, the victim's friend, testified, without objection at trial, that he drove the victim to the exit where she was picked up by the defendants, and that the *victim* told *him* she was going to hitchhike to Louisiana.  (Vol. 6, Tab. 16 at 290).  Thus, unlike *Davis* and *Smith* upon which Grayson relies, not only was there no falsehood to expose in this case, but Smith, who had no financial stake in the lawsuit, corroborated Ms. Deblieux's testimony that her daughter was traveling to Louisiana.  There was nothing to be accomplished by admitting a copy of the lawsuit into evidence (other than to potentially confuse the jury), and the exclusion of that exhibit did not affect in any way defense counsel's ability to place the bias question before the jury. The trial court simply did not limit that inquiry.

Grayson's case does not present a Confrontation Clause issue.  Rather, this is simply an instance where a state trial judge determined that an *exhibit* offered by Grayson's counsel (*i.e.*, the lawsuit) was inadmissible to impeach Mrs. Deblieux.  The main thrust of her testimony was

established through another witness, Smith, who testified that the victim told him that she planned to hitchhike to Louisiana and that he drove her to a certain exit (where she met Grayson and his co-defendants). This evidentiary ruling did not hinder the search for the truth in this matter. Therefore, it was within the trial judge's sound discretion to apply state evidentiary rules to exclude this evidence which was only marginally relevant at best.

Alternatively, even if the Confrontation Clause were implicated by a hypothetical limitation of defense counsel's examination or the exclusion of documentary evidence, for these same reasons, the error was harmless. The United State Supreme Court has described the prejudice inquiry applicable to Confrontation Clause errors as follows:

> the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis. The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. *Cf. Harrington*, 395 U.S., at 254; *Schneble v. Florida*, 405 U.S., at 432.

*Delaware v. Van Arsdall* 475 U.S. at 684 (parallel citations omitted).

Even if Grayson could show the trial court committed error here (and to be clear he cannot), consistent with the analysis above, the court finds that each of these factors unquestionably points to harmless error beyond a reasonable doubt. First, Mrs. Deblieux's testimony on direct during the prosecution's case in chief, while relevant, simply was not critical to the State's case. Her testimony was consistent with that of Andy Smith, who told the jury that the victim intended to hitchhike to Louisiana after he dropped her at the exit. Thus, Mrs. Deblieux's testimony was both cumulative and

150

corroborated.  Second, there was nothing in the record that in any way contradicted her testimony.

Third, and contrary to Grayson's suggestions otherwise, the trial court did nothing to limit his cross

examination of Mrs. Deblieux.  Finally, in light of the overwhelming evidence against Grayson and

the overall strength of the prosecution's case, it is clear beyond a reasonable doubt that Grayson

would have been convicted if the court had permitted introduction of the lawsuit (Exhibit 2), or (for

that matter) even if Mrs. Deblieux was never called to testify.

>    For all of these reasons, the court finds that this claim is without merit and is due to be denied.

**10.    The Trial Court's Failure to Recuse Itself Violated Petitioner's Rights (Doc. #36
        at 60)**

>    Grayson alleges that his right to a "'fair trial by a fair tribunal'" under the due process clause

was violated because "the trial judge failed to recuse himself, despite his defeat of [defense counsel]

Boudreaux in a judicial election that occurred near the time of trial."  (*Id.* at 60) (*quoting Bracy v.

Gramley*, 520 U.S. 899, 904-905 (1997)).  Grayson asserts that a showing of "[a]ctual prejudice is

not a prerequisite to recusal" and that a "[t]rial before an impartial judge is not subject to harmless

error analysis."  (*Id.*) (*citing Arizona v. Fulminante*, 499 U.S. 279, 308 (1991); *In Re Murchison*, 349

U.S. 133, 136 (1955)).

>    Grayson pursued this claim before trial, and filed a petition for writ of mandamus with the

Alabama Court of Criminal Appeals, in which he alleged that the trial court was violating Alabama

law and the Canons of Judicial Ethics by continuing to preside over the action. The appellate court

considered and denied the petition, holding, in pertinent part: "Grayson has made no showing that

Judge McCormick could not try the case against him impartially and without bias.  A lawyer who

becomes a candidate for the public office of judge accepts the risk that, if he loses, he may have to

try cases in the court of his successful opponent."  (Vol. 2 at 234).

The state court's factual findings are presumed to be correct and Grayson has not pointed to any facts to overcome that presumption.  He cannot show that the state court's decision was contrary to or an unreasonable application of clearly established law because he has utterly failed to make specific allegations of judicial impartiality.  Grayson's reliance on *Bracy v. Gramley*, 520 U.S. 899 (1997) affords him no relief because, in that case, the Supreme Court simply held that a habeas petitioner was entitled to conduct discovery concerning the bias of a judge who had been convicted of taking bribes from criminal defendants around the time of the complainant's trial.  520 U.S. at 904-905.  As such, *Bracy* does not stand for the precedent Grayson claims.  As Grayson cannot show that the judge was partial or biased, the question of harmless error is irrelevant.  This claim is without merit and due to be denied.

### 11.    Petitioner's Rights Were Violated When the Trial Court Denied Him Funds for a Neurologist (Doc. #36 at 60-61)

Grayson concedes this claim was not raised on direct appeal, but argues that the ineffectiveness of his appellate counsel is cause to overcome the procedural default.  (Doc. #44 at 65-66).  However, as set out more fully in the discussion of Claim Five, *supra*, the independent ineffective assistance of counsel claim cannot be used as cause to overcome the procedural default because the ineffective assistance claim itself is procedurally defaulted.  This claim is due to be dismissed.

12.   **Petitioner's Federal Constitutional Rights Were Violated by the Trial Court's Failure to Disqualify the District Attorney's Office (Doc. #36 at 61)**

13.   **Petitioner's Rights Were Violated When the Trial Court Failed to Grant a Continuance to Allow Petitioner's Attorney to Obtain Necessary Information (Doc. #36 at 61-62)**

The court addresses these sub-claims (L and M) together because they are procedurally defaulted for the same reason. Respondent argues that the claims are procedurally defaulted because they were summarily dismissed by the state court in accordance with Rule 32.2(a), which is an adequate and independent state procedural rule, and that the state appellate court affirmed the dismissal after considering Grayson's argument on collateral appeal. (Doc. #40 at 7) (citing Tab. 56 at 147 and Tab. 57 at 18, respectively). Grayson again replies that Respondent's "contention fails to recognize that ineffective assistance of appellate counsel can serve both as cause and prejudice for failure to raise a claim during direct appeal." (Doc. #44 at 8).

While Grayson has raised an independent ineffective assistance of appellate counsel as Claim Five in his habeas petition, for reasons set out in this court's discussion of that claim, *infra*, it, too, is procedurally defaulted. Again, as the ineffective assistance of appellate counsel claim is itself procedurally defaulted, it cannot serve as cause to overcome the procedural default of this substantive claims. Accordingly, these claims are procedurally defaulted and due to be dismissed.

14.   **The Trial Court Erred by Instructing on the Aggravating Circumstance of Heinous, Atrocious, or Cruel During the Sentencing Phase of Petitioner's Trial (Doc. #36 at 62-63)**

Grayson alleges that the trial court erred in instructing the jury as to the heinous, atrocious, or cruel (HAC) aggravating circumstance, because most of the wounds the victim suffered were post-mortem, and, by definition and application, Alabama's HAC factor applies only to events occurring before the victim is dead. (Doc. #36 at 62).

153

Respondent asserts (Doc. #40 at 57-58) and Grayson tacitly concedes (Doc. #44 at 65) that he did not raise this as a federal claim on direct appeal. Nonetheless, Grayson contends that the failure of appellate counsel to "federalize" the claim is cause to overcome the procedural default. (*Id.*). As set out more fully in Claim Five, *supra*, the independent ineffective assistance of counsel claim cannot be used as cause because the ineffective assistance claim itself is procedurally defaulted.

Furthermore, even if this claim were not procedurally defaulted, it is without merit. It was not error for the trial court to instruct the jury as to the HAC factor because there was ample evidence that the victim suffered terrible psychological and physical pain *preceding* her death. As aptly stated by the Alabama Court of Criminal Appeals,

> Without revisiting the facts and circumstances of the present case, see the trial court's findings of fact *supra*, this Court has held on the appeal of one of the appellant's accomplice's conviction and sentence, where the same argument concerning this same offense was raised, as follows:
>
> > We reject Loggins's claim that 'the trial court's finding that the offense was especially heinous, atrocious or cruel was incorrect as it was based on the post-mortem mutilation of the victim's body.'. . . *The evidence at trial indicated that the manner in which Loggins and his accomplices killed Deblieux was merciless and Sadistic. The findings of the trial court are fully supported by the testimony and evidence and the finding of this aggravating circumstance is fully justified.* Therefore, there was no error in the trial court's finding that the state established that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses. *See Ex parte McNair*, 653 So.2d 353, 360 (Ala. 1994), *cert. denied*, 513 U.S. 1159, 115 S.Ct. 1121, 130 L. Ed. 2d 1084 (1995).

*Loggins v. State*, 771 So.2d at 1089.

> The trial court's instruction to the jury concerning this aggravating circumstance and the trial court's finding that the circumstance existed was proper as it was amply supported by the facts and evidence. *See also Thompson v. State*, 542 So.2d 1286, 1296 (Ala.Cr.App. 1988), *aff'd*, 542 So.2d 1300 (Ala. 1989), *cert. denied*, 493 U.S. 874, 110 S.Ct. 208, 107 L. Ed. 2d 161 (1989) (this Court rejected the appellant's argument that the trial court erred in finding that the offense was especially

154

heinous, atrocious, or cruel because the majority of the victim's wounds were apparently inflicted postmortem, noting that "[t]he facts of this murder, as demonstrated through the appellant's statement, as well as through the other evidence, show a string of torturous and conscienceless acts").

*Grayson v. State*, 824 So.2d 804, 838-39 (Ala. Crim. App. 1999) (emphasis added).[61]

This claim is due to be dismissed as procedurally defaulted, or, in the alternative, denied on the merits.

### 15.    The Trial Court Erred by Instructing the Jury Prior to Sentencing Phase.[62] (Doc. #36 at 63)

Grayson contends that Alabama law required the trial court to deliver penalty phase instructions to the jury after that phase of the trial, but the trial court reversed the order of the proceedings and then failed to "re-instruct" the jury before it was to deliberate on a sentencing recommendation. (Doc. #36 at 63). He declares the trial court's action deprived him of "due process and a fair trial under the 5th, 6th, 8th, and 14th Amendments to the U.S. Constitution." (*Id.*).

---

[61] To be sure, the trial court administered penalty phase instructions to the jury *before* the penalty phase began and thereafter the closing arguments of the prosecutor and defense counsel made crystal clear that the trial court's HAC instruction, as applied to this aggravating factor in Grayson's case, only could include events occurring *before* the victim's death. As the post-conviction court explained:

the State argued to the jury, "But what we need to focus on in looking at this aggravating circumstance is what happened before death." (R. 1037) Defense counsel followed up the State's argument b[y] reiterating the requirement that the jury consider only the wounds inflicted prior to the death of the victim. (R. 1052-57).

(Tab. 56 at 76). Therefore, the trial court properly instructed the jury as to the HAC factor, all counsel complied with that instruction in their summations, and jurors were quite obviously well aware that application of the factor was limited to ante-mortem injuries. There is no reasonable likelihood that a constitutional error occurred.

[62] Grayson "include[s] by reference," the ineffective assistance of trial counsel claim having the same underlying factual allegations. (*Id.*). However, that claim already has been addressed and rejected by this court. *See supra*, Claim Two B. 2.

155

Respondent points out that on direct appeal Grayson raised this claim as a violation of state statutory law only, and as such did not present it as a federal claim. A careful review of Grayson's briefs on direct appeal shows that assertion is indeed correct.[63]   Accordingly, this claim is procedurally defaulted.[64]

Alternatively, this claim is due to be dismissed because Grayson has provided no Supreme Court precedent showing that the state court's plain error review and rejection of the claim are contrary to or an unreasonable application of clearly established federal law. Having already examined the underlying factual allegations in the context of ineffective counsel (*see supra*, Claim Two, Section B), it is readily apparent that this claim is wholly without merit. Grayson was not deprived of a fair trial or due process because of the timing of the penalty phase jury instructions in his case.

For the foregoing reasons, this claim is due to be dismissed, or, in the alternative, denied.

**16.    The Trial Court's Failure to Grant Motion for Dismissal for Systematic Underrepresentation of Cognizable Groups in the Composition of the Grand Jury Violated Petitioner's Federal and State Constitutional Rights (Doc. #36 at 63)**

This claim reads in its entirety, "[t]he trial court violated Petitioner's 5th, 6th, 8th, and 14th Amendments [sic] to the United States Constitution by failing to grant a motion to dismiss for systemic under-representation of cognizable groups in the composition of the grand jury. Petitioner is entitled to habeas relief." (Doc. #36 at 63). In his reply brief, Grayson states that "[f]or reasons

---

[63]   (*See* Vol. 11, Tab. 32 at 48-49 and Vol. 12, Tab. 35, Brief in Support of Petition for Certiorari at 54-56).

[64]   Grayson tacitly argues in his reply brief that the failure of appellate counsel to "federalize" the claim is cause to overcome the procedural default. (Doc. #44 at 65-66). However, as set out more fully in Claim Five, *supra*, the independent ineffective assistance of counsel claim cannot be used as cause because it is itself procedurally defaulted.

outlined in the petition, the State Court's denial of this claim is contrary to clearly established federal law, and represents an unreasonable application of the facts to the low as outlined." (Doc. #44 at 66).

Grayson's allegations in this court fail to satisfy the heightened pleading requirements for habeas cases.  *See*, *e.g.*, *McFarland v. Scott*, 512 U.S. 849, 856 (1994).  Although required to state the facts supporting each ground in his petition pursuant to Rule 2(c) of the *Rules Governing Section 2254 Cases in the United States District Courts*, he has provided no facts that overcome the presumption of correctness owed to the state court's factual findings, and he points to no precedential support whatsoever for his contention that the state court's legal conclusions are an affront to § 2254(d).  Therefore, the claim is due to be dismissed, or, in the alternative, due to be denied.

17. **The Trial Court Erroneously Admitted Physical Evidence Without Establishing Relevance, Chain of Custody, or Laying the Proper Predicate for the Evidence (Doc. #36 at 63-64)**

When Grayson presented this claim during post-conviction proceedings, he did so as a sub-claim within a section titled, "[t]he trial court violated Mr. Grayson's constitutional rights by failing to sustain numerous objections of defense counsel." (Vol. 16 at 119). Elsewhere in the Rule 32 petition, Grayson made an independent claim in which he asserted that his appellate counsel was ineffective for failing to raise the substantive claim on direct appeal. (*Id.* at 117).  The Rule 32 court dismissed the substantive claim, finding that the claim was procedurally barred pursuant to Alabama Rule of Criminal Procedure 32.2(a)(2), since it was not raised and addressed at trial. (Tab. 56 at 141). The court also summarily dismissed Grayson's claim of ineffective assistance of appellate counsel, finding that it lacked merit. (*Id.* at 136-40).

Grayson appealed the trial court's holding that the claim was procedurally barred. (Tab. 46 at 67).  In so doing, he argued that he had:

asserted and substantiated his claim that ineffective assistance of his counsel prevented him from adequately litigating and preserving [this issue] . . . upon appeal. Therefore, the Circuit Court should not have dismissed the petition prior to evaluating [his] ineffectiveness claim in its entirety without including an evaluation of the underlying substantive claims. *Id.* (*citing Coleman v. Thompson*, 501 U.S. 722, 752 501 U.S. 722, 752 (1991) (ineffective assistance of counsel can serve as cause for failure to raise claim on direct appeal).

The Alabama Court of Criminal Appeals rejected Grayson's attempt to superimpose a federal cause and prejudice inquiry into a state court proceeding, where such an exception to procedural default rules does not exist.  It also affirmed the trial court's summary dismissal of Grayson's discrete ineffective assistance of appellate counsel claim, but did so on the basis that the ineffectiveness claim was insufficiently pled pursuant to Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure.  Since the state appellate court was the last state court to address the ineffectiveness claim, its decision controls for purposes of federal review.

Grayson has raised an independent ineffective assistance of appellate counsel as Claim Five in his habeas petition.  However, for the reasons set out in this court's discussion of that claim, it is procedurally defaulted because the Alabama Court of Criminal Appeals relied on Rule 32.3 and Rule 32.6(b) to affirm the trial court's summary dismissal. Because the ineffective assistance of appellate counsel claim is itself procedurally defaulted, it cannot serve as cause to overcome the procedural default of this substantive claim, which Grayson has consistently admitted should have been but was not raised on direct appeal as required.  Accordingly, this claim is due to be dismissed.

**E.** <u>**Claim Five**</u>    **Appellate Counsel Was Ineffective (Doc. #36 at 64-66)**

This claim was raised for the first time in Grayson's Rule 32 petition. The trial court summarily denied it on the ground that it failed to state a claim, and dismissed it pursuant to Alabama Rule of Criminal Procedure 32.7(d).  (Tab. 56 at 136-40). The Alabama Court of Criminal Appeals

158

found that Grayson's claim was insufficiently specific, and affirmed the trial court's ruling insofar as it found that summary dismissal pursuant to Rule 32.7(d) was appropriate.  (Tab. 57 at 16).

The parties dispute whether or not this claim is procedurally defaulted.  Respondent contends that the appellate court's opinion should be construed as affirming the trial court's Rule 32.7(d) summary dismissal of the claim on the basis of lack of specificity pursuant to Rule 32.6(b).  (Doc. #40 at 63).  Alternatively, Respondent declares that Grayson is not entitled to habeas relief because "the Rule 32 court, accepting the factual allegations as true, reviewed and rejected the merits of this claim," and Grayson cannot show that the Alabama Court of Criminal Appeals' affirmance of the dismissal is an affront to § 2254(d).

In response, Grayson simply references that portion of his reply brief dedicated to Rule 32.6(b) (the variations of which are discussed in depth in Section IV.A.2, *supra*).  (Doc. #44 at 66).  He asserts that Respondent's reliance on Rule 32.6(b) "is misplaced" and that "Rule 32.6(b) is neither 'adequate' nor 'independent' of federal law."  (*Id.*).  He also contends that the state court's finding that his counsel was not objectively deficient is contrary to and an unreasonable application of clearly established law.  (*Id.*).  He attempts to support this assertion by referring the court back to the claim in his habeas petition.  (*Id.*).  Grayson also asserts he is entitled to *de novo* review of this claim because the state court did not address the prejudice prong of the claim in its opinion.  (*Id.*).

The last state court to speak to this claim was the Alabama Court of Criminal Appeals.  Its opinion reads:

> On appeal, the appellant makes only a general claim that more could have been done by his appellate counsel, Virginia Vinson, who, at the time the appellant's case was pending in the Alabama Supreme Court, was elected as a circuit judge in Jefferson County.  Attorney Bryan Stevenson was appointed to represent the appellant on his rehearing.  His representation was not challenged.  The record indicates that the appellant failed to present evidence of any specific acts or omissions by appellate

counsel that would constitute ineffective assistance.  In finding that the briefs filed by appellate counsel were the product of a reasonably competent attorney, the trial court held that "[a]lthough Grayson asserts that more issues could have been raised, that is not the standard for IAC of appellate counsel.  In fact, case law indicates that the most effective lawyers are the ones who limit their presentation of issues."  *Because the appellant's petition does not state any specific deficiencies with regard to his appellate counsel's representation, or lack thereof, the trial court was correct in dismissing the claim.*  Rule 32.7(d), Ala. R. Crim. P.

(Vol. 22, Tab. 57 at 16) (emphasis added).

A review of  the plain language of Rule 32.7(d) shows that the state court may summarily dismiss a petition if it "determines that the petition is not sufficiently specific." The Alabama Court of Criminal Appeals expressly found that this claim did not meet this required procedural criteria. (*Id.*).  "Federal courts may not review a claim procedurally defaulted under state law if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, and the bar presents an independent and adequate state ground for denying relief." *Hill v. Jones*, 81 F.3d 1015, 1022 (11th Cir. 1996) (citing *Harris v. Reed*, 489 U.S. 255, 260-61 (1989)).

After careful consideration, this court finds that Grayson's ineffective assistance of appellate counsel claims in his Petition are procedurally defaulted because the state court relied upon adequate and independent state procedural rules to dismiss the claims.  Grayson cannot show the trial court's decision was contrary to, or an unreasonable application of, clearly established federal law.  Nor can he show that the decision was based upon an unreasonable determination of the facts in light of the evidence before it.  For the foregoing reasons, this claim is procedurally defaulted and due to be dismissed.[65]

---

[65]  Grayson contests the procedural default by referring the court to his general assertion that Rule 32.6(b) is not an adequate and independent state procedural rule. (Doc. #44 at 66).  However, that assertion has already been rejected as a general proposition by this court, and Grayson makes no argument that the state appellate court arbitrarily and capriciously applied the rule to the specific allegations underlying this

**F.**   **Claim Six**      **Pretrial Publicity Made it Impossible to Receive a Fair Trial (Doc. #36 at 66-67)**

Grayson did not raise this claim either at trial or on direct appeal. When he raised it on collateral review, the post-conviction court found it to be procedurally barred pursuant to Rule 32.2(a)(3) and (5). (*See* Vol. 22, Tab. 56 at 148). The Alabama Court of Criminal Appeals affirmed the trial court's ruling on collateral appeal. (*See* Vol. 22, Tab. 57 at 18).

Grayson does not dispute the procedural default of this claim, and he does not assert that the constitutional ineffectiveness of trial or appellate counsel provides cause and prejudice to overcome the procedural default.[66] Accordingly, the claim is procedurally defaulted and due to be dismissed.

**G.**   **Claim Seven**   **Petitioner's Rights to a Fair and Impartial Jury Were Violated by the Jurors' Failure to Truthfully Disclose on Voir Dire and by the Jury's Consideration of Extraneous Material (Doc. #36 at 67-69)**

When this claim was presented for the first time in his post-conviction petition, the Rule 32 court dismissed it for lack of specificity and for failure to raise it at trial or on direct appeal pursuant to Rule 32.2(a)(3) and (5). (*See* Vol. 22, Tab. 56 at 1). The Alabama Court of Criminal Appeals summarily affirmed the trial court's decision. (*See* Vol. 22, Tab. 57 at 18).

Grayson concedes that this claim is procedurally defaulted, but asserts that "ineffective assistance of appellate counsel on direct appeal serves as cause for failure to raise the claim. Because the claim is meritorious, prejudice is also established." (Doc. #44 at 67). He points to part "IV" of

---

claim.

[66] Even if he had, Grayson's independent claim that his trial counsel was constitutionally ineffective for failing to file a motion for change of venue on the grounds of pretrial publicity is procedurally defaulted. *See supra*, Claim Two C.5. Grayson does not even mention a motion for change of venue as a basis for a claim of ineffective assistance of appellate counsel, and, in any event, that independent claim itself was procedurally defaulted. *See supra*, Claim Five.

his reply brief as support for this contention, but a review of that section reveals nothing new.  (*Id.* at 8-9).  In any event, Grayson's cause and prejudice argument fails.

As discussed earlier in this opinion, Grayson raised an *independent* ineffective assistance of appellate counsel claim in Claim Five of his petition, and simply referred the court to his substantive discussion of "Claim Seven" as providing the support for relief.  (Doc. #36 at 66).  This circuitous and conclusory argument is insufficient to state an ineffective appellate counsel claim for federal pleading purposes, and, in any event, for reasons already set out the court's discussion of Claim Five *infra*, Grayson's independent ineffective assistance of appellate counsel claims are procedurally defaulted.  Again, the court notes that independent ineffectiveness claims that are procedurally defaulted cannot serve as cause and prejudice to overcome the procedural default of the substantive claim.

For the foregoing reasons, Grayson cannot establish cause and prejudice to excuse the procedural default.  As such, this claim is procedurally defaulted and is due to be dismissed.

**H.    Claim Eight   Alabama's Capital Punishment Sentencing Scheme Is Invalid (Doc. #36 at 69-70)**

Grayson alleges that pursuant to *Ring v. Arizona*, 536 U.S. 584, 589 (2002), "[i]t was impermissible" for the trial court "to sentence him to death because this sentence had never been authorized by a jury." (*Id.* at 69) (*citing Ring v. Arizona*, 536 U.S. 584, 589 (2002)).  He also asserts that "the jury verdict in this case is impermissible" for five reasons.  First, he declares that fact findings made during the consideration and weighing of aggravating and mitigating factors in his case "were not reliably made by the jury" but by the trial judge.  (*Id.*).  Second, he complains that it is unknown whether the jury found the existence of any of the three aggravating factors argued by the State beyond a reasonable doubt.  (*Id.*).  Next, he claims that his right to due process was violated

162

because the jury was not "fully instructed" at the guilt phase "about the consequences of its findings." *Id.* Fourth, he asserts that "the aggravating circumstances were not specified in the indictment." (*Id.*). Finally, he concludes that it is "now clear that federal law condemns imposition of a sentence of death by a judge." (*Id.*) (*citing Ring*, 536 U.S. at 613 (Breyer, J., concurring in judgment)).

Grayson did not raise this claim in state court, either at trial or on direct appeal. When he raised it on collateral review, the post-conviction court found it to be procedurally defaulted pursuant to Rule 32.2(a)(3) and (5). (*See* Vol. 22, Tab. 56 at 159). The Alabama Court of Criminal Appeals affirmed the trial court's ruling on collateral appeal. (*See* Vol. 22, Tab. 57 at 18).

Respondent asserts this claim is "procedurally barred from review because [it] w[as] not raised on direct appeal and w[as] procedurally barred from review during Rule 32 proceedings." (Doc. #40 at 6-7). Grayson does not dispute Respondent's answer. Accordingly, this claim is procedurally defaulted. But even if that were not the case–*i.e.*, even if the claim were not procedurally defaulted– it is without merit.

"The Federal Constitution's jury-trial guarantee assigns the determination of certain facts to the jury's exclusive province. Under that guarantee, th[e United States Supreme] Court held in *Apprendi*, 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *Oregon v. Ice*, 129 S.Ct. 711, 716 (2009) (*quoting Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) (and acknowledging its extension to death penalty cases in *Ring v. Arizona*, 536 U.S. 584, 602, 609 (2002)).

The petitioner in *Ring* acquired habeas relief pursuant to this legal truism because of the construction and application of Arizona's death penalty sentencing scheme in a particular context. Grayson has made no attempt to identify and explain how Alabama's death penalty sentencing

scheme compares to the Arizona sentencing scheme at issue in *Ring*.  Nor has he explained how the application of Alabama's sentencing scheme in his particular case is a constitutional affront to *Ring*. The only allegations he makes are conclusory, and he has not supported his position with reasoned legal argument.

The sentencing scheme at issue in *Ring* is markedly different from Alabama's sentencing scheme.  Unlike Alabama's hybrid sentencing approach, "[i]n Arizona, following a jury adjudication of a defendant's guilt of first-degree murder, the trial judge, sitting alone, determines the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty." *Ring v. Arizona*, 536 U.S. 584, 588 (2002).  Moreover, and again unlike Alabama, Arizona's sentencing scheme[67] does not contain language that would allow "dual use of an aggravating circumstance to satisfy an element of the capital offense during the guilt phase and as a factor in the sentencing phase," an approach that has been repeatedly held to be constitutional.  *See Tuilaepa v. California*, 512 U.S. 967, 971 (1994) (*citing Lowenfeld v. Phelps*, 484 U.S. at 244-46, wherein the Supreme Court stated, "the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase. . .. The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)").

The factual circumstances underlying the application of the Arizona sentencing statute in *Ring* are different from the scenario underlying Grayson's sentence. Although the state of Arizona presented a theory that Ring committed premeditated murder during the course of a robbery, the jury

---

[67] The Supreme Court listed Arizona's statutory aggravating.  *See Ring,* at 536 U.S. 593.

convicted Ring of a lesser included offense, felony murder, which is classified as first degree murder in Arizona.  The Supreme Court explained the basis for the jury's verdict as follows:

> As later summed up by the Arizona Supreme Court, "the evidence admitted at trial failed to prove, beyond a reasonable doubt, that [Ring] was a major participant in the armed robbery or that he actually murdered Magoch."  200 Ariz. 267, 280, 25 P.3d 1139, 1152 (2001).  Although clear evidence connected Ring to the robbery's proceeds, nothing submitted at trial put him at the scene of the robbery.  *See ibid*. Furthermore, "[f]or all we know from the trial evidence," the Arizona court stated, "[Ring] did not participate in, plan, or even expect the killing.  This lack of evidence no doubt explains why the jury found [Ring] guilty of felony, but not premeditated, murder."  *Ibid.*

*Ring*, 536 U.S. at 591-592.

However, between the date of Ring's conviction and the sentencing hearing before the trial court, the state of Arizona achieved a plea bargain agreement with one of Ring's co-defendants.  In exchange for the agreement, the co-defendant appeared as a prosecution witness at Ring's sentencing hearing, and testified that Ring was the leader of the robbery, that Ring was present at the robbery, and that after murdering the victim, Ring had "upbraided" the co-defendants for "'forgetting to congratulate him [Ring] on [his] shot." *Id.* at 593-94. (record citation omitted).  Defense counsel was able to cross-examine the co-defendant with previous inconsistent statements in which he had stated Ring did not have anything to do with planning or executing the robbery and other information exposing the co-defendant's desire for revenge against Ring.  *Id.*

The Supreme Court described the trial court's fact-finding process after hearing this evidence as follows:

> Because Ring was convicted of felony murder, not premeditated murder, the judge recognized that Ring was eligible for the death penalty only if he was Magoch's actual killer or if he was "a major participant in the armed robbery that led to the killing and

exhibited a reckless disregard or indifference for human life." App. to Pet. for Cert. 46a-47a; *see Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L. Ed. 2d 1140 (1982) (Eighth Amendment requires finding that felony-murder defendant killed or attempted to kill); *Tison v. Arizona*, 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L. Ed. 2d 127 (1987) (qualifying *Enmund*, and holding that Eighth Amendment permits execution of felony-murder defendant, who did not kill or attempt to kill, but who was a "major participa[nt] in the felony committed" and who demonstrated "reckless indifference to human life").

Citing Greenham's [the co-defendant's]  testimony at the sentencing hearing, the judge concluded that Ring "is the one who shot and killed Mr. Magoch." App. to Pet. for Cert. 47a.  The judge also found that Ring was a major participant in the robbery and that armed robbery" is unquestionably a crime which carries with it a grave risk of death." *Ibid.*

*Id.* at 594.

After considering the factors relied on by the trial court, the *Ring* Court determined that

[b]ased solely on the jury's verdict finding Ring guilty of first-degree felony murder, the maximum punishment he could have received was life imprisonment.  *See* 200 Ariz., at 279, 25 P.3d, at 1151 (*citing* Ariz.Rev.Stat. § 13- 703).  This was so because, in Arizona, a "death sentence may not legally be imposed ... unless at least one aggravating factor is found to exist beyond a reasonable doubt." 200 Ariz., at 279, 25 P.3d, at 1151 (citing § 13- 703).  The question presented is whether that aggravating factor may be found by the judge, as Arizona law specifies, or whether the Sixth Amendment's jury trial guarantee, made applicable to the States by the Fourteenth Amendment, requires that the aggravating factor determination be entrusted to the jury.

*Id.* at 607.

As the Court further explained, "[b]ecause Arizona's enumerated aggravating factors operate

as 'the functional equivalent of an element of a greater offense,'  *Apprendi*, 530 U.S., at 494, n. 19,

120 S.Ct. 2348, the Sixth Amendment requires that they be found by a jury."  *Id.* at 609.

Grayson simply cannot show that the same constitutional error that occurred in *Ring* exists in his case.  The jury found that the prosecution had proved beyond a reasonable doubt that Grayson was guilty of murder during the course of kidnapping, a capital offense.  There is no question from the overwhelming evidence against Grayson at his trial that he is indeed guilty of the capital offense.  Because the capital offense for which Grayson was convicted also satisfied one of the statutory aggravating factors — the capital offense was committed during the course of a robbery —  in his case,  *by their verdict* of *guilt* the jury had already found beyond a reasonable doubt the existence of an aggravating factor that increased Grayson's maximum punishment to death.

Moreover, Grayson's jury heard all of the evidence pertinent to the penalty phase of trial, and particularly all evidence regarding each and every aggravating factor presented by the State of Alabama.  Thereafter, it recommended that Grayson receive the death penalty by a unanimous verdict. It is undisputed that defense counsel presented no additional evidence at Grayson's sentencing hearing before the trial judge.  Therefore, it is factually impossible for the trial court to have considered any aggravating factor to which the jury had not already been exposed.

*Ring* does not hold (and the Supreme Court has never suggested) that jury sentencing is constitutionally required.  *Proffitt v. Florida*, 428 U.S. 242, 252 (1976). Therefore, Grayson's contention that *Ring* prohibits a trial judge from sentencing a defendant to death is without merit. Further, *Ring* did not overturn the United States Supreme Court's holding that Alabama's hybrid sentencing scheme passes constitutional muster.  *Harris v. Alabama*, 513 U.S. 504 (1995).

 The sentence in Grayson's case is constitutionally sound under *Ring* because of Alabama's dual use of the elements of the capital offense for which he was convicted as a statutory aggravating factor.  This crucial point dispels any concern that the jury had no hand in determining a factor that

167

increased the maximum punishment Grayson could receive.  Moreover, the jury heard all of the evidence proffered regarding all aggravating factors in Grayson's case, and ultimately recommended that Grayson be sentenced to death by a vote of 12-0. The trial judge heard no additional evidence regarding an aggravating factor, nor was it possible for him to find evidence of an aggravating factor, that had not already been considered by the jury. The judge took the jury's recommendation into account when he sentenced Grayson to death.  Grayson has not shown that his sentence is contrary to or an unreasonable application of *Ring*.

For the foregoing reasons, this claim is due to be dismissed as procedurally defaulted, or, in the alternative, due to be denied on the merits.

I.    <u>Claim Nine</u>    **The Manner of Execution Used by the State of Alabama Constitutes Cruel and Unusual Punishment (Doc. #36 at 70-71)**

Grayson next alleges that "[u]pon information and belief, Alabama's use of lethal injection constitutes cruel and unusual punishment and violates Petitioner's rights under the 8th and 14th Amendments  to the U.S. Constitution."  (Doc. #36 at 71) (*citing Baze v. Rees*, 553 U.S. ___, 128 S.Ct. 1520 (2008)).  Respondent answers that Grayson's "ground for relief is not appropriately within this Court's habeas jurisdiction."  (Doc. #40 at 66) (*citing Hill v. McDonough*, 547 U.S. 573, 580 (2006) (Claims challenging the execution process are properly brought pursuant to 42 U.S.C. § 1983)).   Respondent is correct.

"A § 1983 lawsuit, not a habeas proceeding, is the proper way to challenge lethal injection procedures."  *Thompkins v. Secretary, Dept. of Corrections*, 557 F. 3d 1257, 1261 (11th Cir. 2009) (*citing Hill v. McDonough*, 547 U.S. 573, 579-83 (2006*).  Accordingly, this court is without

jurisdiction to entertain this claim in a habeas context and, for that reason, the claim is due to be dismissed.

**J.**  **Claim Ten**   **In Part, Inadequate Compensation and Lack of Funding for Experts Denied Petitioner Effective Assistance of Counsel (Doc. #36 at 71)**

Grayson alleges that the inadequate compensation afforded defense counsel in Alabama "violates the separation of powers doctrine, constitutes a taking without just compensation,[68] deprived Petitioner of effective counsel, and violates the due process and equal protection clauses."  (*Id.*). When this claim was raised for the first time during post-conviction proceedings, the Rule 32 court found that it was procedurally barred pursuant to Rule 32.2 (a) (3) and (5), and the court further found that the claim of lack of funding for experts insufficiently pled pursuant to Rule 32.6(b).  (*See* Tab. 56 at 14-15).  Alternatively, the court found the claim to be without merit and "borderline frivolous." (*Id*. at 15).  The Alabama Court of Criminal Appeals affirmed the trial court's decision.  (Tab. 57 at 5-7, 18).  Because the state court dismissed this claim pursuant to adequate and independent state procedural rules, and Grayson's assertion of ineffective assistance of appellate counsel is itself

---

[68]  Grayson also alleges that the severe caps on the amount of compensation paid to capital defense counsel amounts to an unconstitutional taking of property without just compensation, a violation of the separation of powers doctrine, and a violation of the Equal Protection Clause by discriminatorily denying indigent defendants their Sixth Amendment right to effective assistance of counsel.  As to the taking claim, Grayson has no standing to assert a claim for the loss of his *lawyers'* property.  He is not being denied just compensation; it is his lawyers who labor under the severe compensation caps, depriving *them* of fair compensation for their work. Similarly, even if the compensation caps amount to a violation of the separation of powers doctrine, which proposition the court rejects, the petitioner has no standing to object.  As with the taking claim, it is his lawyers who suffer injury as a result of the violation, not the petitioner, and they, not the petitioner, would have standing to assert such a claim. Finally, Grayson's equal protection claim seems to assert that the compensation caps deprive him and other indigent defendants of equal protection because the caps result in a denial of effective assistance of counsel. This statement alleges nothing more, however, than that Grayson was deprived of effective assistance of counsel because he received ineffective assistance of counsel. This argument is tautological at best.  In short, the foregoing adds nothing to the analysis of the claim that Grayson received ineffective assistance of counsel, which turns on counsel's actual performance at trial, not on what he might have done if he had had unlimited resources.

defaulted, this claim is procedurally defaulted and no legitimate cause exists to overcome the default.

Alternatively, this court finds the claim is without merit. Inadequate funding of counsel appointed to represent capital defendants, as unfair as it might seem to the attorneys who are appointed, does not itself amount to ineffective assistance of counsel absent a showing that the inadequate funding has contributed to actual errors or shortcomings in the performance of counsel. The *Strickland* standard requires an analysis of specific errors or shortcomings by counsel:[69]

> A convicted defendant making a claim of ineffective assistance must identify *the acts or omissions* of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, *the identified acts or omissions* were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.

*Id.* at 690 (emphasis added).

Thus, the allegation that compensation caps hindered the ability of counsel to represent properly a capital defendant has meaning only if it is made by reference to specific errors or shortcomings. Consequently, as a general claim of ineffectiveness divorced from any analysis of particular errors or omissions, the assertion that the State of Alabama provides inadequate compensation for capital defense counsel and experts fails to state a basis for *habeas* relief. This claim is due to be dismissed, or, in the alternative, due to be denied.

---

[69] Grayson does not contend that *United States v. Cronic*, 466 U.S. 648 (1984), requires a different result. The compensation caps are not the type of circumstances that make it unlikely that *any* lawyer could render effective assistance. Indeed, despite the compensation limits in various states, counsel can and do provide effective representation of capital defendants. Petitioner makes no contention that his case fits either of the two other *cronic* circumstances: complete denial of counsel at a critical stage and the complete failure of counsel to subject the prosecution's case to meaningful adversarial testing. *See Bell v. Cone*, 535 U.S. 685 (2002).

**K.**    <u>**Claim Eleven**</u>   **The Cumulative Effect of All Errors Entitles Petitioner to Relief (Doc. #36 at 71)**

In a one-sentence assertion, Grayson declares that "[t]he cumulative effect of the errors of law discussed in this petition violated Petitioner's rights to due process, a fair trial, and a reliable sentencing protected by the 4th, 5th, 6th, 8th, and 14th Amendments to the U.S. Constitution." (*Id.*). Respondent requests that this "section" be dismissed on the grounds that Grayson's allegation is only a request for "a particular standard of review" and does not state a claim for statutory habeas relief. (Doc. #40 at 71).

Respondent is correct to assert that Claim Eleven is not a separate and distinct constitutional claim. Grayson's conclusory assertion that cumulative error, as it occurs within the strict confines of ineffective assistance of counsel (*Strickland*) claims, should be applied to all constitutional claims, has no basis in Supreme Court precedent. (Doc. #44 at 72-73). Alternatively, for the reasons already set out in this opinion, all of the ten preceding claims are procedurally defaulted or lack merit. This claim is due to be dismissed, or, in the alternative, denied.

<u>**CONCLUSION**</u>

For all of the reasons set out in the Memorandum Opinion, Grayson's petition for writ of habeas corpus and his requests for discovery and an evidentiary hearing are due to be denied. A separate order in accordance with this memorandum opinion will be entered.

**DONE** and **ORDERED** this    29th    day of September, 2009.

 

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE